*To be argued by*
HAROLD SWAIN.

IN THE

# Court of Appeals

ALLEN H. STEM, individually and
  as surviving partner of the firm
  of Reed & Stem,
      Plaintiff-Respondent,

against

WHITNEY WARREN and CHARLES
  D. WETMORE, composing the
  firm of Warren & Wetmore,
      Defendants-Appellants,

and

WILLIAM J. REED, as Executor
  under the Last Will and Testa-
  ment of Charles A. Reed, de-
  ceased,
      Defendant-Respondent.

## BRIEF FOR PLAINTIFF-RESPONDENT.

**Appeal by Permission of the Appellate
Division, First Department, from a Judg-
ment Unanimously Modifying and Affirm-
ing an Interlocutory Judgment Directing
an Accounting.**

The defendants Warren and Wetmore appeal
to this Court from a judgment which modified
the interlocutory judgment directing them to ac-

Exhibit A-1

count to the plaintiff and which unanimously affirmed said judgment as so modified.

The underlying question involved on the appeal is whether a surviving partner, by taking advantage of the death of one of the firm, may bring about the cancellation of a revocable contract running in favor of the firm, and then, by means of a new contract, place himself in the very position which the firm formerly occupied, thus taking for his own benefit the profits which would have resulted from the uncompleted work if the contract had not been cancelled.

## Statement of Facts.

The facts are somewhat complicated, but this arises largely from the magnitude of the field in which the services performed by the firm were rendered. Although the trial was a protracted one, it being necessary to prove many facts by the testimony of hostile witnesses, the essential facts are not difficult to comprehend.

The controversy grows out of a partnership relation or joint adventure entered into between two firms of architects, Reed & Stem and Warren & Wetmore, for the special purpose of accepting employment in connection with the designing and building of the present Grand Central Terminal Station in the City of New York, and certain large buildings which were planned and built in connection with that improvement.

The plaintiff is the surviving partner of Reed & Stem, the deceased partner, Charles A. Reed, having died on November 12, 1911. Mr. Reed's executor, William J. Reed, although a defendant and represented by separate counsel, throughout the litigation co-operated with the plaintiff in the prosecution of the action, and is a respondent

3

upon this appeal. We shall refer to the defendants Warren & Wetmore as the defendants.

The claim of the plaintiff and the Reed estate, which has been sustained by the courts below, is that the defendants have taken an unfair and illegal advantage of the trust and fiduciary relationship growing out of the relations of the parties as fixed and determined by their association agreement and their subsequent employment in connection with the things contemplated thereby.

The affirmance below being unanimous, it is not necessary to go beyond the decision (fol. 265, *et seq.*) for controlling facts. A brief outline of these facts will be helpful.

In the early part of the year 1903 Reed & Stem were invited to submit preliminary drawings or suggestions in connection with a scheme of improvement which the New York Central and Hudson River Railroad Company was contemplating owing to the then proposed change in motive power from steam to electricity. This scheme of improvement contemplated a new terminal station which was to harmonize with the change of motive power, and included, among other basic ideas, the creation of a terminal hotel to be used in close connection with the terminal facilities (decision, fols. 268-70). Up to this time the land adjoining the old station, as it had been previously enlarged and improved, had been used for tracks and as a train yard; and the station itself consisted of an old-fashioned train shed, made necessary on account of the smoke and gases from the engines.

At or about the time that Reed & Stem were invited to submit their ideas, certain other prominent architects (in which the appellants were not included) were also invited to submit suggestions.

Exhibit A-1

4

The outcome of this submission, which was in the nature of an informal competition, was that the Railroad Company viewed with favor the preliminary plans of Reed & Stem and thereupon employed that firm to proceed further with the scheme of development upon the basis of being paid for such services as they might render (decision, fols. 270-1).

The Reed & Stem preliminary plan involved the erection of a new Grand Central Station and an accompanying group of large and important buildings, thus rendering possible the use of the space over, under and in the vicinity of the railroad tracks. The object was to obtain the beneficial use of property which up to that time had been of no practical value except for trackage and its related purposes. One of the striking features of the Reed & Stem plan, which has been much delayed in execution, was a scheme to bridge over 42nd Street and to have an elevated, circumferential driveway around the exterior of the main station so as to make a connection for travel between 4th Avenue, as it extended south of 42nd Street, and Park Avenue at the north of the station. The scheme was that the latter street was to be located over and above the track levels as then proposed (decision, fols. 272-3, 345).

Reed & Stem, having been definitely employed to proceed further with the scheme of development, rendered very substantial service before Warren & Wetmore came into the situation at all. Between July 8, 1903, and February 5, 1904, payments on account were made to Reed & Stem aggregating $20,000 (decision, fols. 273-4). This is the $20,000 mentioned in the employment agreement, soon to be referred to.

After the preparation of certain preliminary plans by Reed & Stem, Warren & Wetmore, at

Exhibit A-1

5

their own suggestion, were allowed to submit sketch plans in connection with the proposed improvement. These sketch plans failed to conform to the basic ideas which had been formulated by the Chief Engineer of the Railroad Company, and tentatively adopted by the Railroad Company. A subsequent effort on the part of Warren & Wetmore to have the basic plan changed so as to make possible the adoption of the plan proposed by them, failed (decision, fol. 274-6).

Reed & Stem were then given to understand that if they wished to continue in the prosecution of the work, it would be advisable to make an association agreement with Warren & Wetmore (decision, fols. 276-7).

The result of this was the association agreement which is made part of the complaint (pages 25-26).

The association agreement is dated February 8, 1904. By it the two firms, Warren & Wetmore and Reed & Stem, joined as associates "for the purpose of *completing the plans* and supervising the construction of the Grand Central Station buildings and such other buildings as the New York Central and Hudson River Railroad Company may desire to entrust to these associates," as provided for in a certain employment agreement to be hereafter referred to, which was executed at about the same time. The architects agreed to devote their joint labor and talents to the adequate prosecution of the Railroad Company's work. Charles A. Reed was named and mutually accepted as the Executive Head of the work. He was given control of the work and the power to "hire and discharge all clerks, draftsmen and employees of the association." He was to administer the offices and affairs of the association and be the treasurer thereof. The va-

Exhibit A-1

6

rious members of the firms, parties to the agreement, pledged themselves to carry out the directions of the Executive Head to the best of their ability. It was provided that in the event of a *vacancy in the position of Executive Head* "by resignation or *otherwise,* or upon the written request of the Railroad Company for a change in said Executive Head," the Railroad Company was to have the right to choose which *member of the two firms* should be the Executive Head, the parties to abide by such determination (decision, fols. 277-80).

The employment agreement was made on the same day (February 8, 1904). It was between the New York Central and Hudson River Railroad Company, party of the first part, and Messrs. Reed and Stem, copartners under the firm name of Reed & Stem, and the various members of the firm of Warren & Wetmore, parties of the second part. The agreement was signed both in the two firm names and by the various members of the two firms. At that time the firm of Warren & Wetmore was composed of Whitney Warren, Charles D. Wetmore, John E. Howe and Lloyd Warren. At the time of Mr. Reed's death the personnel of the Warren & Wetmore firm had changed, Lloyd Warren having retired from the firm in March, 1905, and Mr. Howe having died in August, 1908 (complaint, paragraph third, fol. 20, admitted by amended answer). After these changes Whitney Warren and Charles D. Wetmore continued to do business under the firm name of Warren & Wetmore without any change in their relations with the Railroad Company or Reed & Stem (decision, fols. 293, 294).

The employment agreement provided for the employment of the associated firms in connection with the contemplated improvements and such

Exhibit A-1

7

other buildings or work as might be designated by the Railroad Company. It was provided that the location of any of the buildings might be changed if the Company should see fit, the architects agreeing to devote their joint talents to the work and to be jointly responsible for its satisfactory performance. They were to agree among themselves as to dividing the profits and sharing the losses. In the employment agreement also, it was agreed that Charles A. Reed should be Executive Head of the architects. It was provided that in *case of his death*, or resignation as such Executive Head, or if the Company was dissatisfied with his services, the Company should have the right to and might at any time designate which one of the architects should be his successor as Executive Head (decision, fols. 283-7).

A scale of compensation was provided as follows (fol. 288):

| | |
|---|---|
| For preliminary plans.................. | 1% |
| For working plans and specifications.... | 2% |
| For supervision........................ | 1% |
| Total ............................ | 4% |

These percentages were to be calculated on the actual final cost of the completed buildings. Provision was made for determining the compensation in the event that the employment was terminated before the completion of the entire work. The Railroad reserved to itself the right to terminate the employment upon the work, or any part thereof, by giving notice accordingly (decision, fols. 288-9).

The sum of $20,000 theretofore paid to Reed & Stem on account of work already done by them

Exhibit A-1

8

was to be credited to the Railroad Company and deducted from the total compensation (decision, fols. 289-90).

An arbitration agreement was also entered into at the same time between the architects. This also is part of the complaint (fol. 79, *et seq*). It provided, briefly, that inasmuch as Reed & Stem had made preliminary plans for the terminal, and that certain sketch plans for similar work had been prepared by Warren & Wetmore, the parties agreed that Reed & Stem in any event were to have one-half of the one per cent. which was provided for the preliminary plans, and the disposition of the remaining one-half was to be decided by the arbitration which was provided for in the agreement. Apparently by this the parties recognized that Reed & Stem were entitled to some special consideration by reason of the fact that such a substantial amount of work had been done by them prior to the advent of Warren & Wetmore into the situation.

After the execution of these agreements a separate office was opened by the Associated Architects under Mr. Reed's charge. This office was devoted solely to the work of the association, each firm continuing its separate office for such individual work as did not come within the spirit of the association agreement. From the time of the execution of the agreements down to the time of Mr. Reed's death (November 12, 1911) the association office was under his actual charge and direction as Executive Head (fols. 291-2).

During the time between the execution of the agreements and Mr. Reed's death, an enormous amount of architectural work was done by the Associated Architects in connection with terminal work. The old Grand Central Station and various other buildings were torn down. Many new

9

buildings were erected and many buildings were in the course of erection. The Railroad Company from time to time added to its real estate holdings, and changes, both of design and location, were made in various parts of the entire improvement plan. Many changes in plan were made for work which was never finally consummated. Owing to the complexity of the work, the Associated Architects rendered many services at the request of the Railroad Company without any formal order or designation in writing, as provided for in the employment agreement, this provision of the agreement being, from time to time, waived by the Railroad Company in connection with services performed by the Associated Architects relating to architectural work which was later used and accepted by the Railroad Company (decision, fols. 294-7).

On November 12, 1911, when Mr. Reed died, a large part of the architectural work in connection with which the Associated Architects had been employed by the Railroad Company was in an unfinished condition. Some twenty-four buildings, or parts of the entire development, and the architectural work in connection therewith, were in various stages of progress (decision, fols. 297-8, 343-360).

In this great work the services rendered by Charles A. Reed and Allen H. Stem (the plaintiff) were of great and substantial value. They were satisfactory to and approved by the Railroad Company. Mr. Reed was the most active of all the Associated Architects. He devoted a very large proportion of his time to the affairs of the Associated Architects, and he, more than any other one of them, was identified with and responsible for the improvements as they have been finally built. For his services as Executive

Exhibit A-1

10

Head, and for the time and attention which he gave to the affairs of the Associated Architects, neither he nor the firm of Reed & Stem received any salary or special compensation (decision, fols. 298-300).

At the time of Mr. Reed's death the work on the main station had progressed to a point where the design had been definitely fixed in general outline and architectural features. A large part of the fee for supervision remained to be earned, because only about one-half of the cost of the station had been expended by the Railroad Company (decision, fol. 341, Plaintiff's Exhibit 34, fac simile copies exhibits; see also photograph, Plaintiff's Exhibit 201, fac simile copies exhibits).

The physical part of the project of transformation was so well under way that its completion was assured. City streets which, before the improvement, ended at the railroad property, or, in one or two instances, had been carried over by unsightly foot bridges, were now designed to be carried over the track levels and connect up the east and west side. The buildings were so designed as to be over and above the land formerly used for tracks alone (decision, fols. 343-360).

One of the buildings then projected, but not yet physically built, was the Hotel Biltmore, which was to occupy the entire block between Madison Avenue and Vanderbilt Avenue, 43rd and 44th Streets. This was to be built and operated in connection with the incoming station, which was designed to be partly under the Biltmore Hotel and partly under Vanderbilt Avenue. This incoming station was to be used for the discharge of passenger trains and, as already suggested, the building of the hotel immediately adjacent to and in connection with this passenger traffic was

11

one of the basic ideas prescribed at the time of
the inception of the improvement. For about two
years prior to Mr. Reed's death a great deal of
time and attention were given by the Associated
Architects to the planning of the hotel, as well
as to the incoming station, over which it was to
be built. At the time of Mr. Reed's death the
planning for this hotel had gone forward to such
an extent that within a month after his death the
interested parties practically concluded negotia-
tions which had been pending for two years.
Within three months after his death a formal
contract was entered into which embodied the
essential features upon which the parties had
previously agreed. After the execution of this
agreement on February 15, 1912, the building of
the hotel proceeded and it was completed by the
end of the year 1913 at a cost of over $5,500,000
(decision, fols. 361-375).

While Mr. Reed was the central figure, from
the standpoint of the architects, William H. New-
man took a very prominent part in representing
the Railroad Company. From 1904 to 1909 he
was the President of the Railroad Company.
During this time he was actively engaged, on
behalf of the Railroad, with the development
scheme with which the Associated Architects had
to do. After retiring from the presidency he con-
tinued to be a director, and, at the request of
the succeeding president, he continued his close
association with the matters with which the As-
sociated Architects were dealing. He may be re-
garded at all times as being the Railroad Com-
pany's representative (decision, fols. 300-1).

On November 16, 1911, while the plaintiff was
absent from the City of New York, attending at
the interment of Mr. Reed, the defendant Wet-
more wrote a secret letter to Mr. Newman, sug-

12

gesting that a new contract was necessary because, as he claimed, by the death of Mr. Reed, the old contract was terminated. He enclosed a proposed contract which was "intended to follow the old form in all particulars except that Warren & Wetmore are the architects." He suggested taking up the matter with Mr. Newman in person at any time that might suit his convenience. He suggested further that the old arrangement be terminated as of November 15, 1911 (the day before), that accounts be settled as of that day, and that the new arrangements commence as of that day. His letter contained this significant clause: "You will note that under clause 'Sixth' of the contract between your Company and the Architects you have the right to terminate the agreement at any time" (decision, fols. 302-7).

This letter was written without any suggestion on the part of the Railroad Company, and without the knowledge or consent of the plaintiff or the Reed estate (decision, fol. 305).

Under the terms of the contract of employment the Railroad Company, upon the death of Mr. Reed, had the right to designate some one of the other architects as the Executive Head. We have seen that it had also reserved the right to terminate the employment of the architects at any time.

On December 19, 1911, the Railroad Company gave notice to the interested parties of its intention to terminate the employment of the Associated Architects, the termination to become effective on December 31, 1911 (decision, fols. 307-308).

On the same day that the notice was given, the Railroad Company entered into an agreement with Warren & Wetmore, substantially as pre-

Exhibit A-1

viously suggested by Wetmore. This agreement
is in evidence (Plaintiff's Exhibit 36, fol. 4792,
*et seq.;* decision, fols. 309). It provided for a
continuation of the work mentioned in the origi-
nal agreement of 1904. It recited the making
of the old agreement and summarized the build-
ings or parts of the work which had theretofore
been made subject under the said agreement with
respect to the architects' employment. It recited
that by reason of the various stages of progress
of these various portions of the work, the archi-
tects had become and were entitled in respect of
portions of the work to all, and in respect of
other portions of the work to part of the per-
centage compensation provided for in the original
agreement. It provided that Warren & Wetmore
should enter upon the work at the respective
stage of progress attained at the end of the day
December 31, 1911, and continue to do all the
work provided for in the original agreement or
which had been rendered subject thereunto. The
agreement provided that the entire remuneration
to be paid by the Railroad Company should be
the same as provided in the original agreement.
There was to be deducted from this, such amount
as might be found due the Associated Architects
up to December 31, 1911, and the balance was to
be paid to Warren & Wetmore, that firm promis-
ing to co-operate with the Railroad Company in
ascertaining and fixing the compensation due up
to December 31, 1911. *Warren & Wetmore agreed
to hold the Company harmless as against the As-
sociated Architects* (decision, fols. 308-29).

After January 1, 1912, when they entered upon
the performance of this agreement, Warren &
Wetmore continued to occupy and control the
offices, property and effects of the late firm, they
having assumed such control immediately after

Exhibit A-1

14

Mr. Reed's death.  They continued to employ the same force of draftsmen, clerks and assistants which had up to that time been employed by the associated firms (decision, fol. 333).

They entered upon the performance of the new contract and proclaimed that they were entitled to its exclusive benefits and under no obligation to account for any of the profits arising from the work which was concededly unfinished on December 31, 1911 (decision, fols. 333-5; Plaintiff's Exhibit 316, fols. 5704-5).

We have called attention to the fact that there was no dissatisfaction on the part of the Railroad Company with anything that had been done, either by Mr. Reed or Mr. Stem, throughout the employment.  No reason why the plaintiff could not continue working in harmony with the defendants Warren and Wetmore appears.

It was the plaintiff's claim (and this has been sustained by the Courts below) that the termination of the 1904 contract and the substitution of the new contract were brought about at the suggestion of the appellants for the very purpose of excluding the plaintiff, and the estate of his deceased partner, from the profits of the work which had then been assigned to the Associated Architects and upon which, on December 31, 1911, they were working as uncompleted business (decision, fols. 335-6).

The recitals in the superseding contract (Plaintiff's Exhibit 36, Decision, fols. 309-20) show clearly that many of the different buildings which had been assigned to the architects under the contract in 1904 were, in fact, in an uncompleted condition so far as the architectural work was concerned.

After the plaintiff had been notified of the cancellation of the old contract and the making of

Exhibit A-1

15

the new one with Warren & Wetmore, he set
about, in accordance with the suggestion of the
Railroad Company, to ascertain the amount due
from the Railroad Company up to December 31,
1911 (decision, fol. 339; Plaintiff's Exhibit 20,
fols. 4666-8).

It was necessarily a difficult and complex prob-
lem to arrive at the fair amount which was due
to the architects for their work up to this time.
This was partly because of the complex nature of
the services which the architects had rendered,
and also because of the fact that different phases
of the work had progressed to different relative
stages of completion at the end of the year 1911,
and because many matters had received the atten-
tion of the architects without question as to how
the formal agreement could be made to apply to
the situation (decision, fols. 339-40).

In November, 1912, after a difficult and some-
what tedious negotiation, an adjustment of the
fair amount to be paid for services rendered by
the Associated Architects to December 31, 1911,
was made.  A statement which is an accurate
synopsis or resume of various different phases
or parts of the entire improvement for which the
Railroad Company was liable, together with the
estimated cost thereof and the amount actually
expended thereon up to December 31, 1911, was
made up.  This statement is in evidence (Plain-
tiff's Exhibit 34, fol. 859; for copy see *fac simile*
copies exhibits).  This statement, amplified by the
testimony, has been used as the basis of the ac-
counting which has been ordered (decision, fols.
343-60).

This statement was the basis for the payment
made by the Railroad Company, as shown by its
voucher of November 21, 1912 (Plaintiff's Exhibit
29, fols. 4726-39).  The total for the work done

up to December 31, 1911, amounted to $990,-
587.60, from which there were to be deducted pre-
vious payments of $790,000, leaving a balance of
$200,587.60 (decision, fols. 342, 384-6).

After this voucher of November 21, 1912, had
been prepared and was ready for payment, to-
gether with a $10,000 voucher which had been
previously prepared, but not collected, the parties
met for the purpose of collecting the money from
the Railroad Company and making provision for
its distribution.  This meeting took place on No-
vember 29, 1912.  An objection was then inter-
posed by the defendant Wetmore as to the form
of the receipt which the Railroad Company re-
quired.  His final insistence that there should be
no collection of the amount due by the Railroad
Company until an agreement should be reached
between Warren & Wetmore and the plaintiff,
representing the firm of Reed & Stem, as to the
adjustment of the affairs of the Associated Archi-
tects, delayed the collection of the money until
July 8, 1913 (after the commencement of this
action), although the plaintiff was ready to take
all reasonable steps and co-operate in every rea-
sonable way in the collection of the money.  This
caused a total loss of interest on $203,233.24 from
November 29, 1912, to July 8, 1913 (decision,
fols. 387-393).

The meeting of November 29, 1912, and the
ensuing discussion of the terms of the contract
of December 19, 1911, brought about the pro-
duction of that document.  This was the first op-
portunity the plaintiff had ever had to see or
examine the superseding contract (decision, fol.
339).

In May, 1913, arbitrators were chosen in ac-
cordance with the arbitration agreement of Feb-
ruary 8, 1904.  Hearings before the arbitrators

were completed prior to the commencement of the present action, but at the time of the beginning of the action the award had not yet been made (complaint, paragraph XX, fol. 62). On July 25, 1913, the arbitrators made their award, whereby they fixed $106,000 as being the one per cent, one-half of which was to be the subject matter of the arbitration. Under the terms of the association agreement, the other one-half of this one per cent was to be paid to Reed & Stem in any event. Of the one-half of one per cent which was the subject of the arbitration, the arbitrators awarded $28,000 to Reed & Stem and $25,000 to Warren & Wetmore. These amounts have not been paid, but are to be taken into account in the accounting which has been ordered (decision, fols. 395-8, 413).

It has been the defendants' contention that the death of Mr. Reed broke off all relations with the plaintiff in relation to any of the work which has been prosecuted since December 31, 1911. They have claimed that all their relations with the plaintiff terminated on the death of Mr. Reed, that the plaintiff is in no manner interested in the work which has taken place since that time, and that they are under no obligation to account for any profits whatsoever which may be made from the work thus prosecuted (decision, fols. 333-7; see also amended answer, paragraphs XXII and XXIII, fols. 144-7).

It was their claim that the Associated Architects were entitled to no compensation for the two years of work which was done on the hotel plans prior to the end of the year 1911. Their claim was that all the plans, drawings and all other architectural work used in connection with the hotel were new and complete, and had no relation to the work done by the Associated Architects (amended answer, paragraph XXIII,

Exhibit A-1

18

fols. 145-7). They claimed that the $5,000 which, as appears from Plaintiff's Exhibit 34 (*fac simile* copies exhibits) was allowed in the settlement with the railroad for the work done in connection with the incoming station, was full payment for all work done by the Associated Architects in connection with the proposed hotel, although this sum was not intended to be in compensation for any work done in connection with the proposed hotel building (decision, fol. 357).

The case was tried before Mr. Justice Delehanty in January, February and March, 1916. By a decision which set forth the controlling facts to which we have alluded, be held, as a conclusion of law, that the appellants, by their actions in seeking and obtaining the superseding contract for their exclusive benefit in respect of the work which was uncompleted on December 31, 1911, took an unfair and illegal advantage of the trust and fiduciary relationship growing out of the agreement of association and growing out of the relations of the parties as fixed and determined by their joint employment under the agreement (decision, fols. 403-4).

He held that by the very terms of the superseding agreement, appellants were placed in a position where their individual interests were in conflict with their duties as surviving partners (decision, fols. 404-5).

The decision sets forth the scope of the accounting. Besides taking account of the money on hand, office equipment, etc., as well as bank accounts aggregating $249,390.73, and directing that the arbitration award should be given effect in making up the account, it specifies the work which may fairly be considered as unfinished business, and directs an accounting with reference to it (decision, fols. 406-413).

By the decision it was held that no compensation should be allowed to the appellants for their services in connection with the completion of the unfinished work other than the one-half of the profits as provided for in the association agreement (decision, fol. 413).

The Hotel Biltmore was included in the list of unfinished work and by the decision the plaintiff was allowed one-half of the profits and emoluments growing out of that work (decision, fols. 409-10).

The Special Term wrote a comprehensive opinion (fols. 481-521, 96 Misc., 362).

The defendants Warren and Wetmore appealed from the interlocutory judgment entered in accordance with the decision. The Appellate Division modified the judgment by limiting the profits and emoluments for which the defendants Warren and Wetmore were required to account in connection with the Hotel Biltmore to three per cent of the cost of the completed building. That Court held that the firm of Warren & Wetmore should be required to account for the amount received for preparing the plans and specifications of the Biltmore, that being clearly a continuation of the business that the Associated Architects were engaged in at the termination of the contract on December 31, 1911. It stated that in carrying out this work, Warren & Wetmore availed themselves of the preliminary plans and results of labor expended by the Association. It held that no deduction should be made from that amount for Warren & Wetmore's services. It measured the compensation for these services by the standard of the original employment agreement with the Railroad Company—one per cent for preliminary plans and estimates, two per cent for working plans and specifications as finally accepted

by the Railroad Company. As to the sum earned for supervision, it held that this might be properly considered as new work undertaken by the defendants Warren & Wetmore for their own account, and not on behalf of the former partnership (fols. 6401-2; opinion, 6483).

As so modified the judgment was unanimously affirmed (fol. 6404). The opinion of the Appellate Division, by Mr. Justice Page, will be found at fol. 6436, *et seq.* (185 App. Div., 823).

In the Appellate Division order certain additional findings of fact were made (fols. 6396-6401).

From the judgment entered upon the Appellate Division order the defendants Warren and Wetmore have, by permission of the Appellate Division, appealed to this Court. The following questions have been certified for this Court's decision:

1. Was the agreement between the Associated Architects terminated by the death of Charles A. Reed?

2. By reason thereof were the obligations of the joint adventurers to the Railroad Company cancelled?

3. Are the firm of Warren & Wetmore to be held accountable to the plaintiff in this action for the profits made out of the prosecution of the joint enterprise in so far as it related to unfinished work which had been assigned to them prior to the death of Charles A. Reed?

4. Are the firm of Warren & Wetmore to be held accountable to the plaintiff in this action to the extent of three per cent or any other proportion of the cost of the Biltmore Hotel?

## POINTS.

### I.

**A preliminary consideration of the relations incident to partnership.**

A preliminary consideration of the relation in which partners or business associates stand will be helpful in approaching a determination of the rights of the parties. This Court, when considering the duties of parties about to engage in a joint adventure, whether as partners *inter sese* or not, has said, "It is now well settled that persons in, or about to assume, that relation owe to each other the utmost good faith and the most scrupulous honesty. *Getty* vs. *Devlin,* 54 N. Y. 403; *Mitchell* vs. *Reed,* 61 N. Y. 123; *Kimberly* vs. *Arms,* 129 U. S. 512). They do not deal at arm's length."

*Selwyn* vs. *Waller,* 212 N. Y. 507, 511.

It is elementary that the partnership relation is one of trust and confidence and that a partner may not profit individually at the expense of his firm. The textbook writers are unanimous in upholding the high standard of morality which is an essential element in the situation. Says Parsons:

"The first and highest duty which partners owe to each other, is that of perfect good faith."

And, again:

"There certainly seems to be no relation in life calling, either by its own exigencies or

Exhibit A-1

by the rules of law, for a more absolute good faith than the relationship of partnership."

> *Parsons, Partnership,* 4th Ed., pages 192, 193.

Lindley says:

> *"In societatis, contractibus fides exuberet* (a) The utmost good faith is due from every member of a partnership towards every other member."

> *Partnership,* 8th Ed., page 364 (Lindley).

In *Mitchell* vs. *Reed,* 61 N. Y. 123, this Court declared, at page 126:

> "The relation of partners with each other is one of trust and confidence.  Each is the general agent of the firm, and is bound to act in entire good faith to the other.  The functions, rights and duties of partners in a great measure comprehend those both of trustees and agents and the general rules of law applicable to such characters are applicable to them."

In *Platt* vs. *Platt,* 2 T. & C. 25, the learned General Term, First Department, said, at page 39:

> "In their dealings with each other, partners occupy a position of trust.  They are held to the utmost good faith; a purer and more elevated morality is demanded of them than the common morality of trade, and the standard by which they are tried in a court of equity is far higher than 'the standard of the world.' *Blisset* vs. *Daniel,* 10 Hare, 493, 536."

The decision was affirmed by this Court (58 N. Y., 646).  See also:

*Kerr, Fraud & Mistake,* 4th Ed., 175;

*Butler* vs. *Prentiss,* 158 N. Y., 49;

*Snyder* vs. *Lindsey,* 157 N. Y., 616;

*Holmes* vs. *Gilman,* 138 N. Y., 369;

*Harlow* vs. *La Brum,* 151 N. Y., 278;

*Manufacturers' National Bank of Troy*
   vs. *Cox,* 2 Hun, 572, 59 N. Y., 659;

*Getty* vs. *Devlin,* 54 N. Y., 403;

*Kelly* vs. *Delaney,* 136 App. Div., 604;

*Kimberly* vs. *Arms,* 129 U. S., 512;

*Castle* vs. *Marks,* 50 App. Div., 320;

*Church* vs. *Odell,* 100 Minn., 98;

*Linde* vs. *Webber* (Nevada), 134 Pac.,
   461, 50 L. R. A., N. S., 1046.

*Hardin* vs. *Robinson,* 178 App. Div., 724;

*May* vs. *Hettrick Bros. Co.,* 181 App.
   Div., 3; affirmed 226 N. Y. Advance
   Sheets No. 959, Memo., p. 24.

We must keep in mind throughout the discussion, then, that the duty of the appellants to the plaintiff, and to the representative of their deceased partner, Mr. Reed, was to observe "the utmost good faith." The morality demanded of them was "a purer and more elevated morality" than "the common morality of trade." The standard by which they are to be tried in this Court is "far higher than the standard of the world."

Approaching the discussion in this spirit we shall see whether the Courts below were justified in holding that they have failed to maintain the high standard which a court of equity demands (decision, fols. 403-6; opinions, fols. 492, 497, 500, 6469-70).

24

## II.

**It is the duty of a surviving partner of a firm to complete its unfinished business, performing its contracts and closing up its business in the manner most advantageous to the interests of all the parties concerned.**

Upon the termination of a partnership by reason of the death of a partner, whether or not the death caused *eo instante* a dissolution of the partnership, the duty is at once thrust upon the surviving partners to wind up the firm's affairs *for the benefit of the partnership.*

> "In case of the death of a partner, the surviving partner or partners have the exclusive right of possession and control of the firm's property for the purpose of doing any act necessary or proper for *completing existing contracts* and winding up the firm's business."

*Gilmore on Partnership,* Sec. 353.

> "He (the surviving partner) stands in the place of the partnership with respect to its assets and liabilities, and is vested with full power, possession and *management of the firm's business.*"

*Gilmore on Partnership,* Sec. 354.

Citing

> *Murray* vs. *Fox,* 39 Hun, 108, 110.
> *Nehrboss* vs. *Bliss,* 88 N. Y., 600.

> "The dissolution of a firm does not deprive a partner of the power to perform on behalf of the firm existing contracts, *nor does it re-*

Exhibit A-1

25

> lieve him from the duty of having them per-
> formed. On the other hand, such dissolution
> does not ordinarily absolve third persons
> from their contractual obligations to the
> firm."

30 *Cyc.*, 661.

After the death of a partner a surviving part-
ner becomes a trustee of the firm's property for
the benefit of his deceased partner.

> "A firm, notwithstanding it has been termi-
> nated either by the act of the partners or by
> limitation of time, nevertheless continues to
> exist for the purpose of collecting, distribut-
> ing its assets and performing its antecedent
> engagements (*Kennedy* vs. *Porter*, 109 N. Y.,
> 552). The dissolution of a firm looks only to
> the future. The partners continue to be bound
> by, and must fulfill, all prior contracts re-
> maining unfulfilled. (*Griswold* vs. *Wadding-
> ton*, 16 Johns., 438.) See also, 17 Am. &
> Eng. Ency. of Law, 1150, and cases there
> cited."

*Castle* vs. *Marks*, 50 App. Div., 320, 322.

As such trustee he may not reap a personal
benefit in connection with the winding up of the
firm's affairs.

In *King* vs. *Leighton*, 100 N. Y., 386, 392, Chief
Judge Ruger used this comprehensive language:

> "After the dissolution by death or bank-
> ruptcy the solvent or surviving members be-
> come trustees of the assets for the purpose of
> winding up its affairs and distributing its
> effects and *they will not be allowed to reap
> a profit made by the use of the partnership
> assets after dissolution.*"

Again, at page 393:

> "In the case of *McLean* vs. *Kennard* (L.
> R., 9, Ch. App., 336), it was held that upon
> the death of a member of a firm, his estate was
> entitled to share in the profits of a contract
> unperformed at the time of death, and that
> those profits were to be the actual profits
> ascertained when the contract was completed,
> and not by valuation or sale of the contract
> as of the time of death.
>
> "Thus, as the result of an examination of
> the authorities, we are clearly of the opinion
> that upon the dissolution of a firm by the
> death or bankruptcy of one of its members,
> it is the duty of the surviving or solvent
> members to take possession of the firm assets
> and perform its contracts, extinguish its lia-
> bilities and close up its business, *in the man-
> ner most advantageous to the interests of all
> the parties concerned; that it is the right of
> the representatives of a deceased or bankrupt
> partner to share in the profits of all business
> unfinished at the dissolution, but completed
> afterward*, and that a valuation of such busi-
> ness as of the time of the dissolution will not
> be required unless peculiar circumstances ex-
> empting the particular case in equity from
> the operation of the general rules exist (*Wed-
> derburn* vs. *Wedderburn*, 22 Beav., 84; *Simp-
> son* vs. *Chapman*, 4 DeGex, M. & G., 154;
> *Case* vs. *Abeel*, supra; *Collyer on Part.*, Sec.
> 199; *Pars. on Part.*, 505)."

If the assets of the old firm are made use of in
new enterprises, the representatives of the retir-
ing partner may, if they wish, claim a propor-
tionate share of the profits. As stated by this
Court, if they, the surviving partners, "make use
of such assets in new enterprises, it usually is at
the option of the representatives of the retiring

partner to claim a proportionate share of the profits in such enterprises or not (*King* vs. *Leighton,* 100 N. Y., 386).''

*Kennedy* vs. *Porter,* 109 N. Y., 526, 551.

### III.

**In completing the firm's unfinished business, not only is the surviving partner precluded from making an individual profit at the expense of the firm, but upon him is imposed the duty of completion of the unfinished business without personal recompense.**

At one time there was some doubt whether the rule stated above, which was well settled in the case of commercial partnerships, applied equally in the case of partnerships between profssional men. This question arose in *Denver* vs. *Roane,* 99 U. S., 355. In that case it was mutually agreed between the members of a co-partnership of lawyers that they should dissolve, but that their unfinished business should be closed as rapidly as possible as partners under their original terms of association. Subsequently they agreed that in case of death of any partner, his personal representative should receive one-third of the fees in cases nearly finished, and one-quarter in other cases. One of the partners subsequently died, and the suit was brought by his executor for an accounting and to recover from the surviving partners the share of the testator in the fees received by them for unfinished business. The objection was made that the Court erred in applying to a

Exhibit A-1

28

partnership between lawyers the principles of the
law of commercial partnerships, in regard to the
mode of settlement after the death of a partner,
and that by the decree no compensation was al-
lowed to the survivors for carrying on the unfin-
ished business, but that they were required to con-
tinue it as well for themselves as for the deceased
partner's estate.

The Court refused to sustain these objections.
The Court unanimously held that having, by their
agreement, prescribed the rule for determining
their rights as against each other, and having
jointly undertaken the partnership business, all
parties were obliged to conduct it to the end.

Mr. Justice Strong (page 358) said:

"Having jointly undertaken the business
intrusted to the partnership, all the parties
were under obligation to conduct it to the
end. This duty they owed to the clients and
to each other. And as to the unfinished busi-
ness remaining with the firm on the 18th day
of March, 1869, the duty continued. The
agreement provided for that. Now, in refer-
ence to this duty the law is clear. 'As there
is an implied obligation on every partner to
exercise due diligence and skill, and to de-
vote his services and labors for the promo-
tion of the common benefit of the concern, it
follows that he must do it without any re-
wards or compensation, unless there be an
express stipulation for compensation.' Story,
Part., Secs. 182, 331; *Caldwell* vs. *Leiber*, 7
Paige, 483. So it is held that where part-
nerships are equal, as was true in the present
case, and there is no stipulation in the part-
nership agreement for compensation to a sur-
viving partner for settling up the partnership
business, he is entitled to no compensation.
*Brown* vs. *McFarland*, 41 Pa., 129; *Beatty* vs.
*Wray*, 19 Pa., 516; *Johnson* vs. *Hartshorne*,
52 N. Y., 173. This is the rule in regard to

Exhibit A-1

what are commonly called commercial part-
nerships, and the authorities cited refer to
those. There may possibly be some reason
for applying a different rule to cases of wind-
ing up partnerships between lawyers and
other professional men, where the profits of
the firm are the result solely of professional
skill and labor. No adjudicated cases, how-
ever, with which we are acquainted, recognize
any such distinction. And in the present
case, as we have said, the parties made ar-
rangements for the work and results of work
after the death of any of their number. The
agreement of Aug. 13, 1869, provided that in
case of the death of any partner, one-third of
the fees in cases nearly finished, and one-
quarter of the fees in other partnership cases
should belong to the representative of the de-
cedent. Of course, it was contemplated that
the surviving partners should finish the work,
and that no allowance should be made to
them beyond the share of the fees specified
in the agreement."

It is no answer that it might take years to
complete the unfinished business, and that dur-
ing that time the surviving partners must con-
tinue their labors without other compensation
than their partnership interests.

It has been urged that in such cases the sur-
viving partners should at least have special com-
pensation for their services and under special cir-
cumstances this has been allowed.

The U. S. Supreme Court a few years ago
passed upon such a claim, in

*Consaul* vs. *Cummings*, 222 U. S., 262.

In delivering the unanimous opinion of the
Court, Judge Lamar said (page 269):

"Claims of this sort are not favored. They
lead to efforts to prove a disparity between