the partners, when the law implies equality. They necessitate a balancing of the value of the work of each in securing the business and earning the profits, as well as a comparison of the time they may spend on the matters under consideration. Each partner is bound to devote himself to the firm's business, and there is no implied obligation that for performing this duty he should be paid more than his proportionate share of the gains. Neglect by one to do his part may be of such character as to justify a dissolution. But as long as the firm continues there is usually no deduction because one partner has not been as active as the other. The same is true where death prevents either of the partners from performing his contract. The law did not permit him to appoint a substitute, nor can his personal representative, no matter how well qualified, assist in winding up the affairs of the firm. Whether that be considered a right or duty, it is in either event cast on the survivor. In performing it he only carries out an obligation implied in the partnership relation, and is, therefore, entitled to no compensation for thus doing what he was bound to do and what would have been imposed on the other had the order of their death been different. To allow the survivor compensation wherever he continues the business would be to offer an inducement to delay the settlement which ought to be made as soon as possible."

In that case, as in the case at bar, the partnership was not general, but had been entered into in connection with a special line of work. The partners were lawyers and the partnership related solely to certain claims pending in the Court of Claims and before Congress. The agreement was made in 1888. In 1891 one of the partners became a lunatic, and most of the claims were still pending at the time of his death in 1896. In

Exhibit A-2

31

1899 the surviving parties succeeded in making large collections. The administrator of the deceased partner then filed a bill for an accounting.

Referring to the fact that the services of the surviving partner extended over a considerable length of time, the Court said (page 272):

> "That these services extended over a long period does not increase his share nor lessen Edmonds' interest in the profits. Under the contract, Moyers agreed to prosecute the claims and could neither abandon them without just cause nor advise clients to put them in the hands of others. If he did so, he is chargeable with the fees which should have been earned by him under the articles of partnership. *Neither can Edmonds' interest be diminished on the ground that the contract of employment by the client was revoked by his insanity or death.* They made no such objection and apparently acquiesced in Edmonds' arrangement by which they were put in the hands of Moyers. *The survivor cannot retain the business thus coming to him by virtue of a contract with Edmonds without accounting for his share of the fees.*"

The Court at Special Term correctly stated the law in the opinion (fol. 517):

> "Under the authorities no such compensation is allowed unless there is some special circumstance requiring that an allowance be made in the exercise of equitable principles. The partnership relation carries with it the obligation to complete unfinished business and account to the representatives of the deceased partner. The partner is therefore entitled to no special compensation for doing only what he was fairly bound to do and what would have been imposed upon the others had the order of their death been different."

Exhibit A-2

32

On this point Mr. Justice Page said:

> "There is no fixed rule of law as to the rights of compensation to partners who carry on the business of a partnership after the death of one of the members. Each case must be decided on equitable principles, appropriate to the facts of the case. As a general rule the surviving partner is not entitled to compensation for his services, it being recognized that his duty requires him to do whatsoever is within his power to further the joint enterprise for the common advantage of all."

He added that there were exceptions to the rule where otherwise an inequitable result would be produced, but held that in the instant case there should be no such deduction (fol. 6479).

## IV.

**A partner cannot extinguish a contract belonging to the partnership by the substitution of a new contract relating to the same subject matter, in the profits of which he alone is to participate. In settling the accounts, such a new or substituted contract must be regarded as only a modification of the former contract, and the partner must account for the profits realized from the new or substituted contract.**

The California case, *Little* vs. *Caldwell*, 101 Cal., 553, is squarely in point. The same principles have been applied in this jurisdiction. In that case, as in the case at bar, a new contract was executed between a client and the surviving partner. There, however, the terms were slightly

Exhibit A-2

modified in accordance with the wish of the client, whereas, in the case at bar, the terms were left unchanged. The case at bar is, therefore, more favorable for the application of the principle which was laid down. The following quotation from the syllabus shows how close is the analogy to the case at bar:

> "The employment of a firm of attorneys to conduct a litigation is so far for the personal services of all that upon the death of one member of the firm the client may elect to consider the employment as terminated; but the option to declare the contract terminated for such a cause is with the client, and, if he does not do so, *but is willing to entrust the survivor with the further management of the litigation in which the firm was employed, the survivor is bound to complete the unfinished contract for the benefit of the partnership,* without compensation, unless otherwise agreed between the partners.
>
> A surviving partner must complete all executory contracts of the firm which remain in force after the death of a partner, and must settle the business of a partnership without charge against the partnership for his personal service.
>
> *A surviving partner cannot extinguish a contract belonging to the partnership by the substitution of a new contract relating to the same subject matter, in the profits of which he alone is to participate; and in settling the accounts of the partnership a court of equity will allow the representatives of the deceased partner an equitable participation in the profits realized from the new or substituted contract, which will be regarded, so far as concerns the partnership, as only a modification of the former contract."*

The authority of that case is emphasized by the fact that at the time of the death of the partner nothing had been earned under the contract.

Exhibit A-2

34

At that time an adverse decision had been obtained as a result of the firm's endeavors. Upon an appeal decided after a new and modified contract had been made with the surviving partner, a reversal was obtained and the fee earned.

The Court said (page 559):

> "*It is urged here* in behalf of defendant, and in support of the judgment of the superior court, that when Little died nothing had been earned under the contract made by the firm of Little and Caldwell with the heirs of the Westerfield estate, and *that as the contract was one for the personal services of both defendant and Little, it terminated upon the death of the latter, and was in fact superseded by the subsequent agreement by which the defendant himself undertook to perform the legal services* in the action then pending for the recovery of the Westerfield estate, for the clients named in the original contract, and also to bear all the costs attending the litigation; and it is further contended that the fee in controversy was the result of the latter contract in which the estate of Little has no interest."

The ruling was that the surviving partner was entitled to the increased compensation provided by the subsequent contract, but the plaintiff was allowed to share in what would have been the proceeds of the original contract.

The Court said (page 561):

> "Applying the foregoing general principles to the facts of this case as stated in the complaint, we have no difficulty in reaching the conclusion that the plaintiff is entitled to recover. The contract by which Little and defendant were employed to conduct the litigation referred to in the complaint did not *ipso*

35

*facto* become extinguished upon the death of Little; the persons with whom it was made did not refuse to permit the defendant to complete it because death had deprived them of the personal services of his deceased partner but they desired for other reasons to modify it in such a manner as to relieve themselves from some of its burdens, and, in consideration of the assumption of such burdens by defendant, offered him an increased compensation in the event of final success; and *when the defendant consented to this modification of the contract, the right of the estate of the deceased partner to share in the contingent fee to the extent given by the contract in its original form was not extinguished.* The defendant was at liberty to consent to this modification, and, as the partnership loses no rights thereby, no principle of equity will be violated by permitting him to retain the increased compensation given in the modified contract by reason of the increased personal risk which he assumed.

"It follows from these views that upon the facts as stated in the complaint, the plaintiff is entitled to recover one-half of the fifteen per cent provided for in the original contract, after deducting all proper expenses chargeable to the partnership in the matter of conducting the litigation."

It is true that in this case, as well as in the case of *Consaul* vs. *Cummings*, the arrangement for compensation was *in solido*, instead of there being, as in the case at bar, a standard by which the compensation was fixed up to the time when the superseding contract went into effect. This, however, does not detract from the value of these cases as authorities. It is well settled that even where the arrangement for the fee is contingent, the client has the absolute right to terminate the litigation and discontinue the employ-

36

ment at any time, leaving the attorney to such remedies as he may have.

*Andrews* vs. *Haas*, 214 N. Y., 255.
*Martin* vs. *Camp*, 219 N. Y., 170.

Conceding thus the right of the attorney to terminate the employment at any time, we have the same situation as the case at bar, where the employer expressly reserved that right in the contract.

As stated in *Johnson* vs. *Ravitch,* 113 App. Div., 810, 812:

> "Every attorney enters into the service of his client subject to the rule that his client may dismiss or supersede him at will; and if he makes a contract for future services to his client, it is necessarily subject to such rule, and made with full knowledge that he may never perform such service, for the reason that his client may not keep him, and that in that event he will not be paid therefor, but will be entitled to compensation only for the services he has actually rendered."

A similar rule was laid down by this Court in *Tenney* vs. *Berger,* 93 N. Y., 524, 529, where Judge Earl said that "a client may discharge his attorney, arbitrarily, without any cause, at any time, and be liable to pay him only for the services which he has rendered up to the time of his discharge."

In *Martin* vs. *Camp, supra,* this Court recognized that the client's right to discharge the attorney at any time was an implied term of the contract. The Court, by Judge Seabury, said:

> "The discharge of the attorney by his client does not constitute a breach of the contract,

Exhibit A-2

37

because it is a term of such contract, implied
from the peculiar relationship which the con-
tract calls into existence, that the client may
terminate the contract at any time with or
without cause."

The law being thus, the *client* has a perfect
right to discontinue the employment of the firm;
and, having done so, make a new and superseding
contract with the surviving partner. Equity, how-
ever, steps in and says, in effect, that this is proof
that the client was willing to go on without the
services of the deceased partner and that, *as be-
tween the partners,* the superseding contract will
be treated only as a modification of the former
contract.

A case much in point, although the question of
the death of one of the partners was not involved,
was one which the Special Term referred to in its
opinion (fols. 500-4).

*Castle* vs. *Marks,* 50 App. Div., 320.

The Court, in calling attention to the points of
similarity to the case at bar, said (fol. 503):

"In principle the Castle case is almost
identical with the case at bar. In each there
is the outside contracting party having the
right to cancel the contract because of the
nature of the services to be performed; as-
suming, as claimed by the defendants, that
the association agreement was terminable at
will. In both cases there is a substitution of
the partnership suggested and brought about
through the activity of one of the partners
anxious to secure for his own interest the
profits which would otherwise have accrued to
the firm as proceeds of an unfulfilled contract.
There is also the fact in each case of the

Exhibit A-2

38

outside party dealing with the partner in a
superseding contract, thus indicating a will-
ingness to continue dealing with the firm
despite the right of that outside party to with-
draw on account of the loss of one of the
partners."

In the *Castle* case, the decision was based,
among other things, upon the authority of *Mitch-
ell* vs. *Reed*, 61 N. Y., 123, and other well recog-
nized lease cases (*Holbridge* vs. *Gillespie*, 2 Johns.
Ch., 30; *Phyfe* vs. *Wardell*, 5 Paige, 268; *Clegg* vs.
*Edmondson*, 8 DeG., M. & G., 787; *Struthers* vs.
*Pearse*, 51 N. Y., 537).

See also:

    *Clegg* vs. *Fishwick*, 1 McN. & G., 294.
    *Featherstonhough* vs. *Fenwick*, 17 Ves.,
      298, 311.

In the first of the above two cases the same
principle was applied, although the negotiations
for the new lease were not begun until after the
termination of the partnership relation. In the
latter case it was held that it mattered not that
the landlord would have no dealings with the
complaining partner, the Court holding that there
could be no injury to the landlord if the tenant
be adjudged to hold in trust for the plaintiff.

The appeal in the case of *Castle* vs. *Marks,
supra*, was from the interlocutory judgment di-
recting an accounting. After the accounting was
made, in accordance with the principles indicated
by the Appellate Division, an appeal was taken
from the final judgment. The questions consid-
ered on the previous appeal were once more pre-
sented to the Court for review. The Court said,
by O'Brien, J. (58 App. Div., 33, 34):

39

"Although we are invited to reconsider our decision rendered upon that appeal, we are not disposed to do so for the reason that we think all the questions involved were there correctly passed upon and that the conclusion then reached must be regarded as the law of the case."

Upon appeal to this Court, the same questions were fully argued, and the case was affirmed without opinion (170 N. Y., 594).

The same principles were applied by this Court in *Spears* vs. *Willis*, 151 N. Y., 443. In that case the partnership had a profitable contract to furnish certain sap spouts, for which the partnership held a patent. The defendant, claiming that under the peculiar circumstances of that case, a dissolution of that partnership had been effected, set up the claim that after this dissolution he had made a new and improved sap spout, which ne had since manufactured and sold. The contract above referred to was made in January, 1887. In the Fall of that year the plaintiff removed from the town where the business was being conducted and thereafter took but little, if any, part in the partnership business. In the early part of 1888 the defendant, without the plaintiff's knowledge, procured a cancellation of the written contract of January, 1887, and the substitution of a verbal contract of the same tenor, the only change in terms being that the defendant individually was substituted as the vendor of the sap spouts in place of the partnership.

The partnership agreement was oral and the duration of the partnership was not expressed in the agreement between the parties.

The Court held that the dissolution of the partnership at will might be implied from the circumstances. It stated, however (page 449), that when this was not the result of mutual agree-

Exhibit A-2

40

ment, "there must be notice by the party desiring a dissolution, to his co-partner, of his election to terminate the partnership, or his election must be manifested by unequivocal acts or circumstances brought to the knowledge of the other party, which signify the exercise of the will of the former that the partnership be dissolved."

The Court brushed aside the defendant's claim that he was entitled to all of the profits of the substituted contract, stating (at page 452):

> "The conclusion of the referee, that the plaintiff was entitled to an account of the partnership transactions from and including the year 1888, and of all dealings of the defendant under the contract with Millar & Son of January, 1887, *or under any contract in his own name in contravention thereof, or substitution therefor,* legitimately followed from the facts found. The contract of January, 1878, was valuable, and was an asset of the partnerhip. The relation between partners is fiduciary, and the strictest good faith is required in their dealings with each other or with the partnership interests. 'All the partnership property (says Judge Story, Sto. on Part., Sec. 174) and partnership contracts should be managed for the equal benefit of all partners according to their respective shares and interests therein. If, therefore, any one partner should stipulate clandestinely for any private advantage or benefit to himself, to the disadvantage or in fraud of his partners, he will in equity be compelled to divide such gains with them.' (See also, 2 Kent's Com., 51.)"

More recent cases are

> *Hardin* vs. *Robinson*, 178 App. Div., 724;
> *May* vs. *Hettrick Bros. Co.*, 181 App. Div., 3; affirmed 226 N. Y., Advance Sheets No. 959, Memo., page 24.

Exhibit A-2

41

In the Hardin case, although the Court was not dealing with the effect of death, the language of the opinion is peculiarly appropriate. The Court said (page 728):

"It is true that where a partnership is not limited as to time, and there is nothing to show the intention of the parties as to its duration, it will be held to be a partnership at will. But where a partnership has for its object the completion of a specified piece of work, or the effecting of a specified result, it will be presumed that the parties intended the relation to continue until the object has been accomplished. There is, then, a term fixed by the co-partnership agreement, and until that time arrives one partner cannot terminate the partnership and continue the enterprise for his own benefit.

Nor can the other parties, without his consent, exclude one partner from participation and take to themselves the profits. It may be terminated at any time by consent, but the consent must be mutual. A joint adventure is subject to exactly the same rules as a technical partnership."

It would seem from the foregoing cases that exactly the same rules apply whether the opportunity to take an unfair advantage is caused by the death of one of the partners, or by his bringing about a termination of the partnership relation or of the firm's employment for the very purpose of taking advantage of his partner and securing for himself the coveted profits.

We thus see that whatever may be the rights of those dealing with a partnership in regard to substituting a new contract with some of the partners in the place of a prior contract with all, these rights will not be considered in an action between the representatives of the old partners and those who have sought to obtain

42

the exclusive advantage of the substituted contract. The reason for this is that the firm's customer or client is in no manner harmed if the Court requires the partner taking an improper advantage to account and thus place the partners in the same position that they would have been in had the superseding partner conformed "to the high standard of honesty and good faith which the law exacts from one partner or co-adventurer towards the other." As recently stated by this Court in *Selwyn & Co.* vs. *Waller,* 212 N. Y., 507, 512 :

> "In our opinion that standard should not be lowered by putting dubious conduct outside of the domain of law, especially as exact justice can always be done by making the wrongdoer a trustee of his secret interest for himself and his associates."

## V.

### The agreement between the associated architects was not terminated by the death of Charles A. Reed.

Upon this point the Appellate Division has made the following finding of fact (fols. 6396-7) :

> "On February 8, 1904, when the Association Agreement referred to in the finding of fact numbered IX, and the Employment Agreement, referred to in the finding of fact numbered XI, were executed, it was the intention of the parties to said agreements that said agreements were to continue and be binding upon all the parties thereto and that the terms of the agreements were to be performed even if the said Charles A.

Exhibit A-2

43

> Reed should die, and that the death of said
> Charles A. Reed should not release his estate
> from the obligations thereof."

This Court will not disturb this unanimous
finding. The only question that remains for
consideration under this point is whether, as a
matter of law, it was impossible for the parties
to so contract that the death of one of them
would not thwart their expressed intention.

The agreement itself, when read in connection
with the employment agreement, also referred to
in the finding, bears abundant evidence of the
intention which the Appellate Divison has found.

The association agreement refers in terms to
the employment agreement which it was expected
the associated firms were to secure. The two
agreements bear the same date and must be ex-
amined together, since the purpose of the asso-
ciation is stated to be that of completing the
plans and supervising the construction of the
Grand Central Station buildings and such other
buildings as the Railroad Company might desire
to intrust to the associates, *as provided for in the
agreement of employment.*

The association agreement, after providing for
the appointment of Mr. Reed as Executive Head
and after stating some of the duties of that
position, contains this significant language (fol.
77):

> "In event of a vacancy in the said posi-
> tion of executive head by resignation *or other-
> wise*, or upon the written request of the Rail-
> road Company for a change in said executive
> head, the said Railroad Company shall have
> the right to determine, from time to time, as
> it may choose, which member of the firms,

44

> parties hereto, shall be the executive head,
> and the parties hereto are to abide by such
> determination." (Italics ours.)

In view of the fact that both resignation and a possible request of the Railroad Company for a change in this position are specifically mentioned, it would seem that the words "or otherwise" could only refer to the death or total disability of Mr. Reed, since otherwise there could be no "vacancy" in the position.

When the employment agreement is examined, there can be no doubt that the parties had in mind that it was not expected or intended that Mr. Reed's death should necessarily bring about a dissolution of the partnership or a termination of the employment of the surviving architects. The language is significant (fols. 94, 95):

> "*In case of the death*, or in case of the resignation *of the said Charles A. Reed*, his successor or successors as such Executive Head, or in case the Railroad Company shall at any time be dissatisfied with the said Charles A. Reed, his successor or successors as such Executive Head, the Railroad Company shall have the right to, and may at any time, and from time to time, designate in writing which one of the architects shall be the executive head." (Italics ours.)

Moreover, as we have seen, the very clause which reserved to the Railroad Company the right to terminate the employment, provided for the cancellation by notice in writing, the termination to be effective "upon such date as may be specified in any such notice in writing."

One of the text book writers states the tendency of the modern decisions to be that if there is an agreement to that effect in the articles, the part-

45

nership will not come to an end upon the death of
a partner, but will continue in existence.

> *Parsons on Partnership*, 4th ed., page
> 432, note.

We know of no principle of law which requires
that the expressed intentions of the parties in
such a case should be thwarted.

The Appellate Division opinion discussed the
very point now under consideration. Mr. Justice
Page said (fol. 6465-6):

> "(1) Was the agreement between the as-
> sociated architects terminated by the death
> of Reed? In my opinion, it is very clear
> that it was not. In the first place this agree-
> ment construed with the agreement made
> between the railroad company and the as-
> sociated architects shows that the contin-
> gency of Reed's death was taken into con-
> sideration by the parties to the agreement
> at the time they executed it, and provision
> was made for the selection of someone to
> take his place in the event of his death
> or resignation, thus showing that it was
> clearly the intention of the parties that the
> agreement was to continue and be binding
> upon all the parties thereto and the terms
> of the agreemnt were to be performed even
> if Reed should die (*Braddock* vs. *Hinchman*,
> 78 N. J. Eq. 270).

Even if there was a technical dissolution of
the partnership at Mr. Reed's death, it none
the less continued for the purpose of winding
up the firm's affairs to the best advantage. In
view of the principles of law to which we have
called attention, the completion of the unfin-
ished business was to be "in the manner most
advantageous to the interests of all the parties

concerned," it being "the right of the representatives of a deceased or bankrupt partner to share in the profits of all business unfinished at the dissolution, but completed afterwards." We may concede that the surviving partners would not have been justified in entering upon entirely new obligations or contracts, in the name and upon the credit of the old firm. If the Railroad Company wished a job taken up which was entirely new and upon which the Associated Architects had done no work, it would probably not have been justified in undertaking it without the consent and approval of the representatives of the Reed estate. They were bound, however, to complete the unfinished work *in the manner most advantageous to the old partnership.* This does not prevent them from entering into such new engagements, or assuming such new obligations, as are required to complete the unfinished business.

*King* vs. *Leighton,* 100 N. Y., 386.

Not only do the agreements plainly indicate an intention that Mr. Reed's death should not *eo instante* cause a termination of the employment and a dissolution of the partnership, but the acts of the parties clearly show their intention without regard to the language referred to.

Thus it is conceded that when, in 1905, *Lloyd Warren,* one of the contracting partners, *retired from the firm of* Warren & Wetmore, the business of the associated firms went on without interruption. In 1908 when the composition of the firm of Warren & Wetmore was changed by reason of *the death of John E. Howe,* the remaining partners of the Warren & Wetmore firm continued in the association without any change in the relations

Exhibit A-2

47

(Complaint, paragraph III, fols. 19, 20, which is admitted by answer; see also decision, fols. 293, 294).

If we may look into the undisputed documentary evidence to ascertain the intentions of the parties, we find that the Railroad Company at no time acted upon the view that Mr. Reed's death of itself brought about the cancellation of the employment agreement. This is strikingly shown by the resolution of December 6, 1911 (Plaintiff's Exhibit 368, fol. 6032). By this it is shown that

> "Mr. Newman stated that upon the death of Mr. Charles A. Reed, the Executive Head of the Architects for the Grand Central Terminal, on November 12, 1911, the company had the right under the contract of February 8, 1904, with the Associated Architects, *to either designate some one of the other Architects as the Executive Head or to terminate the employment of the Architects under the contract.*"

When the cancellation notice was given, it apparently was not drawn upon the theory that the death of Mr. Reed of itself terminated the contract of employment, or dissolved the contract of association. On the contrary, the notice specifically names December 31, 1911, as the day when the termination of the employment will become effective. We thus see that the intention of the parties, as gleaned from their acts, was that the death of one or more of the contracting parties was not to do away with the partnership or the employment. This practical construction put upon the contract by the parties themselves is of value in determining what was the reasonable way of closing up the firm's affairs to the best advantage.

Mr. Reed's death clearly did not terminate the agreement in question.

Exhibit A-2

48

## VI.

### The obligations of the associated architects to the railroad company were not cancelled by the death of Mr. Reed.

We have seen that the Appellate Division has found as a fact that it was the intention of the parties to both the Association Agreement and the Employment Agreement that these agreements "were to continue and be binding upon all the parties thereto and that the terms of the agreements were to be performed even if the said Charles A. Reed should die, and that the death of said Charles A. Reed should not release his estate from the obligations thereof" (fols. 6396-7).

With this unanimous finding of the intention of the parties, it is only necessary for this Court to consider whether, as a matter of law, it was impossible for the parties, by the agreements which they made, to carry out their intention. It will be noted that the employment agreement was executed by all of the various members of the two firms which were being employed (fols. 86, 87, 110, 111). In the preceding point we called attention to that provision of the agreement providing that in case of the death of Mr. Reed, the Railroad Company should have the right to designate in writing which one of the architects should become executive head in his place. We have also called attention to that part of the contract which reserved the right of the Railroad Company to terminate the employment of the architects upon such date as might be specified by the notice to terminate. These pro-

Exhibit A-2

49

visions are quoted in full in Mr. Justice Page's opinion (fols. 6450-2).

We have shown that when the notice to terminate was actually given, the date fixed as the termination was not the date of Mr. Reed's death, November 12, 1911, but December 31, 1911.

Except that Mr. Reed was a more commanding figure, there was no more reason why his death should terminate the employment of the surviving partners or cancel the obligations of the joint adventurers, than there was when John E. Howe, one of the Warren & Wetmore firm, died in 1908 (decision, fols. 293-4).

There seems to be no escape from the concluson that the obligations of the joint adventurers to the Railroad Company were not cancelled by Mr. Reed's death.


## VII.

**The claim that upon Mr. Reed's death a new contract was necessary was a mere pretext to further Wetmore's fraudulent scheme to supplant the associated architects.**

Four days after Mr. Reed's death, while the plaintiff and Mr. Reed's executor were absent from the City of New York attending the ceremonies incident to Mr. Reed's interment, the defendant Wetmore wrote and sent, from the private office of Warren & Wetmore, the following letter:

50

"November 16, 1911.

Wm. H. Newman.
   Grand Central Station,
     New York City.

Dear Mr. Newman:

I am enclosing the proposed contract which is intended to follow the old form in all particulars except that Warren & Wetmore are the Architects. I would be glad to take the matter up with you in person at any time that may suit your convenience.

At the death of Mr. Reed the old contract is terminated and a new contract becomes necessary. I would suggest that the old arrangement be terminated as of the 15th day of November and accounts be settled as of that date and any new arrangement that may be made shall commence as of that date.

You will note that under clause 'Sixth' of the contract between your Company and the Architects you have the right to terminate the agreement at any time.

Very truly,

CHARLES D. WETMORE.

1 enclosure" (decision, fols. 302-4).

The enclosure referred to in the letter was a proposed contract, in all of its essential features identical with and similar to the employment agreement with the Associated Architects, except that it was with Warren & Wetmore, instead of the various members of the associated firms (decision, fol. 306).

We have referred to this as a secret letter. It has been found that no record of its writing or sending was made or kept in the office or records of the associated firms, but that a copy was retained in Wetmore's personal letter book (decision, fols. 306, 307).

Exhibit A-2

51

It has also been found that the defendants Warren and Wetmore gave no notice to the plaintiff or the estate of Charles A. Reed of any election to terminate or discontinue the relations created by the association agreement or the employment agreement other than by entering into the superseding agreement of December 19, 1911, with the Railroad Company (decision, fol. 332). Neither the plaintiff nor any representative of Mr. Reed's estate received any notice that the defendants Warren and Wetmore were seeking to obtain a new contract for themselves, prior to December 19, 1911, when the superseding agreement was executed (decision, fol. 338, 330, 331).

We submit that these controlling facts show that the defendants' attitude was not honest or honorable.

Under the authorities to which we have called attention the plaintiff and those interested in the Reed estate were entitled to the very best ability which all of the surviving partners had in the liquidation of the rather complicated affairs of the Associated Architects. If Warren or Wetmore had any special influence with the railroad, it was their duty to use it for the purpose of continuing the relations of employment, at least as to all matters upon which the associated firms had up to that time done a substantial amount of work.

The fair, honest thing to have done would have been to have called a meeting with Stem and, perhaps, the executor of the Reed estate, and thus, in partnership council, laid out a program to be adopted with the railroad. It would not have been difficult to determine at that time what was unfinished business. If, for any reason, Warren & Wetmore did not care to continue their relations

Exhibit A-2

52

with Stem as to any new business which the association might reasonably expect to get, proper arrangements could have been made in regard to the good will of the association. If it was their contention that this good will, being a possible demand for professional services, was not properly an asset of the firm, then fairness demanded that they make their position known promptly to the surviving partner of the Reed & Stem firm, so that he at least would be upon an equality with them in regard to seeking the new business. If it was their contention that competition under the circumstances was fair and honorable, they were certainly under an obligation to make their attitude known promptly and unequivocally.

Instead of that, what did they do? In view of the unequivocal findings, this Court will not care to examine the evidence. The finding is that the cancellation by the Railroad Company of the employment contract and the execution of the superseding contract of December 19, 1911, between the Railroad Company and Warren & Wetmore "were brought about by the secret actions and the solicitation and procurement of the defendants Whitney Warren and Charles D. Wetmore, and with the purpose and intent of excluding the plaintiff and the estate of Charles A. Reed from any profits and emoluments which would accrue after December 31, 1911, in connection with the work which the Associated Architects had in hand and under way and uncompleted on December 31, 1911" (decision, fols. 335-6).

The Appellate Division, after a careful review of the entire case, has said that there is ample evidence to sustain this finding (fol. 6471).

## VIII.

**In determining whether the defendants are to be held accountable to the plaintiff for the profits made out of the prosecution of the joint enterprise, in so far as it related to unfinished work, it should be borne in mind that by their unfair conduct and abuse of the partnership relation, the defendants not only sought money to which the plaintiff and the Reed Estate were fairly entitled, but caused damage to the plaintiff which the law should not tolerate.**

In determining whether the defendants Warren and Wetmore are to be held accountable for their fraudulent actions, there are certain equities in favor of the plaintiff to which we have not called attention.

It must be remembered that Reed & Stem were in the employ of the Railroad at the time that Warren & Wetmore sought employment. Plaintiff's firm had been employed as a result of an informal competition and because it was they that first suggested the bridge over 42nd Street and the broad plaza north of the station known as the Park Avenue improvement (decision, fols. 270-3).

The development of this scheme was a work of which any architect might be proud. Plaintiff's connection, and that of his firm, with this great work, which was almost in the nature of a municipal improvement, was, aside from the mere financial aspect of it, a connection to be highly prized. It is reasonable to assume that it was widely known by both his friends

Exhibit A-2

54

and business acquaintances. Mr. Reed's connection with the work was relatively so important that it has been held that he, more than any other one of the Associated Architects, was identified with and responsible for the improvements as they have been finally built (decision, fol. 300).

Yet about a year after Mr. Reed's death, when the opening of the new station was being proclaimed as the consummation of one of the great architectural and building enterprises of the century, it was made known from one end of the country to the other that Warren & Wetmore were the architects for this great work.

The finding is that after the completion of the Hotel Biltmore and the main station and its accompanying group of buildings, and as a result of Warren & Wetmore having obtained and accepted the superseding agreement, Warren & Wetmore were represented and held out to the public as being the sole and exclusive architects of the Railroad Company in connection with the work which had been intrusted to and largely performed by the Associated Architects, thus depriving the plaintiff and his firm of the honor and credit naturally accruing to those who had been connected with the designing and execution of an enterprise of such magnitude and importance (decision, fols. 380-381).

A reference to the evidence which supports this finding would show the nature and extent of the credit that was wrongfully and unfairly given to the superseding firm (fols. 1574, 1579, 1580-88, Plaintiff's Exhibits 211, 212, 214, 215).

By this means, and as a result of the unfair action of the defendants, the world was thus told that the Railroad Company, the owner for whom the work had been done, considered Warren &

Wetmore as the architects entitled to the credit. The reason why such a thing could be done was because the defendants had improperly sought for and obtained the exclusive employment by the Railroad Company to complete the work which had been intrusted to the joint firms, thus taking unfair advantage of the trust and confidence incident to the partnership relation.

Damage such as this cannot be calculated in dollars. It may properly be considered, however, in reviewing the action of the Courts below.

## IX.

**In determining whether the defendants are to be held accountable for the profits made out of the prosecution of the joint enterprise, consideration should be given to the fact that the superseding contract, by its terms, placed the defendants in a position where their individual interests conflicted with their trust duties as surviving partners.**

The terms of the superseding contract are substantially set forth in the decision. The recitals are set forth in full (fols. 309-20). The substance of the active provisions of the contract may be found at folios 321-9. The recitals clearly show the unfinished condition of the work which was in the Associated Architects' hands. As stated in the agreement, the different phases or portions of the work were expected to arrive at different relative stages of completion on December 31, 1911.

56

The compensation of Warren & Wetmore was to be fixed by ultimately determining what the entire compensation would have been to the Associated Architects had that contract not been terminated, and then deducting such amount as must necessarily be paid to the Associated Architects in settlement for their labors up to the end of the year 1911. The balance was to be the compensation to Warren & Wetmore for their services (fols. 324-327).

Thus, of necessity, if the Railroad Company made a settlement with the Associated Architects which was favorable to the Railroad Company, this would enure to the benefit of Warren & Wetore, as it would increase the amount ultimately to be paid to them. On the other hand, if the settlement was a favorable one to the Associated Architects, there would be a corresponding decrease in the amount of the ultimate compensation of Warren & Wetmore. We thus see that, by entering into this contract, the defendants placed themselves in a position where their individual interests were frankly and directly in conflict with the beneficiaries of the trust relationship which was imposed upon them by reason of Mr. Reed's death, viz.: that of completing the firm's unfinished business upon the best terms possible from the standpoint of the partnership.

However Spartan-like may be the virtue of a trustee, the law will not allow him to deal individually with the trust estate. A trustee may not buy trust property, although he is willing to pay its full value. The law will not allow a trustee to put himself in such an equivocal position.

> "A trustee cannot purchase or deal in the trust property or for his own benefit directly

Exhibit A-2

or indirectly. This is a rule of equity and is not to be impaired or weakened.

> *Harrington* vs. *Erie County Savings Bank,* 101 N. Y., 257, 264.

Parsons, referring to surviving partners, says:

> "Thus, like other trustees, they cannot sell the property of the firm and buy it themselves; nor, as the converse of this, can they buy from themselves property for the firm."

> *Parsons on Partnership,* 4th ed., page 436.

In a decision of the Appellate Division which was affirmed by this Court, language was used with respect to the duties of a testamentary trustee which is equally applicable to the trust relation growing out of survivorship in a partnership.

Mr. Justice McLaughlin, in stating the rule for the Appellate Division, said:

> "It is a fundamental rule relating to the acts of a testamentary trustee that he must not only act for the benefit of the trust estate, but also in such a way as not to gain any advantage, directly or indirectly, except such as the law specifically gives him, for himself. He owes an undivided duty to his beneficiary, and he must not, under any circumstances, place himself in a position whereby his personal interests will come in conflict with the interest of his *cestui que trust* (Pom. Eq. Juris. Sections 1075-1077; Chaplin on Express Trusts & Powers, Section 193; *Matter of Hirsch, No.* 1, *supra*). The purpose sought to be secured by this rule of law is to require a trustee to assume a positon where his every act is above suspicion and the trust estate, and it alone,

Exhibit A-2

58

can receive not only his best services, but his unbiased and uninfluenced judgment. When he has acted otherwise, or when he has placed himself in such a position that his personal interest has or may come in conflict with his interest as trustee, then, so far as I have been able to discover, the court never hesitates to remove him. Under such circumstances the court does not stop to inquire whether the transactions complained of were fair or unfair. It stops the inquiry when the relation is disclosed (*Munson* vs. *S., G. & C. R. R. Co.*, 103 N. Y. 58)."

*Pyle* vs. *Pyle*, 137 App. Div., 568, 572; affirmed 199 N. Y., 538.

We do not mean to suggest that the settlement made with the Railroad Company was not, in fact, a fair one. It cannot be doubted, however, that Warren & Wetmore voluntarily placed themselves in a position where their individual interests were antagonistic to and diverse from the interests of the beneficiaries of their trust relation as surviving partners. Under these circumstances, a court of equity will not hesitate to allow the beneficiary to take the benefit of the trustees' unauthorized action. This risk a trustee always runs, when he deals personally with the trust estate and places himself in a position where his individual interests conflict with those of his beneficiary.

On this point the Special Term made a conclusion which seems unassailable. It is as follows (fols. 404-5):

"II. By the terms of the superseding agreement of December 19, 1911, between the New York Central and Hudson River Railroad Company and the defendants Whitney War-

ren and Charles D. Wetmore, said defend-
ants were placed in a position where their
individual interests were in conflict with
their duties as surviving partners."

## X.

**The defendants' culpability is emphasized
by the fact that the employment of Reed &
Stem preceded that of the Associated Archi-
tects. It was through the association with
Reed & Stem that Warren & Wetmore made
their intimate business acquaintance with
the railroad company.**

It appears from the findings (fol. 268 *et seq.*)
that in the early part of the year 1903 the firm
of Reed & Stem was invited to submit drawings
and suggestions in connection with a scheme
of improvement which the Railroad Company
was then contemplating, owing to the necessary
change in motive power from steam to elec-
tricity. The scheme of improvement then pro-
posed involved the erection of a new station to
replace the one then in existence and contem-
plated many other buildings with a view of util-
izing the space to the north of the station which,
up to that time, had been used for railroad
tracks, but which, owing to the change of motive
power, became possibly available for high-class
buildings.

Warren & Wetmore were not among the ar-
chitects who were first invited to submit sug-
gestions relative to the intended improvement
(fols. 270, 271). The outcome of the informal
competition which was entered into was that the
scheme shown by the preliminary plans of Reed &

Exhibit A-2

Stem was favored by the Railroad Company and that Reed & Stem were thereupon employed to proceed further with the scheme of development upon the basis of being paid for such services as they might render (fol. 271).

The scheme of treatment suggested by Reed & Stem was for a group of buildings which accompanied the station and were so arranged as to enable the Railroad Company to utilize the space over, under and in the vicinity of said tracks, thus obtaining the beneficial use of much real property which up to that time had been of no practical value except for trackage and its related purposes. Among the novel ideas which distinguished this scheme of treatment was the creation of an elevated, circumferential driveway around the exterior of the main station, together with a proposed bridge over 42nd Street, thus making a connection for vehicular and other travel between 4th Avenue as it extended south of 42nd Street, with Park Avenue at the north of the station, which latter street was to be located over the railroad track levels as then proposed (fols. 272, 273).

It was only after this informal competition had been won by Reed & Stem, and after a large amount of architectural work had been done by Reed & Stem, that Warren & Wetmore came into the situation at all. Payments on account aggregating $20,000 were made to Reed & Stem between July 8, 1903, and February 5, 1904 (fols. 273, 274).

It was after this employment of Reed & Stem by the Railroad Company that Warren & Wetmore, with the knowledge that Reed & Stem were so employed, obtained permission to submit sketch plans in connection with the proposed improvement (fols. 274, 275).

Exhibit A-2