61

In pursuance of this permission, plans were submitted by Warren & Wetmore. They were told, however, by William J. Wilgus, the chief engineer of the Railroad Company, that the plans as submitted did not conform to the basic ideas which had been previously formulated by the Chief Engineer and tentatively adopted by the Railroad Company (fol. 275).

After an ineffectual effort on the part of Warren & Wetmore to have the basic plan changed so as to make the adoption of their plan possible, the firm of Reed & Stem was informed by the Railroad Company that if Reed & Stem were to continue in the prosecution of the work, it would be advisable, and in accordance with the preference of the Railroad Company, that a working arrangement be made for the association of the two firms. This was shortly prior to February 8, 1904, when the association agreement and the employment agreement were made (fols. 276, 277, 283).

It is not necessary to discuss the ethical problem as to whether Warren & Wetmore acted according to the highest standards of their profession in thus bringing themselves into the situation after Reed & Stem had obtained their employment as a result of the competition. These were naturally questions of considerable importance before the arbitrators in the arbitration for which the association agreement provided (fol. 281). The point that we wish to emphasize is that Reed & Stem were definitely in the Railroad Company's employ at and before the time when Warren & Wetmore came into the situation and joined them in the proposed adventure. It is not unreasonable to assume that there may have been some reluctance on the part of Reed & Stem to join hands with a competing firm in order

Exhibit A-3

62

to get the final agreement after having fairly won the right to the exclusive employment by the Railroad Company. It does not appear, however, that this feeling of disappointment on the part of Reed & Stem affected their loyalty to the joint venture after the associaton agreement was made. It would seem that Reed & Stem, at least, went into the partnership understanding its intimate relation and the obligations attending it.

The fact that Warren & Wetmore as architects became intimately acquainted with the Railroad and its officials as the partners of Reed & Stem makes an added equity in favor of Reed & Stem when the question is considered whether Warren & Wetmore, as the result of that acquaintanceship, have taken an unfair and illegal advantage of the trust and confidence arising and growing out of the partnership relation.

## XI.

**By continuing in the possession of the property and assets of the Associated Architects after December 31, 1911, defendants were able to use and enjoy an organization which was peculiarly the result of the labor of the associated firms.**

Shortly after the association effected by the agreement of February 8, 1904, a separate office was opened and maintained by the Associated Architects. This office had its own corps of draughtsmen, employees and necessary appurtenances and was devoted exclusively to the work of the association (decision, fol. 291). It continued down to the time that Mr. Reed died,

Exhibit A-3

63

(November 12, 1911), during all this time being under the actual charge and direction of Mr. Reed as Executive Head (decision, fols. 291-292). Mr. Reed, it must be remembered, devoted a large proportion of his time to the affairs of the Associated Architects, and he, more than any other of the Associated Architects, was identified with and responsible for the improvements as they have been finally built. For these services, and for the time and attention which he gave to the affairs of the associated firms, neither he nor the firm of Reed & Stem received any salary or special compensation (decision, fols. 299, 300). The offices of the associated firms were fitted up for their particular use, at their own expense. Plaintiff's Exhibit 347 (fol. 5957) shows an undisputed item of $2,767.47 for "fitting up office." The office equipment and furniture alone cost over $6,000 (decision, fol. 382).

After Mr. Reed's death, and after December 31, 1911, when the superseding agreement went into effect, the defendants simply continued in possession of what was the office of the Associated Architects, using and enjoying the organization which had been built up by Mr. Reed as Executive Head. They openly claimed that this use and enjoyment was for their exclusive benefit (decision, fol. 333). In the light of the findings it is clear that the ability to supply the needs of the Railroad as they arose from day to day, and please its various officers, was no small part of the value of the organization which had been effected. Doubtless it was in the Railroad's mind that Warren & Wetmore would be able to continue with this organization when the superseding agreement was drafted and signed.

We have called attention to the fact that the recitals of the superseding agreement, as disclosed

Exhibit A-3

64

by the findings, show that a large part of the architectural work, as well as a large part of the physical work, was in an unfinished state. The varying degrees of completion in the different parts were such as would naturally be expected in a gigantic work of this sort. It would have been practically impossible for other and different architects to have taken up the project as it then stood with any degree of success. Unless the architectural work was continued by the same organization which then had it in charge, chaos would have resulted.

It is fair to assume that the same men continued in charge of the various departments into which the work had been classified. The evidence shows not only that the heads of departments were the same and that the same books and records were used, but that for some years after December 31, 1911, the office went along as before, except that it was under the direction of the defendants instead of under the direction of the Associated Architects (fols. 1033, 1031, 3114, 1038, 1041-3, 1045, 1047, 1074-5).

We thus see an attempt on the part of the defendants to use the assets of the old partnership for the advantage and benefit of the new firm. Yet the defendants have gravely urged that all their relations with Mr. Stem were terminated on the death of Mr. Reed, and that they were under no obligation to account for any profits that might be made from the work prosecuted thereafter. Our claim is that the very ability to go on with the work as they did go on with it, with the same organization and in a way to give satisfaction to the Railroad Company, was peculiarly a partnership asset of which they would rob the plaintiff and the Reed Estate if they should escape the liability to account for

Exhibit A-3

the profits which they have been able to make through its use.

It may be that the employment of the various draughtsmen and other employees of the Associated Architects was cancelled by Mr. Reed's death. Probably any one of these could have made this the excuse for his withdrawal, if he had so wished, but this did not prevent the surviving members from continuing the employment for the benefit of the association if the employees were willing.

With the work for which the association had been founded well under way, should the surviving members of the firm be allowed to assert that the work should not continue under the unfinished business rule, simply because of the legal principle that the contracts of employment with the workmen were terminated by the death of one of the partners?

It is interesting to note that when John E. Howe, a member of the firm of Warren & Wetmore, and one of those with whom the original contract was made, died, no such claim was asserted by anyone. The finding is that at the time of his death and also when Lloyd Warren, another one of the Warren & Wetmore firm, retired from the firm, there was no change in the relations with the Railroad Company so far as the carrying out of the agreement was concerned, and that the remaining members of the Warren & Wetmore firm continued to act both under the Association Agreement and under the Employment Agreement (decision, fols. 393-4).

As we understand the law, it is its wise policy to prevent a partner from betraying his associates and the representatives of those who may have died, by using the firm assets for indi-

Exhibit A-3

66

vidual profit if a situation arises where a firm's customer may be induced to cancel the relations with the firm for the very purpose of making a superseding agreement with the faithless partner.

## XII.

**The relations of the parties with reference to the Hotel Biltmore were such that the defendants should be held accountable at least to the extent directed by the Appellate Division.**

The work done by the Associated Architects with respect to the Hotel Biltmore stands upon a somewhat different footing from the rest of the work, by reason of the fact that up to the time of Mr. Reed's death there had been no formal designation by the Railroad Company, bringing the architects' work in connection with this enterprise formally within the terms of the employment agreement.

The story of the Hotel Biltmore is briefly told by the findings. One of the basic elements in the original scheme of improvement was the creation of a terminal hotel in close connection with the terminal facilities of the Railroad (decision, fol. 269). The scheme was to have the hotel so placed that passengers arriving in the City might be accorded modern, high-class hotel facilities without the necessity of leaving the Railroad property.

For many years prior to the actual building of the hotel, the City block bounded by Madison Avenue, 43rd Street, Vanderbilt Avenue and 44th Street, had been chosen as the desired site.

Exhibit A-3

67

As early as the Spring of 1910 negotiations commenced between Gustav Baumann (then about to give up the Holland House) and the New York Central and Hudson River Railroad Company, relative to the building of the hotel in connection with the terminal facilities of the Railroad Company. The scheme was to build the hotel over that part of the Railroad property technically known as the incoming station. This incoming station was designed to be partly under the block in question and partly under Vanderbilt Avenue (fol. 355). There was some delay in regard to the physical work on the incoming station by reason of the necessity for the change of position of Vanderbilt Avenue, which was not consummated until June 15, 1911 (decision, fol. 356). This delay in the physical work had not done away with the necessity for a large amount of architectural work (decision, fol. 355).

Throughout the years 1910 and 1911, negotiations continued between the Railroad Company and Baumann. Baumann was at first represented by his own architects, Messrs. D. H. Burnham & Co. of Chicago. At an early stage of the negotiations Baumann and his architects were referred by Mr. Newman, who was conducting the negotiations on the part of the Railroad Company, to the Associated Architects, so that whatever arrangements were to be made with respect to the hotel might proceed in harmony with the primary use of the land by the Railroad Company, which was for the incoming station (decision, fol. 362). The function of the Associated Architects at first was only to assist Baumann's architects in placing the proposed hotel so as not to interfere with the use of the underlying tracks. It was only a short time, however, before Mr. Baumann perceived that better results could be ob-

68

tained by dealing directly with the Associated
Architects. During the years 1910 and 1911,
prior to Mr. Reed's death, the Associated Archi-
tects prepared many plans and rendered a large
amount of important and valuable service in con-
nection with the designing of the proposed hotel.
Many different sets of plans were drawn, includ-
ing floor plans, and prior to Mr. Reed's death the
Associated Architects had become the chief archi-
tects for the proposed improvement.

Under the original scheme, Baumann was to
make a substantial contribution to the expense
of construction. This scheme of financing was
afterwards changed so that the entire cost was
to be borne by the Railroad Company. This
naturally carried with it the choice of architects,
and left the field open for the Associated Archi-
tects (opinion, fol. 6473).

The negotiations between Baumann and the
Railroad Company continued without interrup-
tion from the time they were originally taken
up, down to the time of Mr. Reed's death, except
for some temporary interruptions caused by the
necessary absence of some of the parties. We
have referred to the delay caused by the change
in location of Vanderbilt Avenue, the lines of
which were, at the instance of the Railroad
Company, moved during the progress of the ne-
gotiations (decision, fol. 364).

The Trial Court found that prior to Mr. Reed's
death the preliminary plan in connection with
the proposed hotel was substantially completed
in so far as this was necessary to form a basis
of intelligent negotiation between the Railroad
Company, which contemplated building the hotel,
and the interests represented by Mr. Baumann,
which were to lease and operate it (fol. 365).
After Mr. Reed's death the negotiations contin-

ued, Mr. Schultze, who was one of the employees of the Associated Architects throughout the years 1910 and 1911, taking an active part in the furtherance of the negotiations (decision, fol. 366). On December 13, 1911, before the time which was fixed for the taking over of the work by the defendants, the negotiations had reached a point where Mr. Newman presented to the Board of Directors of the Railroad Company a formal proposition embodying the principal features of the agreement pursuant to which the hotel was to be built and leased to Mr. Baumann's corpora-tion. On that day the approval of the Railroad Company to the proposition was obtained (de-cision, fol. 366, 367).

Before the end of the year 1911, Mr. Baumann caused The Beau Site Company, a corporation in which he owned practically all of the stock, to be incorporated (decision, fols. 367, 368). It has been found that the architectural work done by the Associated Architects in connection with the proposed hotel "was an important and essen-tial element in connection with the negotiations heretofore referred to between Gustav Baumann and the New York Central and Hudson River Railroad Company" (fol. 368).

Following, and as a result of, these negotiations, a formal agreement and lease between the New York Central and Hudson River Railroad Com-pany and the New York, New Haven and Hart-ford Railroad Company, which joined with it in building the hotel, and The Beau Site Com-pany, which was to operate the hotel, was entered into on February 15, 1912. This agreement pro-vided that the Railroad Companies were to have prepared by their architects working plans and specifications for the proposed building, which was to cost in the neighborhood of $5,500,000, ex-

70

clusive of the part of the improvement which was for railroad purposes. It provided that the design of the hotel building was to conform substantially to preliminary drawings dated on that day, which drawings were identified and referred to as being then on file in the office of the Grand Central Station Architects. Mr. Graham, of the firm of D. H. Burnham & Co., was to be consulting architect to represent The Beau Site Company, his fees to be paid by the Railroad Company and included in the cost of the hotel building. Provision was made for changes which might be required from the preliminary drawings (decision, fols. 369-372). On March 11, 1912, Warren & Wetmore were formally designated in writing, in accordance with the superseding agreement of December 19, 1911, to act as architects. This designation included the preparation of preliminary plans, working plans and specifications, and the supervision of the construction of the hotel. It provided that the architects' compensation was to be 5% of the final cost of construction (decision, fols. 372, 373).

After the execution of the agreement and lease of February 15, 1912, the building of the hotel proceeded and was completed by the end of the year 1913 at an actual cost of about $5,500,000 (decision, fol. 375).

The Trial Court held that the preliminary plans mentioned in the agreement of February 15, 1912, "were similar to and in many respects identical with the preliminary plans prepared by the Associated Architects, and the plans so prepared by the Associated Architects were used by the firm of Warren & Wetmore in the preparation of said preliminary plans mentioned in said agree-

71

ment of February 15, 1912" (decision, fols. 375-6).

The Trial Court further held that the Hotel Biltmore, as finally built, "conformed substantially to the preliminary plans prepared by the Associated Architects prior to December 31, 1911. Most of the basic features remain unaltered and the changes and departures from the preliminary plans in the building as finally built are not greater or more substantial than are usual and customary between preliminary plans as tentatively approved by the owner and working plans as developed for the building, in connection with the designing and building of buildings of the general character of the Hotel Biltmore" (decision, fol. 376-7).

It held that the plans for the Hotel Biltmore as finally constructed were arrived at through a process of development and elimination and that the original ideas and essential elements of the proposition were largely conceived and executed through the work of the Associated Architects (decision, fol. 378). It held that an important asset of the Associated Architects at the time of the death of Mr. Reed, and at the end of the year 1911, when the superseding contract went into operation, was their reasonable expectation of being formally chosen as the architects for the hotel building, with the attendant compensation in profits for the work already done and to be done (decision, fols. 378, 379).

The Appellate Division has held as a matter of fact that "in the course of the work done by the defendants Warren and Wetmore in and about the preparation of preliminary plans and final or working plans and specifications for the Hotel Biltmore after the death of Charles A. Reed, the defendants used the preliminary plans

theretofore prepared by the Associated Architects. Such preliminary plans, and the work done by the Associated Architects in producing them, were of great and substantial value in the preparation of the final plans and the said work of the defendants Warren and Wetmore was merely a continuation of the business that the Associated Architects were engaged in on December 31, 1911, at the time of the termination of the Employment Agreement dated February 8, 1904, heretofore referred to" (fols. 6397-9).

The Trial Court further held that although at the time of Mr. Reed's death the Associated Architects were closely connected with the projected hotel enterprise, being familiar with all its details, and so organized that they might carry on the enterprise to a successful conclusion, the defendants made no effort to obtain for the Associated Architects their designation as architects in connection with the hotel enterprise, although at that time the connection of the Associated Architects with it was such that the assignment would have been the natural, reasonable and probable thing to expect (decision, fols. 379-80).

We thus see that the preliminary work done by the Associated Architects was the usual preliminary work which necessarily preceded the point where, in any building transaction of the size and character of this one, the interested parties have come to a substantial point of agreement as to what is to be built and how, so that the architects may commence work on the final plans or working drawings. We further see that the work done on the final plans was a mere continuation of the preliminary work which had been substantially completed by the Associated Architects prior to the time when, by

73

its terms, the superseding contract went into operation. We see further that the building as finally completed made no greater departures from the preliminary plans than might reasonably be expected.

The Trial Court in its opinion (fol. 509) refers to "the correspondence in relation to the Biltmore when chronologically read." We do not deem it necessary to discuss this correspondence before this Court. If, however, the Court, for the purpose of appreciating the full effect of the findings, should wish to examine the evidence, we have, for convenience of reference, prepared a supplement to this brief in which the correspondence in the case and certain of the Railroad's resolutions have been arranged chronologically. Beginning at page 25 of this supplement, and running throughout the volume, will be found documentary evidence showing the character of the preliminary work done by the Associated Architects, but for which the defendants only have received compensation, and showing clearly that the work done by the defendants was, as found by the Appellate Division, merely a continuation of the work done by the Associated Architects.

Owing to the fact that a large part of the preliminary work done by the Associated Architects on the hotel was done at a time when it was expected that Mr. Baumann's corporation would furnish the money for the building of the hotel, the Associated Architects did not have a claim which could be successfully asserted against the Railroad Company for the preliminary work which they had done. We have seen that in the settlement with the Railroad Company the $5,000 which was allowed to the Associated Architects for their work in connection

Exhibit A-3

74

with the incoming station was not intended to
be in compensation for any work done by them
in connection with the proposed hotel building
(decision, fols. 356, 357). Under these circum-
stances, unless this important work was to go for
naught, the only way that the Associated Archi-
tect could be compensated for what they had
done was by the acceptance and recognition of
this work by the Railroad when the formal desig-
nation was made. If the claim of the appellants
were to be upheld, they only would benefit by
the work done by the Associated Architects before
Mr. Reed's death. If Warren & Wetmore, having
been paid for this work, are not liable to account
to their old partners, a premium is put upon
sharp practice and deliberate scheming to obtain
the benefits of work done by a deceased partner.

It will doubtless be urged here, as it was
below, that since the firm was in liquidation,
the survivors had no right to undertake new con-
tracts involving new obligations. It must not be
overlooked, however, that a large amount of
labor and expense had already been devoted to
the enterprise, and that with the preliminary
work practically completed, the only way that
they could obtain payment for this was by se-
curing the formal designation when the build-
ing contract was executed. If, by way of illus-
tration, the evidence may be examined for the
purpose of discussing what might be the reason-
able assumption, it appears from a cost sheet
showing the actual expense to December 31,
1911, that $3,203.32 had been incurred in con-
nection with the preparation of the drawings
(fol. 5556). This, of course, made no allow-
ance for the services of the Associated Architects
themselves, including only the drafting and inci-
dental expenses (fol. 3076, page 692). Upon the

Exhibit A-3

75

basis of the proposed cost of the Biltmore ($5,500,-
000) (fol. 5741), 1% for the preliminary plans
would be $55,000, thus leaving a large margin
for the services of the architects themselves. It
is not unreasonable to assume that the rest of
the work might also be expected to be profitable.

The risk in the case, then, had already been
incurred. This was in doing the preliminary work
for which they might not be paid if the work
was abandoned or the contract not obtained. This
risk had been undertaken more than a year before
Mr. Reed's death, when the first preliminary
work was done. It continued down to the end
of the year 1911, when, as we have seen, the pre-
liminary plans were substantially completed and
all the essential details of the deal between the
Railroad and the Baumann interests had been
worked out. As far as the architects were con-
cerned, the project was then in a condition
where they might, as soon as the contract was
signed, reap the reward for their labor and out-
lay.

In the court below the appellants argued that
the surviving members of a law firm are under
no obligation to account for business secured from
the old clients of the firm. This might well be
true if there were no capitalized value in the
business prior to the work done by the sur-
viving partner. If, however, a case had been
taken upon a contingent fee, and, before the death
of one of the partners, a large part of the labor
had been done which would eventually secure
its reward by a successful termination of the
case, we have no hesitation in suggesting that a
court of equity should compel an accounting if
the surviving partner took over the uncompleted
business with the consent of the client and
then refused to make a proper accounting for

Exhibit A-3

76

the rewards of success. This, we have seen, has been the ruling of the highest courts.

> *Consaul* vs. *Cummings*, 222 U. S., 262, and cases cited *supra* in Points III and IV of this brief.

Whatever may have been the date when, technically speaking, the partnership of the joint firms was ended, there was undoubtedly, after Mr. Reed's death, a joint holding of the assets by the surviving partners. They were trustees for the purpose of obtaining for their beneficiary and themselves the most that could honestly be made from the assets. They were precluded from allowing their individual interests to conflict with their trust relationship.

> *Marston* vs. *Gould*, 69 N. Y., 220, 225.

For the purpose of determining what could be realized from the assets of the old firm, the situation must be considered as it would have been if none of the surviving partners had entered the field as competitors of the old firm. In that way must it be determined whether there was a reasonable chance of obtaining compensation for the work already done and the profits in connection with the completion of the work.

In the light of the findings let us suppose that the survivors had given their undivided efforts to making the most of the unfinished business, pulling together as one team, without thought of competing themselves, against the interests for which they were acting as trustees. We have seen that this was their duty according to the high standard which the law imposes. Can there be any doubt that in that case they could

Exhibit A-3

77

have secured the final designation for this work,
just as Warren & Wetmore in fact secured it?
They were the ones who knew all the ins and
outs of the transaction. They had the organiza-
tion capable of handling the work successfully.
They were the only ones (with the possible excep-
tion of Graham) to whom the Railroad could
turn, and have the transaction go on to a suc-
cessful conclusion without interminable delay and
hopeless confusion.

This was the view adopted by the Trial Justice.
After calling attention to the fact that what had
been done by the architects, had been done with
the reasonable hope of obtaining a formal designa-
tion as architects for the hotel, thus securing com-
pensation and profits for the work already done
and to be done, he says (fol. 512):

> "In view of the facts presented, it seems to
> me that if the surviving partners had all
> striven to procure this work for the Associa-
> tion Architects the probabilities are that the
> work would have been given to them. They
> were in on the ground floor, so to speak, had
> made innumerable plans in connection there-
> with, were familiar with the problems of
> financing the project, and had the organiza-
> tion with which to carry on the transaction to
> a sucessful conclusion without delay and con-
> fusion. Instead of doing this, Warren &
> Wetmore stepped into the situation, com-
> peted for the business of which they were
> trustees, and took for their immediate firm
> not only the financial reward which it was
> their duty to take for the Associated Archi-
> tects, but also to a large extent the credit
> for the masterful work of their deceased
> partner, Reed, who undoubtedly supplied
> many of the fundamental plans for building
> the wonderful hotel structure."

Since the work was not of a speculative nature
and since, as has been held by the Court below,

Exhibit A-3

78

the making of the final plans was only a con-
tinuation of the business that the Associated
Architects were engaged in prior to 1912, it
seems clear that it was their duty as trustees
to so complete the work as to make the most of
it for their beneficiaries. Since the surviving
partners were in position to get the work for
the old firm, and since the old firm was still
organized so that the completion of the work
could be taken care of properly, thus obtaining
compensation and profits for the work done and
to be done, it was the duty of the surviving
partners to classify this as unfinished work and
proceed with it for the old firm if possible. Con-
sidering the attendant circumstances, there is
no doubt that they could have done this. There
is no doubt that they would have done it had
not the defendants conceived the idea of stepping
into the situation themselves, competing with the
business of which they were the trustees, and
snatching for themselves the financial reward
which it was their duty to take for the firm.

## XIII.

### Question Number 4 is objectionable in form.

This question as certified is as follows (fol.
6426):

"4. Are the firm of Warren and Wetmore to
be held accountable to the plaintiff in this action
to the extent of three per cent. or any other pro-
portion of the cost of the Biltmore Hotel?"

It offends the rules laid down by this Court
in that it improperly combines more than one

Exhibit A-3

79

proposition in a compound question, alternative in form, which cannot be categorically answered.

*Devlin* vs. *Hinman*, 161 N. Y., 115;

*Grannan* vs. *Westchester Racing Assn.*, 153 N. Y., 449.

Thus this Court, in determining that the firm of Warren & Wetmore are to be held accountable to the extent of three per cent., by an affirmative answer to this question in its present form, would seem to sanction the proposition that the accounting might properly be for "any other proportion of the cost of the Biltmore Hotel."

It may be that the Court will think it proper to divide this question into two parts, the first one ending with the words "three per cent.," the remainder of the question being formulated as follows: "Are the firm of Warren and Wetmore to be held accountable to the plaintiff in this action for any proportion of the cost of the Biltmore Hotel less than three per cent.?"

## XIV.

**The first two questions should be answered in the negative and the third question in the affirmative. The fourth question, if answered, should be divided into two parts as indicated in Point XIII, the first part being answered in the affirmative and the second part in the negative. The judgment should be affirmed with costs.**

Respectfully submitted,

HAROLD SWAIN,

Attorney for Plaintiff-Respondent.

Exhibit A-3

To be argued by ARTHUR I. STRANG.

# Court of Appeals

## STATE OF NEW YORK

---

ALLEN H. STEM, individually and as
surviving partner of the firm of
Reed & Stem,

*Plaintiff-Respondent,*

against

WHITNEY WARREN and CHARLES D.
WETMORE, composing the firm of
WARREN & WETMORE,

*Defendants-Appellants,*

and

WILLIAM J. REED, as Executor under
the last Will and Testament of
CHARLES A. REED, deceased,

*Defendant-Respondent.*

---

BRIEF FOR DEFENDANT-RESPONDENT, WIL-
LIAM J. REED, AS EXECUTOR OF CHARLES
A. REED, DECEASED.

An interlocutory judgment in the above entitled
action was entered in the office of the Clerk of the

Exhibit A-3

County of New York on the 23rd day of November, 1916, wherein and whereby the defendants Whitney Warren and Charles D. Wetmore, composing the firm of Warren & Wetmore, were directed to render an account of the property and assets of the Associated Architects, so called, and adjudicating that as a part of such assets said defendants should include the profits and emoluments which they received in connection with certain unfinished work in the hands of said Associated Architects and uncompleted on December 31, 1911.

An appeal was taken by said defendants Warren and Wetmore to the Appellate Division of the Supreme Court in and for the First Department, and such appeal resulted in an order of said Appellate Division made the 10th day of January, 1919, and entered in the office of the Clerk of said Appellate a judgment of modification and affirmance and thereafter on the 10h day of February, 1919, a judgment of modification and affirmance was entered pursuant to said order in the office of the Clerk of the County of New York; by an order of said Appellate Division dated the 2nd day of May, 1919, as resettled by the order of said Appellate Division dated the 26th day of May, 1919, the said defendants-appellants were granted leave to appeal to this court and four questions were certified in said order granting leave to appeal.

The decision (fols. 265 to 416) fully set forth the facts on which the action is based.

Summarizing those findings of fact as a matter of convenience it appears that on February 8, 1904, two firms of architects, namely, Reed & Stem and Warren & Wetmore associated themselves by an agreement in writing for the purpose of preparing plans and super-

Exhibit A-3

3

vising the construction of the group of buildings
known as the Grand Central Station, New York City,
and including such other buildings as the New York
Central might desire to entrust to those associates
(Finding of Fact IX and see Fols. 73 to 78).

On the same day the New York Central entered
into a contract with said two firms so associated and
known as "Architects for the Grand Central Station"
(Finding of Fact XI, fols. 86 to 111). By that con-
tract, Charles A. Reed of the firm of Reed & Stem
was nominated and made the executive in charge of
the work and continued in that position until his death
November 12, 1911 (Finding of Fact XII and fols.
93 to 95). After the agreement was made with the
Railroad there was assigned by the Railroad Com-
pany to said Associated Architects the preparation of
plans for numerous buildings, some of which on No-
vember 12, 1911, were fully completed, some of
which were in the course of construction, and in some
cases the plans only had been prepared. (Findings
of Fact XIV and XV.)

After Mr. Reed's death and on December 19, 1911,
an agreement was entered into between the Railroad
Company and the single firm of Warren & Wetmore
(Findings of Fact XXIV and XXV and fols. 163 to
188) wherein Warren & Wetmore were employed as
architects to complete the work which had been as-
signed to the Associated Architects and to do such
other work as might be assigned by the Railroad
Company to them, and on the same day the contract
with the Associated Architects (fols. 86 to 111) was
cancelled by the Railroad Company to take effect
December 31, 1911 (Findings of Fact XXIV and
XXV and Vol. IV fols. 4649 to 4656).

4

Thereafter the New York Central Railroad Company paid to the Associated Architects a sum of money in full payment for all services up to and including December 31, 1911, and no present dispute exists as to the liability to account for such moneys (Findings of Fact XXXIII, XXXIV, XXXV and XXXVI, Plaintiff's Exhibit 34, Vol. 5 Facsimilie copies exhibits).

The Special Term directed said defendants Warren & Wetmore to account, including all moneys received for services after December 31, 1911, in connection with buildings or projects assigned by the New York Central Railroad Company to the Associated Architects and uncompleted on that date.

The Appellate Division of the First Department made four additional Findings of Fact, LXXII, LXXIII, LXXIV and LXXV (fols. 6396 to 6401), and two additional Conclusions of Law, XIV and XV (fols. 6403 to 6404), and modified Conclusion of Law No. IV by restricting the amount for which Warren & Wetmore were to account in so far as moneys received for the plans of the Hotel Biltmore were concerned, (fol. 6402).

As to all other Findings the Appellate Division unanimously affirmed.

The facts relating to the Hotel Biltmore will be summarized in the point hereinafter taken up in reference thereto.

The order permitting this appeal certified the following questions to be answered by this Court, viz.:

1. Was the agreement between the associated architects terminated by the death of Charles A. Reed?

5

2.   By reason thereof was the obligation of the joint adventurers to the railroad company cancelled?

3.   Are the firm of Warren and Wetmore to be held accountable to the plaintiff in this action for the profits made out of the prosecution of the joint enterprise in so far as it related to unfinished work which had been assigned to them prior to the death of Charles A. Reed?

4.   Are the firm of Warren and Wetmore to be held accountable to the plaintiff in this action to the extent of three per cent. or any other proportion of the cost of the Biltmore Hotel?

I

A.

The Court of Appeals has no jurisdiction except to review questions of law.   (New York Constitution, Article VI, paragraph 9.)

No question of law arises relative to Findings of Fact except whether or not there is any evidence to support such Findings.

No appeal lies from an interlocutory judgment as is the instant case, except on questions of law certified by the Appellate Division.   The Appellate Division not having certified any question as to the sufficiency of evidence on which the various Findings of Fact are based, the Findings of Fact as found and modified by the Appellate Division are binding upon this Court and cannot be reviewed.

6

## B.

If, however, this Court shall hold that the sufficiency of evidence is a question that may be considered without being certified by the Appellate Division, we urge that under the rules as recently laid down that this Court is bound in this matter to the facts as found and cannot consider the question whether there is any evidence to support such findings.

Notwithstanding the allowance of an appeal by the Appellate Division, the jurisdiction of the Court of Appeals is not enlarged, and where Findings of Fact have been unanimously affirmed the Court of Appeals cannot consider the sufficiency of the proof.

Reed vs. McCord, 160 N. Y. 330, 335.

Deiner vs. Third Avenue R. R. Co., 162 N. Y. 193, 198.

Porter vs. Consolidated Gas Co., 220 N. Y. 160.

Commercial Bank vs. Sherwood, 162 N. Y. 317.

The unanimous affirmance by the Appellate Division limits the Court of Appeals to an examination of the correctness of the legal conclusions upon the facts found, that is, the Court of Appeals must assume the facts to be as found.

Kissam vs. U. S. Printing Co., 199 N. Y. 76.

Where the Appellate Division makes additional Findings of Fact, no exceptions need be taken to enable the Court of Appeals to review such Findings, but it is limited to the one question of law so far as those Findings of Fact are concerned, namely, is there evidence to sustain them?

Exhibit A-3

Andrews vs. Cohen, 221 N. Y. 148, 152.
In re Houseman, 224 N. Y. 525, 528.

In the present case where the Special Term has
made Findings and they have been unanimously af-
firmed by the Appellate Division, which, however,
makes additional Findings, the Court of Appeals
cannot consider the sufficiency of evidence to support
those Findings of the Special Term unanimously af-
firmed by the Appellate Division, but are bound by
them; they may only consider so far as the evidence
is concerned the sufficiency of the evidence as to the
additional Findings made by the Appellate Division.

Andrews vs. Cohen, 221 N. Y. 148, 152.

Whether the Finding of Fact of the Appellate Divi-
sion number LXXII is a Finding of Fact or a Conclu-
sion of Law may be a close question, but considered as
the former, it is well supported by the agreement be-
tween the firms of Warren & Wetmore and Reed &
Stem (fols. 73 to 78) and the contracts between the
Associated Architects and the New York Central
(fols. 86 to 111).

As to Finding of Fact of the Appellate Division
No. LXXIII, we submit that the first sentence thereof,
namely,

"In the course of the work done by the defend-
ants Warren and Wetmore in and about the prep-
aration of preliminary plans and final or working
plans and specifications for the Hotel Biltmore after
the death of Charles A. Reed, the defendants used
the preliminary plans theretofore prepared by the
Associated Architects,"

8

is practically, if not actually, identical with Finding of Fact No. XLVII found by the Special Term and unanimously affirmed by the Appellate Division; therefore, any consideration of evidence to support this portion of Finding of Fact LXXIII is unnecessary.

The balance of such Finding of Fact LXXIII is, we submit, a statement in other language of the facts found by the Special Term and set forth in Findings of Fact XLVII, XLVIII, XLIX, L and LIII.

Finding of Fact number LXXIV is in substance a finding that the supervision of the construction of the Biltmore Hotel was not one for which the defendants are accountable in this proceeding, and as the respondents do not appeal to this Court, such fact throws no light or has no bearing upon the question to be considered here.

As to Finding LXXV, it is in substance to the effect that the plaintiff did not offer to contribute his time and skill to the supervision of the construction of the Hotel Biltmore, nor did he demand any participation therein; and as to that the same statement applies, namely, that the respondents do not appeal, and, therefore, it is of no moment in the question before this court.

If, therefore, we have stated correctly the rules of law applicable to this appeal and the comments upon the Findings of Fact made by the Appellate Division above are sound, the result is, in fact, that this court has but a single question before it, namely, do the facts as found by the Special Term and unanimously affirmed by the Appellate Division justify the conclusions drawn by the Appellate Division and compel a negative answer to the first two questions and an affirmative answer to the third and fourth questions?

Exhibit A-3

9

### C.

It is also well settled that any question submitted must be so framed as to determine the whole controversy.

Blaschko vs. Wurster, 156 N. Y. 437, 444.

We believe that even if the association agreement between the two firms of architects was terminated by the death of Reed, and that thereby the obligation of the joint adventurers to the railroad company was terminated, or in other words, that even if the first two questions were answered in the affirmative, still under the facts found, showing that the cancellation of the railroad contract was brought about by the improper solicitation of the appellants, the Court is justified in directing the appellants to account for the assigned and unfinished work. Assuming that no active solicitation was proven, one cannot conceive of a client cancelling a contract with a partnership because of the death of one partner and re-letting that contract to the surviving partner under the same terms and conditions, but solely for the benefit of the surviving partner, without necessarily implying therefrom that such surviving partner solicited or pursuaded the client to make such a contract. It is true that the client may cancel a contract because of the death of one of the partners, because, having contracted for the services of A and B, he is entitled to the services of both, but if he makes a new contract with A, he gets the same services that he would have if he did not cancel it, and the only one deriving any benefit is the surviving partner, A. But whether we are correct in that or not, in a case where, as we have in the present case, shown that such cancellation was at the active solicitation of the surviving partner, there is only one answer, namely, that the survivor must account.

Exhibit A-3

10

If we are correct in that, then this Court should decline to answer the first two questions under the authority of Blaschko vs. Wurster (supra).

Again assuming for the purpose of argument that the third question stated by the Appellate Division is a question of law, we submit that the fourth question is a question of fact, which this court cannot and should not answer. It may well be that in a case as the one at bar the question as to whether or not they should account for unfinished business is a question of law, but what that unfinished business is, is surely a question of fact. Certainly, the fourth question is framed so as to be a question of fact, not only as to what work he should account for, but the value of that work. If the fourth question is a question of fact, as we have pointed out above, then the only question of law relative to it that this Court should consider is whether there is any evidence to support the Finding of Fact that they should account for three per cent., but that question of law is not certified by the Appellate Division.

We believe, therefore, that there is only one question before this Court, namely, whether or not the appellant should account for unfinished work and that that question of law must be determined upon the Findings of Fact, both those made by the Special Term and those made by the Appellate Division. We have, however, endeavored to answer the various questions upon their merits.