11

## II

## WAS THE AGREEMENT BETWEEN THE AS-SOCIATED ARCHITECTS TERMINATED BY THE DEATH OF CHARLES A. REED?

While no question is or can be raised as to the general proposition that death dissolves a copartnership, it is equally true that copartners may provide in express or implied terms that such shall not be the result of the death of any one of them.

In re Marx, 106 App. Div. 212.

The death of Charles A. Reed did not dissolve the copartnership or association for the following reasons:

1.   The association agreement itself indicates that it is an agreement between the firms rather than between individuals, and that while Mr. Reed was to be the executive head, there was express provision in the fourth paragraph of the agreement (fol. 76) how his successor should be appointed.  That of itself shows that they contemplated the possibility that Mr. Reed's position might become vacant "by resignation or otherwise."

2.   The agreement between he railroad company and the Associated Architects has a similar arrangement in paragraph fourth of that agreement, and even more emphatic because it particularly mentions the possibility of the death of Charles A. Reed and provides that in such case the railroad company shall have the right to designate which one of the architects shall be the executive head (fols. 94-95).

Exhibit A-4

12

3.   The fact that the new agreement made between the railroad company and Warren & Wetmore on or about December 19th, 1911 (fols. 163-188), which provided that Warren & Wetmore should become the architects after December 31st, 1911, and the fact that the railroad company notified the Associated Architects that the old contract of February 8th, 1904, should terminate December 31st, 1911, without any reference to the death of Mr. Reed as the cause of terminating (fols. 4649-4656), clearly shows the intention of the survivors, including the railroad company, that the death of Mr. Reed should not be considered as terminating or dissolving the associated partnership on the date of his death.

4.   The fact that Mr. John E. Howe, one of the members of the firm of Warren & Wetmore, died in August, 1908, and that Mr. Lloyd Warren, another one of the firm of Warren & Wetmore, retired from that firm in March, 1905 (fol. 293), shows that the parties did not consider that the Associated Architects were dissolved by any occurrence which affected the firm of Warren & Wetmore.

All of these facts indicate and show that the death of Mr. Reed was not intended to cause a dissolution of the partnership, and furthermore, that none of them, after its occurrence, considered that it did.

Exhibit A-4

13

## III

## BY REASON THEREOF WAS THE OBLIGATION OF THE JOINT ADVENTURERS TO THE RAILROAD COMPANY CANCELLED?

If the Associated Architects were not dissolved by the death of Reed, the agreement with the railroad company was certainly not affected. The death of one member of the partnership can certainly be excluded by agreement as cause for ending the contract and much that is said in answer to the first question is applicable here. The agreement between the railroad company and the Associated Architects expressly provides for the appointment of a successor in case of Mr. Reed's death. The railroad company had all the protection it needed by its distinct reservation of the right to cancel the contract at any time with or without cause. His death would be a cause for cancellaion but did not of itself cancel the agreement.

If the Associated Architects were dissolved as to finished matters and not as to unfinished ones, the decision reached in this case is the only one possible in equity for it compels the accounting of only unfinished matters.

The appellants based their argument in the lower courts upon three alleged propositions of law, viz.:

(1) The death of a person under a contract to perform personal services terminates the contract.

(2) The death of a member of a firm terminates the contract of an employee to render personal services to the firm.

Exhibit A-4

(3)   The contract of a firm which has undertaken to render professional or other personal services is terminated by the death of a member of the firm.

They then assert that the case in question is controlled by such propositions, and conclude therefrom that the contract between the railroad company and Warren & Wetmore was legal and equitable and that there is no obligation cast upon Warren & Wetmore to account for the proceeds thereof.

It is submitted that though the three propositions at law may be correct in a limited and abstract sense, nevertheless they form incorrect premises as applied to the instant case.

A true and correct statement of the principle of law referred to in the first paragraph is found in Lorillard vs. Clyde, 142 N. Y., 456, 462, where the Court said:

"When the performance (that is, of a contract) depends upon the continued existence of a given person or thing, and such continued existence was assumed as the basis of the agreement, the death of the person or the destruction of the thing puts an end to the obligation."

See also Sargent vs. McLeod, 209 N. Y. 364.

Examples of the application of this principle come to one's mind at once, for instance, in the contract of an actor or singer for his personal services, in either of those capacities. It is not every contract for services that comes under the correct application of that principle. There is simply a covenant implied in a contract for services, and if the facts do not justify

Exhibit A-4

13

the implication or if the parties expressly exclude such implication, no Court would imply such a covenant.

In the present case the fact that the association agreement and the agreement between the railroad company and the Associated Architects contain an express provision for the appointment of a successor to Mr. Reed in case of his death or resignation or removal; the fact that the new agreement between the railroad company and Warren & Wetmore provided that the latter should become the architects after December 31st, 1911; the fact that the railroad company gave formal notice of the cancellation of the old contract, to take effect December 31st, 1911, without any reference to the death of Mr. Reed as a cause for terminating such contract; the fact that one member of the original firm of Warren & Wetmore died and another retired; all of these facts as pointed out above indicate clearly that in the present controversy the parties to the contract at the time of executing the same and at the time of terminating the same, never considered that the death of any partner of itself would terminate the contract between the railroad and the Associated Architects. There never was any necessity for the parties to rely upon that doctrine, for the railroad had reserved the right to cancel the contract when it saw fit, with or without reason.

As to the second proposition, it may be accurate, but it has not the slightest application to the present case.

As to the third proposition, we believe that while the death of a member of the firm may terminate the contract, it is only so when into such contract there can be implied a covenant of the continued existence of all members of the firm as a basis of such contract, depending upon the identical theory that is set

Exhibit A-4

forth in the first proposition. Of course, a contract of an employment of architects is a contract for services, and of course, the railroad would consider the personality of the architects, but that is far short of stating that the continued existence of each member was a basic condition.

Under the original contract the railroad company had the right to designate either Mr. Warren or Mr. Wetmore as executive. The railroad company also had the right to terminate the old contract but to permit Warren & Wemore to use the strict legal rights of the railroad for the sole purpose of depriving Reed & Stem of a fair proportion of the money reward is unfair and inequitable. Mr. Reed had borne the brunt for years and shared the proceeds with Warren & Wetmore, and it is not unfair to require Warren & Wetmore to take their share of the burden and share the proceeds with Reed & Stem. If Warren & Wetmore had sufficient influence with the railroad to obtain the contract for themselves and exclude Reed and Stem, they surely had sufficient influence to obtain the designation of either of themselves as the executive for the benefit of the Associated Architects. The same parties in either case would do the work and the railroad had no interest in the division of the proceeds.

The principal authority cited by the appellants was the case of Baxter vs. Billing, 83 Federal Reports, 790, andthe only New York cases cited by that authority are Martine vs. Society, 53 N. Y. 339, and Salisbury vs. Brisbane, 61 N. Y. 617. The Martine case was simply to the effect that where a partnership is appointed as agent the dissolution of the firm is a termination of the appointment because the continued existence of such partnership was a basic element in the employment. The Salisbury case holds that where

two persons appointed agents, jointly, and one be-
comes incapacitated, the principal has the right to
terminate the appointment. It does not hold that the
partnership is terminated, but that it is cause for ter-
mination.

Certainly the association was not dissolved for any
unfinished matters but would continue until the final
discharge of all its obligations either to third parties
or between themselves.


## IV

IS THE FIRM OF WARREN & WETMORE TO
BE HELD ACCOUNTABLE FOR THE PROFITS
MADE OUT OF THE JOINT ENTERPRISE IN SO
FAR AS IT RELATED TO ANY UNFINISHED
WORK WHICH HAD BEEN ASSIGNED TO THEM
PRIOR TO THE DEATH OF CHARLES A. REED?

Joint adventurers are subject to the same rules in
equity as are partnerships; their relations and liabili-
ties as between themselves are just as strong as those
between partners, and in one sense they are copart-
ners.

Selwyn & Co., vs. Waller, 212 N. Y. 507.

Just as in the case of a partnership the joint adven-
ture cannot be dissolved so as to affect past engage-
ments. Such engagements are the assets and the
property of the joint adventurers, and the dissolution

Exhibit A-4

only affects future engagements.  Each one just like a copartnership is under the duty and obligation that he was before, namely, to give his best efforts for the benefit of such joint adventure, to complete the unfinished engagements for its benefit and to take no advantage of his knowledge or of his power for his personal profit.

> Kennedy vs. Porter, 109 N. Y. 526 and cases cited at 552.
>
> Castle vs. Marx, 50 App. Div. 320, 322.
>
> Griswold vs. Waddington, 16 John 438, 493.

In speaking of certain unfinished contracts in Castle vs. Marx (supra), Judge McLoughlin says, at page 322:

> "This asset belonged to the partners according to their respective interests in the firm, and neither could be deprived, without his consent, of such interest by the act of the other.  The relation between partners is a fiduciary one.  Each must act towards the other honestly and whatever he does must be done with the utmost good faith, having in view the interest of his co-partners as much as his own. This is elementary."

It is urged that the New York Central, having the right to cancel the contract, and having done so, it was then in their power to contract with any one to complete the unfinished work, including Warren & Wetmore, and that the latter on their part were justified in accepting the contract for their sole benefit. With all due respect, we are compelled to differ with that suggestion.  We believe it to be erroneous in law and in morals, and in partnership matters, if in

no other branch of the law, good morals is good law.

We must concede that by the wording of the contract of employment the New York Central had a right to cancel such contract, with or without justification. Throughout this whole controversy we have conceded that right to the railroad, and we have no desire to change our position. There is no doubt that if the railroad saw fit to cancel the contract they could have employed any other person they wished to complete the unfinished work and antecedent engagements with the Associated Architects, but we insist that this action is subject to the limitation that Warren & Wetmore had no right to accept a contract from the railroad to complete such work without being liable to account to their former partners for moneys received. The New York Central owed no duty to the Associated Architects or any member of that partnership, but Warren & Wetmore did owe that duty, and if they proved false to it the Court should hold them responsible.

Whether the Associated Architects were dissolved on December 31, 1911, or on any other date, the fact remains that Warren & Wetmore were the liquidating partners of that co-partnership and they did owe an affirmative duty to their former partners, and the very highest duty at that. It was for them to complete all unfinished work and all antecedent engagements for the benefit of the Associated Architects. The dissolution of the co-partnership did not of itself cancel the contract with the railroad, although it might be a justifiable reason for such cancellation.

Little vs. Caldwell, 101 California Rep., 553.
United States vs. U. S. Fidelity & Guaranty Co. 139 App. Div. 262, 265.
Salisbury vs. Brisbane, 61 N. Y. 617.

20

Warren & Wetmore were, therefore, required to use all honorable means to persuade the client of the Associated Architects to permit the work to be completed for the benefit of the Associated Architects; they had no right even to sit idly by and, without an effort, let the railroad company, after canceling their contract, make an arrangement with anyone else to complete it. True, they could not compel the railroad company to permit the completion of the work by the Associated Architects, but they must make an effort to get such permission. If the railroad company had seen fit to contract with other architects, or to do it itself, no one could hold Warren & Wetmore responsible, and it would be a valid answer to any complaint for Warren & Wetmore to show that they had done what a reasonable person was expected to do, and, through no fault of their own, the railroad had seen fit to refuse to permit the work to be completed. We cannot complain because the railroad company cancelled the contract, but we can and do complain because Warren & Wetmore completed it for their individual benefit and not for the benefit of the Associated Architects.

Whether the completion of the unfinished work and antecedent engagements was simply by carrying out the plan suggested in the original employment agreement and in the association agreement, namely by the designation of a new executive, or whether it was to be completed by a new contract or under new arrangements, makes no difference; the result must be the same. If the railroad desired a new contract with certain individuals to better protect the railroad's interest, it was the duty of Warren & Wetmore to comply, but everything that they did should have been for the benefit of the Associated Architects and not for themselves.

A very important point to be considered is the fact that Warren & Wetmore completed the contract with the same force of draughtsmen, the same heads of departments, and in the very same offices (Finding of Fact XXVIII). If the railroad had simply designated Mr. Warren or Mr. Wetmore as executive, as they had the right to do, Warren & Wetmore would and could not have acted any differently so far as their part in the completion of the unfinished work and antecedent engagements was concerned. No Court of Equity should permit Warren & Wetmore to use the new contract as a sword to cut off Reed & Stem; that new contract can only be permitted to be used by Warren & Wetmore as a shield to prevent Warren & Wetmore from being held to account for anything more than was included in it.

It simply shows the best arrangement they could make with the New York Central, and for that they are and should be held accountable.

The mere fact that the New York Central was willing to make a new contract with Warren & Wetmore to complete the unfinished work and antecedent engagements being under the old contract conclusively shows that the railroad company had not the slightest complaint of the method or manner in which the Associated Architects were doing their work, and if the railroad was willing to permit the work to be finished, surely Warren & Wetmore cannot use that new contract as an excuse or reason for their failure to perform their duty to their former partners. The completion, under the guise of the new contract with Warren & Wetmore, was nothing but the completion by the liquidating partners in a new dress, and equity looks to the substance, not the form. The duties of Warren & Wetmore were in reference to the subject matter of the contract, not to the written paper itself.

22

An examination of the decided cases shows how insistent the Courts of Equity are that liquidating partners should treat former partners with scrupulous honesty.

> Mitchel vs. Reed, 61 N. Y., 123.
> Denver vs. Roane, 99 U. S., 355.
> Consaul vs. Cummings, 222 U. S., 262.
> Little vs. Caldwell, 101 California, 553.
> Castle vs. Mark, 50 App. Div. 320.
>    Approved in same case reported as Hasbrouck vs. Marks, 58 App. Div. 33.
> Spiess vs. Rosswog, 63 How. Pr., 401, affirmed 96 N. Y., 651.
> Tolen vs. Carr, 12 Daly 520.
> Spears vs. Willis, 69 Hun., 408, see same case 151 N. Y., 443.
> King vs. Leighton, 100 N. Y., 386.

The case of Spiess vs. Rosswog (supra), affirmed 96 N. Y. 651, is more particularly in point because in that case the co-partnership had been dissolved and the firm was in the process of liquidation. One of the liquidating partners procured a new lease of the premises from the date of the expiration of the partnership lease, and the action was brought to declare such renewal lease to be for the benefit of the partnership. The Trial Court dismissed the complaint, but the General Term reversed, and says at page 402:

> "The fact in this case, which the learned counsel for the respondents argues distinguishes it from those cases in which a partner taking a renewal of the partnership pleases has been held a trustee of the firm, is that the defendant, Constantine Rosswog, obtained them after the firm was dissolved. This dissolution did not annul or change those relations

between the parties which are the basis of the obligation in such cases. After the dissolution the original leases remained partnership property for the purpose of liquidation. The obligation of each partner to deal with them, not for his individual benefit, but for the common or joint interest, remained. The trust as to the use of the partnership property remained attached to these leases as part of their value was the so-called expectation of renewal."

In Denver vs. Roane (supra), the controversy was between members of a co-partnership of lawyers, the administrator of a deceased partner demanding an accounting for fees received by the liquidating partner for work undertaken by the co-partnership. The Court, at page 272, says:

"That these services extended over a long period does not increase his share nor lessen Edmond's interest in the profits. Under the contract, Moyers agreed to prosecute the claims and could neither abandon them without just cause nor advise clients to put them in the hands of others. If he did so, he is chargeable with the fees which should have been earned by him under the articles of partnership. Neither can Edmonds interest be diminished on the ground that the contract of employment by the client was revoked by his insanity or death. They made no such objection and apparently acquiesced in Edmonds' arrangement by which they were put in the hands of Moyers. The survivor cannot retain the business thus coming to him by virtue of a contract with Edmonds without accounting for his share of the fees."

The case of Little vs. Caldwell (supra) is decidedly in point and has many striking similarities to the case at bar. In that case a firm of attorneys had a certain

contingent arrangement for the conduct of a certain
litigation. Before the completion of the litigation
one of the partners died, and the Court points out that
thereupon a client had a perfect right to consider the
employment terminated, but that that is an option in
favor of the client, and if he is willing to entrust the
survivor with the further management of the litiga-
tion, the survivor is bound to complete the unfinished
litigation for the benefit of the partnership. The cli-
ent, in fact, made a new contract with the surviving
partner at an increased rate of compensation, certain
additional burdens being assumed by the surviving
partner in return for the new contract. After con-
sidering the facts and pointing out the general prin-
ciples governing partnerships ,the Court, at page 561,
says:

"Applying the foregoing general principles to
the facts of this case as stated in the complaint we
have no difficulty in reaching the conclusion that
the plaintiff is entitled to recover. The contract
by which Little and defendant were employed to
conduct the litigation referred to in the complaint
did not ipso facto become extinguished upon the
death of Little; the persons with whom it was made
did not refuse to permit the defendant to complete
it because death had deprived them of the personal
services of his deceased partner, but they desired
for other reasons to modify it in such a manner as
to relieve themselves from some of its burdens,
and, in consideration of the assumption of such
burdens by defendant, offered him an increased
compensation in the event of final success; and
when the defendant consented to this modification
of the contract, the right of the state of the deceased
partner to share in the contingent fees to the extent
given by the contract in its original form was not
extinguished. The defendant was at liberty to con-

sent to this modification, and, as the partnership loses no rights thereby, no principle of equity will be violated by permitting him to retain the increased compensation given in the modified contract by reason of the increased personal risk which he assumed. It follows from these views that upon the facts, as stated in the complaint, the plaintiff is entitled to recover one-half of the fifteen per cent. provided for in the original contract, after deducting all proper expenses chargeable to the partnership in the matter of conducting the litigation."

The case of Castle vs. Marx (supra) is so much in point, we have taken the liberty of going into the facts somewhat in detail.

In June, 1898, the plaintiff and defendant, by an oral agreement, associated themselves under the name of The M. Powers Company for the purpose of dealing in fire supplies in the City of New York; no time was fixed for the continuance of the firm, and on October 19th, 1898, the firm entered into two (2) contracts, one with the La France Fire Engine Company and the other with The American Fire Engine Company, by which it was given the sole and exclusive agency for a term of three (3) years to sell certain supplies to the fire department of the City of New York. The business appeared to be profitable to the extent of the sum of Twelve Thousand Dollare ($12,-000) up to March 5th, 1899. The firm was a partnership at will and the defendant terminated the same by a notice given March 5th, 1899, and on March 6th, 1899, he notified the two engine companies that the co-partnership had been terminated and requested that a representative of each company meet him at Albany on March 8th, 1899, to arrange for the surrender of their contracts with The M. Powers Company.

26

The defendant did meet those representatives on March 8th and the contracts with The M. Powers Company were then surrendered and each company entered into a contract with the defendant personally upon, substantially, the same terms and conditions as were embodied in the prior contracts. The defendant went ahead with those personal contracts, and up to the time of the trial received a profit on such contracts which amounted to the sum of Four Thousand Dollars ($4,000).

The case book and briefs on appeal show that the defendant made two principal contentions, namely: (1) That the partnership was at will and was terminable at pleasure; and (2) that personal services were called for so that the companies had a right to cancel the contract and make a new arrangement with anyone to carry it out.

The plaintiff claimed that neither partner had the right to surrender the contract or enter into a new contract with the engine companies for his sole benefit so as to prevent the new contract from inuring to the benefit of both co-partners.

The Trial Court held that the engine companies upon the dissolution of the firm of The M. Powers Company, had a perfect right to cancel the agreement with The M. Powers Company and to make a new contract with whomsoever they saw fit.

The Appellate Division most emphatically differs with the lower Court and states, at page 323:

"Applying the principle alluded to in these authorities to the facts in this case, it must be held that the contracts entered into by the defendant personally belonged to and constituted an asset of the firm of The M. Powers Company. It cannot be that

27

one member of a firm which is the owner of valua-
ble contracts having over two (2) years to run can
surrender them without the consent of his co-part-
ners, and by so doing procure contracts in which he
alone has a personal interest. The law will not
sanction transactions of that character, nor will it
permit partners thus to deal with each other."

It has always been conceded that the Railroad Com-
pany had the absolute right as between themselves
and the Associated Architects to cancel the contract
of employment, and the Associated Architects would
probably have no right in law or in equity to com-
plain thereof, and even if it be conceded that in such
a case the New York Central had the further right to
make the new contract with Warren & Wetmore to
complete the work, we submit that such is not the law
in the face of Findings of Fact, numbers XVIII, XIX,
XX, XXI, XXII, XXVI, XXIX, XXXI and XXXII,
which are as follows:

"XVIII. From a date prior to November 8,
1904, to February 1, 1909, William H. Newman
was president of the New York Central and Hudson
River Railroad Company. As such president said
William H. Newman was acitvely engaged in the
affairs of the Railroad Company with which the
Associated Architects had to do. After he ceased
to be president he continued to be a director of said
Railroad Company and at the request of the suc-
ceeding president and the said Railroad Company,
he continued, on behalf of said company, to be
actively engaged in connection with the develop-
ment above referred to and the matters with which
the Associated Architects had to do in the course of
the fulfillment of their duties."

"XIX.  On November 16, 1911, the defendant Charles D. Wetmore wrote and sent, from the private office of Warren & Wetmore, a letter to William H. Newman, on the letter-head of Warren & Wetmore ,as follows:

'November 16, 1911.

Wm. H. Newman,
   Grand Central Station,
      New York City.

Dear Mr. Newman:

I am enclosing the proposed contract which is intended to follow the old form in all particulars except that Warren & Wetmore are the Architects. I would be glad to take the matter up with you in person at any time that may suit your convenience.

At the death of Mr. Reed the old contract is terminated and a new contract becomes necessary. I would suggest that the old arrangement be terminated as of the 15th day of November and accounts be settled as of that date and any new arrangements that may be made shall commence as of that date.

You will note that under clause "Sixth" of the contract between your Company and the Architects you have the right to terminate the agreement at any time.

Very truly,

CHARLES D. WETMORE.

I enclosure.' "

"XX.  The foregoing letter was written without any suggestion on the part of the Railroad Company and without the knowledge or consent of the plaintiff or any representative of the estate of Charles A. Reed, the plaintiff and William J. Reed,

who was named in the will of Charles A. Reed as
his executor, being then absent from the City of
New York attending the ceremonies incident to the
interment of said Charles A. Reed."

"XXI.   Enclosed with the letter of the defendant
Charles D. Wetmore to William H. Newman, dated
November 16, 1911, was a proposed contract
which, upon the trial of this action, was produced
by the Railroad Company and received in evidence
as Plaintiff's Exhibit 242, which contract was in all
of its essential features identical with and similar
to the employment agreement of February 8, 1904,
between the Railroad Company and the Associated
Architects, except that it was with the defendants
Whitney Warren and Charles D. Wetmore as co-
partners, instead of the associated firms and the
various members thereof."

"XXII.   No record of the writing or the sending
of the letter of the defendant Charles D. Wetmore
to William H. Newman of November 16, 1911,
heretofore referred to, was made or kept in the
office or records of the associated firms, but a copy
thereof was retained in the personal letter-book of
the defendant, Charles D. Wetmore."

"XXVI.   At no time was any suggestion made to
the Railroad Company by or on behalf of the firm
of Warren & Wetmore, that the old relations with
the Associated Architects be continued until the un-
finished business was completed, and the defend-
ants Whitney Warren and Charles D. Wetmore
made no effort to be allowed to complete the un-
finished business of the Associated Architects for
and on behalf of said Architects.  Said defendants
Whitney Warren and Charles D. Wetmore did not
consult the plaintiff or any one connected with the
estate of Charles A. Reed as to the dealings which
should be had with reference to the unfinished work

or as to the program that was to be adopted with regard to the Railroad Company. Neither the plaintiff nor any one representing the estate of Charles A. Reed knew of the making of the agreement of December 19, 1911, between the New York Central and Hudson River Railroad Company and Warren & Wetmore before the same had been executed and neither the plaintiff nor any representative of said Reed estate consented to the making of said new agreement or its substitution for the employment agreement of February 8, 1904."

"XXIX.  The cancellation by the Railroad Company of the contract of February 8, 1904 between the Railroad Company and the Associated Architects and the execution of the new contract of December 19, 1911, between said Railroad Company and the firm of Warren & Wetmore were brought about by the secret actions and the solicitation and procurement of the defendants Whitney Warren & Charles D. Wetmore, and with the purpose and intent of excluding the plaintiff and the estate of Charles A. Reed from any profits and emoluments which would accrue after December 31, 1911, in connection with the work which the Associated Architects had in hand and under way and uncompleted on December 31, 1911.

"XXXI.   Prior to December 19, 1911, the date when the agreement between the Railroad Company and the firm of Warren & Wetmore was made, neither the plaintiff nor any representative of the estate of Charles A. Reed received any notice that the defendants Whitney Warren and Charles D. Wetmore were seeking to obtain a new contract for themselves for the completion of the work which was then in the hands of the Associated Architects and uncompleted.

"XXXII.   The terms and provisions of said agreement between the Railroad Company and the firm of Warren & Wetmore of December 19, 1911, were not made known to the plaintiff until November 29, 1912."

Those Findings were made by the Special Term and having been unanimously affirmed by the Appellate Division become facts which cannot be changed or even the evidence considered by this Court.

Those facts clearly justify the judgment in this case compelling the defendants Warren & Wetmore to account, even if this Court has answered the first two questions in the affirmative.

A mere reading of the new contract between the New York Central and Warren & Wetmore (Vol. 1, Fols. 163 to 189) shows clearly that the New York Central Company not only contemplated using many plans of projects not formally assigned to the Associated Architects but actually done by them, but desired to protect themselves from any double liability and therefore caused the new contract to compel Warne & Wetmore to finish such old plans to date, and to indemnify the New York Central against any liability therfeor. (See particularly Vol. I, Fols. 172 to 183.)

32

## V.

### ARE THE FIRM OF WARREN & WETMORE TO BE HELD ACCOUNTABLE TO THE PLAINTIFF IN THIS ACTION TO THE EXTENT OF THREE PER CENT. OF ANY OTHER PROPORTION OF THE COST OF THE BILTMORE HOTEL?

The facts relating to the Hotel Biltmore may be found in Findings of Fact XXXVII to LIII, both inclusive, and the appellants and respondents must stand or fall so far as the facts are concerned on what is therein found.

As a matter of convenience only, we summarize those findings.

In or about 1910 the New York Central opened negotiations with one Baumann for the construction of a hotel in connection with the Grand Central Station. Mr. Baumann was assisted by his own architects, B. H. Burnham & Co., and the Railroad was advised by the Associated Architects. Prior to Mr. Reed's death, November 12, 1911, these negotiations had resulted in the preparation of elaborate and detailed plans, prepared by the Associate Architects sufficiently complete to permit the negoitation of a lease between the Railroad Company and the interests represented by Mr. Baumann, who were to operate the same. After Mr. Reed's death, Mr. Schulze, an employee of the Associated Architects, continued such negotiations, with the result that on December 13, 1911, the Board of Directors of the New York Central considered a formal proposition as to the lease to the Baumann interests, and on December 22, 1911, the Baumann interests were incorporated, as it were, into

the Beau Site Company, of which Mr. Baumann owned practically all the stock.

Within two months, namely, February 15, 1912, a formal agreement and lease were made between the parties interested, calling for the erection of the hotel and providing that the building was to be constructed in accordance with certain preliminary drawings, bearing date on that day, and prepared by Warren & Wetmore. These preliminary plans were practically identical with the preliminary plans prepared by the Associated Architects, and the resulting hotel conformed substantially to the original preliminary plans prepared by the Associated Architects, with such minor changes and departures as are usual and customary in the construction of buildings. It is distinctly found (Finding of Fact XLIX) that the parties interested were satisfied as to the essential features and plans of the new hotel prior to January 1, 1912.

The formal designation of Warren & Wetmore as architects did not occur until on or about March 11, 1912, and their compensation was designated at five per cent., which later is modified by a supplemental agreement or memorandum dated February 21, 1913. (See Finding XLV.)

The Findings of Fact above referred to give in detail the above facts and there is only one conclusion that can be drawn therefrom, namely, that the preliminary plans referred to in the contract between the Railroad and the Beau Site Company were for all practical purposes completed before the death of Mr. Reed. It is true that there was no designation and no binding agreement requiring the Railroad and the Beau Site Company to use the plans prepared by the Associated Architects, but where in fact they did, it

is submitted there can be only one conclusion, and the Appellate Division had no hesitancy in arriving at the conclusion that the appellants should account to the respondents for the percentage received for the preparation of all plans, on the theory that there had been, in equity at least, assigned to the Associated Architects the task of preparing all plans for this hotel. The Appellate Division stopped there, and differing from the Special Term concluded that the supervision was distinct, and as the Railroad Company might well designate other architects to supervise, that part of the contract had not been assigned to the Associated Architects, and for the supervision the appellants need not account.

The Appellate Division limited the appellants to accounting to the extent of three per cent. of the cost of the Biltmore, upon the theory apparently that in the contract between the New York Central and Associated Architects dated February 8, 1904 (fols. 86 to 111) the compensation of the architects was determined by the agreement to be one per cent for preliminary plans and estimates, two per cent. for working plans and specifications, and one per cent. for supervision, the aggregate being four per cent. Bearing in mind that the preliminary plans and estimates were practically completed and paid for by the Associated Architects and about which there could be no question as to the liability of the Appellants to account, it compelled the appellants to account for an additional two per cent. as representing the fair compensation for preparation of the working plans and specifications. As the appellants in an accounting are, of course ,entitled to credit themselves with the actual expense, no hardship is done them in the result reached by the Appellate Division.

35

It is respectfully urged that if it is within the power of the Court of Appeals more even justice could be done by requiring Warren & Wetmore to account for three and three-fourths per cent., as it appears by Finding of Fact XLV that the appellants' compensation was increased so far as the Hotel Biltmore was concerned to five per cent. In other words, if their compensation was increased generally twenty-five per cent. why should it not be said that they received an additional twenty-five per cent. for the plans? The question as allowed by the Appellate Division, submits to this Court as to whether the appellants are liable to account for three per cent. "or any other proportion" of the cost of the Biltmore Hotel, and although the respondents have not appealed, we submit that this Court can modify the Appellate Division as long as the Appellate Division has modified the Special Term.

The Appellants to succeed must satisfy this court that it is proper for one joint adventurer to use all of the material in the way of plans for which the Associated Architects paid and which in fact the genius of Mr. Reed created, and obtain all the profit. The expense must have been tremendous, for the court well knows the amount of time it must have taken to prepare the many preliminary sketches and ideas. After that to allow a partner to practically steal them and by making draughtsman's copies to collect from the client of both partners $50,000 or $60,000, would be so inequitable that it would almost shock the conscience of the court to even argue it.

## VI.

WE SUBMIT, THEREFORE, THAT QUESTIONS ONE AN DTWO SHOULD BE ANSWERED IN THE NEGATIVE AND QUESTIONS THREE AND FOUR IN THE AFFIRMATIVE, OR IN  THE  COURT'S DISCRETION, BY ANSWERING THE FOURTH BY INCREASING THE AMOUNT TO BE ACCOUNTED FOR BY THE APPELLANTS  TO  THREE  AND THREE-FOURTHS PER CENT. OF THE TOTAL COST OF THE BILTMORE, AND THE JUDGMENT AFFIRMED WITH COSTS.

STRANG & TAYLOR,

> Attorneys  for  Defendant-Respondent, William J. Reed as Executor of Charles A. Reed, deceased.

ARTHUR I. STRANG,
CLINTON T. TAYLOR,
     of Counsel.

# COURT OF APPEALS

### STATE OF NEW YORK.

ALLEN H. STEM, individually and as surviving partner of the firm of Reed & Stem,

*Plaintiff-Respondent,*

*against*

WHITNEY WARREN and CHARLES D. WETMORE, composing the firm of WARREN & WETMORE,

*Defendants-Appellants,*

*and*

WILLIAM J. REED, as Executor under the last Will and Testament of CHARLES A. REED, deceased,

*Defendant-Respondent.*

## SUPPLEMENT TO RESPONDENT'S BRIEF.

## Correspondence, etc., chronologically arranged.

HAROLD SWAIN,
*Attorney for Plaintiff-Respondent,*
176 Broadway,
New York City.

Exhibit A-4

Exhibit A-4

1

**Plaintiff's Exhibit 23.**

314 Madison Avenue.

Telephone 2741-38th St.

GRAND   CENTRAL   STATION
ARCHITECTS

REED & STEM          WARREN & WETMORE

When answering letter mention
Subject ........................................................

June 9th, 1908.

Mr. G. W. Kittredge,
    Chief Engineer, 335 Madison Ave.,
      N. Y. City.

Dear Sir:-

Referring to your letter of June 8th, and our interview thereafter, in regard to payments to the Grand Central Sta. Architects.

The preliminary plans for the future extension of the Post Office Building to 18 stories in height was sent to Mr. Wilgus on Dec. 30th, 1905, in the shape of two sets of blue prints for his files, with our estimate of $7,000,000 for completing the building.

We send you with this a blue print file of the record plans and maps of our study for future buildings north of 45th Street which give the location of all the columns, their loads and details for the major part of this space. The plans and sections herein given is the standardization of preliminary plans we have drawn for the Grand Central Palace Co., Express Com-

Exhibit A-4

2

panies, Y.M.C.A. Building, Apartment Houses, besides the study given personally by the Architects in order to secure supports for the height of buildings shown that could be used for any purpose. This data has been requested and used throughout in planning the track work by the Terminal Engineers.

In accordance with the terms of the contract with the Architects the Railroad Co. reserves the right to estimate on the value of this work for the monthly payments.

Yours truly,

GRAND CENTRAL STATION ARCHITECTS.
C. A. REED, Executive.

CAR/L