3

## Plaintiff's Exhibit 22.

NEW YORK CENTRAL & HUDSON RIVER
R. R. CO.

K-A

New York, July 3rd, 1908.

Dictated by Mr. Kittredge.

Mr. C. A. Reed,
  c/o Grand Central Station Architects,
    #314 Madison Avenue, New York City.

Dear Sir:—

Referring to your letter of June 9th., in regard to payments to the Grand Central Station Architects. I don't quite understand the last sentence in which you say that the Railroad · Company reserves the right to estimate on the value of this work for monthly payments. Do I understand your letter of the 9th., to be a claim that the Railroad Company is already obligated to the Architects for their commission on plans furnished based upon the possibility of improvements both in the extension of the Post Office building to 18 stories and for future buildings north of 45th Street?

Yours truly,

GEO. W. KITTREDGE,

Chief Engineer.

Exhibit A-5

4

## Plaintiff's Exhibit 30.

WARREN AND WETMORE
Architects
3 East 33d Street
New York

Whitney Warren
Charles D. Wetmore
Lloyd Warren

July 14, 1908.

C. A. Reed, Esq.,
  Executive,
    G. C. S. Architects,
      New York City.

Dear Sir:—

I have your letter of July 6th with enclosures. It seems to me that you do not answer Mr. Kittredge's letter of July 3rd, in which he says: "Do I understand your letter of the 9th to be a claim that the Railroad Company is already obligated to the Architects for their commission on plans furnished based upon the possibility of improvements both in the extension of the Post-Office building to 18 stories and for future buildings north of 45th Street?" In your reply dated July 6th, you quote Section 8 of the Agreement between the Railway Company and the Architects. I would make it clear that you do make a claim that the Railroad Companies are obligated to the Architects for commission on plans furnished based upon improvements, both for extension of Post-Office and for future buildings north of 45th Street. It might be well to bring out now the terrible ex-

Exhibit A-5

5

pense to which we have been on account of their dilatory methods, which I presume to be intentional on account of lack of funds. There is no reason why we should suffer for this. Before closing this correspondence with Mr. Kittredge, it would be well to put before him the entire story.

Very truly yours,

CDW                    CHARLES D. WETMORE.

6

## Plaintiff's Exhibit 21.

314 Madison Avenue.

Telephone 2741-38th St.

### GRAND CENTRAL STATION ARCHITECTS

REED & STEM          WARREN & WETMORE

When answering letter mention

Subject Grand Central Terminal
New York, July 15th, 1908.

Mr. George W. Kittredge,
    Chief Engineer.

Dear Sir:-

Answering your letter of July 3rd, which refers to plans for future buildings.

The Railroad Company is certainly obligated to the Architects for their commission for services and plans used in preparing for future buildings north of Forty-fifth Street and the increase of height of Post Office and Office Building.

In this connection we call your attention to the extra services required of the Architects on account of the delay in completing the Terminal; the number of schemes requiring preliminary and working plans; the conditions under which it has been necessary for the Architects to explain these plans to the unusual number of Officials and employees connected with the work; the necessity of sub-contracting, and

Exhibit A-5

prosecuting the building by day work by the Architects in order to accomplish results requested by the Officials; and the conditions under which it has been necessary for them to employ an engineer familiar with the yard and track work.

The usual services rendered by Architects is to prepare plans upon data furnished them and to let contracts for complete buildings to a general contractor and to furnish the supervision necessary to see that their plans are architecturally properly executed.

You will undoubtedly appreciate that these are not the conditions under which we are caring for the Terminal Buildings, but that the conditions in this complicated Terminal work are such that additional work is required of the Architects in order to properly care for the Railroad Company's interests, which we have given and will continue to give when we find it necessary.

The Architects expect proper compensation for their whole services upon this Terminal with all conditions under which they have carried on the work taken into consideration.

Yours truly,

GRAND CENTRAL STATION ARCHITECTS.
C. A. REED, Executive.

CAR/R

8

## Plaintiff's Exhibit 24.

314 Madison Avenue

GRAND CENTRAL STATION
ARCHITECTS
REED & STEM        WARREN & WETMORE

When answering letter mention Subject Grand Central Terminal.

New York, July 15th, 1908.

Mr. Geo. W. Kittredge,

Chief Engineer.

Dear Sir:

Referring to the verbal conference with President Newman and his reference of the matter to yourself in regard to the extra work being performed by the Associated Architects in connection with the Terminal Buildings on account of the necessity of letting contracts for parts of a building at a time and the sub-contracting of the work instead of letting it to a general contractor. It is my understanding that you wish the Architects to continue this extra work during the summer and that the matter will be taken up for consideration next fall.

In the meantime it is necessary to check the work and bills rendered by the John Peirce Company under the agreement for supervising the Post Office construction; we have assigned to this duty Mr. C. G. Munsell, a young man that was employed by the New York Central Railroad Company on the Yonkers Power Station and Overhead Stations and whose work has been such as to lead us to believe that he is perfectly honest and will be diligent in looking after the interests of the Railroad Company. We would, however, ask you to approve this assignment in the interests of the Railroad Company.

CAR/R

Exhibit A-5

9

**Plaintiff's Exhibit 26.**

NEW YORK CENTRAL & HUDSON RIVER

R. R. CO.

K-A

No. 5935 File
July 27 1908
Ans.

New York, July 24th, 1908.

Mr. C. A. Reed, Executive,
   Grand Central Station Architects,
      #314 Madison Avenue, New York City.

Dear Sir:—

    I have your letter of July 15th., in which you say on the first page,—"that the Railroad Company is certainly obligated to the Architects for their commission for services and plans used in preparation for future buildings north of 45th Street and the increase in the height of the Post Office and Office building."

    On the second page of your letter, you say,— "the Architects expect proper compensation for their whole services upon this terminal with all conditions under which they have carried on the work taken into consideration."

    Will you please indicate to me just what these paragraphs mean in dollars and cents, and on what authority are they based?

Yours truly,

GEO. W. KITTREDGE,
Chief Engineer.

Exhibit A-5

19

## Plaintiff's Exhibit 27.

NEW YORK CENTRAL & HUDSON RIVER
R. R. CO.

K-A

New York, July 24th, 1908.

No. 5936 File
July 27 1908
Ans.

Mr. C. A. Reed, Executive,
  Grand Central Station Architects,
    #314 Madison Avenue, New York City.

Dear Sir:—

    Referring to your letter of July 15th., in regard to extra work being performed by the Architects in connection with the Terminal buildings on account of the necessity of letting contracts for a part of the buildings at a time and the sub-contracting of work instead of letting a general contract.

It is our desire that this work continue as it has been in the past, during the summer and the matter will be taken up for consideration in the Fall.

Yours truly,

GEO. W. KITTREDGE,
Chief Engineer.

11

## Plaintiff's Exhibit 25.

314 Madison Avenue.

Telephone 2741-38th St.

### GRAND CENTRAL STATION
### ARCHITECTS

REED & STEM          WARREN & WETMORE

When answering letter mention

Subject Grand Central Terminal
New York, July 30th, 1908.

Mr. Geo. W. Kittredge,
     Chief Engineer.

Dear Sir :-

Answering your letter of July 24th, referring to our compensation as Architects.

The authority for our statements is the agreement, correspondence and verbal instructions received and the plans and information furnished and used by the Railroad Company.

It is impossible for us to state in dollars and cents a proper charge for a part of the services rendered under the terms of the agreement until the entire work is completed.

If the Railroad Officials find it difficult to apply the terms of this agreement to the services which they have found it necessary to request of the Architects, we suggest that a final settlement for all services to date be made and the terms of the agreement be modified if possible so as to more clearly define the different classes of services required of the Architects in properly

Exhibit A-5

12

caring for the Railroad Company's interests in so large and complicated a building operation.

In our conferences with the officials of the Railroad Company there have from time to time developed the necessity of prompt attention to architectural and other matters, which we as Architects were best able to give promptly, and they have received this attention from us without question as to how the formal agreement could be made to apply to the same by the Railroad Officials and with the understanding that if the specific provisions could not be made to apply without injustice to the Railroad Company or the Architects an adjustment would be made as provided for in Sections Six and Ten of the agreement at the time of the final settlement.

The above will probably more clearly define our meaning in the paragraph you quote from our letter,—"the Architects expect proper compensation for their whole services upon this terminal with all conditions under which they have carried on the work taken into consideration."

Yours truly,

GRAND CENTRAL STATION ARCHITECTS,
C. A. REED, Executive.

CAR/R

Exhibit A-5

13

## Plaintiff's Exhibit 28.

New York, October 17th, 1908.

Mr. G. W. Kittredge,
    Chief Engineer,
        N. Y. C. & H. R. R. R. Co.

Dear Sir:-

The following is a description of the work which we wish you to consider in connection with your estimate of work not included in your present schedule, as requested by President Newman.

As the work of Reed & Stem and payments made to them was assumed by the Associate Architects, the dates used herein refer to the commencing of the work by them.

I will be pleased to go over the description and give any further detail you may desire.

*Post Office and Office Building:*

(1) After preliminary plans had been made the following letter was received from Vice-President Wilgus:

"Mr. Newman has verbally decided that the post office building on Lexington Avenue should be designed with the columns and other work sufficiently strong so as to safely support a future addition of as many stories as in your opinion are proper to be constructed on that site, under all the conditions with which we have to contend, up to the limit of the twenty stories that you have reported upon. This with the understanding that the provision for a future addition will entail an expense of between $400,000 and $500,000 over

Exhibit A-5

14

the estimated cost of the six story building
without this provision.

Mr. Newman considers that twenty stories
is rather high and that sixteen or eighteen
would be sufficient but I understand that your
object in selecting twenty is because of the
architectural necessities.''

(2) Preliminary plans required additional
studies in order that Architects might intel-
ligently advise on the best height for comple-
ted building.

(3) Modifications in design and plan to make
low building proper for increasing height.

(4) Preliminary and partial working plans of
upper stories to ascertain load to be carried
on foundation and steel.

(5) Long span over tracks increased the usual
work of designing structural parts for such
a building. No existing design could be
found for building columns of the 1800 ton
loads. It was therefore necessary to devise
entirely new form of base, and assure our-
selves that it was proper by consultation with
two of the best Structural Engineers. The
design as adopted has received praise from
Technical Press.

(6) The detail of the structural steel had to be
designed for future upper stories, as it was
necessary to transfer weight to columns of
the 40′ + spacing at different parts of its
height.

15

(7) The heating of this building was necessarily considered in connection with the other Terminal Buildings which were all to be low. As the present practice approves entirely different methods for high and low buildings, it, the high building, made necessary the harmonizing of the design for heating. On this work two Experts had it under consideration for nearly two years, with the constant attention of the Architects.

(8) The elevator design for the building was effected the same as Heating.

(9) Plumbing same as above.

(10) Ventilation, Pneumatic Cleaning, Refrigeration, Pneumatic Tubes, etc., were all effected the same as heating.

(11) The Electric Lighting required a careful estimate for use in designing Power Plant, and as the large increased load possible at this one point by future increased height of this building so effected the main distribution system, as to leave it still a question as what is best to adopt.

(12) In connection with Heating, Plumbing, Elevators and Lighting we have constantly had to provide, in the present work for their future connections and to base our opinion as to how much it was profitable for the Company to care for at this time by estimates and carefully considered practical opinion based upon our past experience in similar problems.

(13) The consideration of the above will show you that during the entire time this work   Exhibit A-5

16

on this building is in progress the Architects must constantly consult the necessities of the high building in deciding the detail of the work, which will make them give attention to this problem for a period extending over 120 months.

(14) It can be readily seen from the above description of the character of the work that it was an impossibility to keep its cost separate as its consideration was a delay on the design of nearly every detail of the low building.

(15) Together with the above extra work should be considered the extra expense and time given to this building by the Architects in the past and what they may expect in the future. Instead of one General Contract for the work, and the entire building being erected in from two to three years, they will have been employed for twelve years on the building, and have prepared and rearranged plans for twenty contracts to the present time and checked $100,000.00 of day work.

The cost of changing plans and specifications for the completion of Post Office part only, from plans for completing the interior of the North Half has been $6,000.00 and this is but a small part of the work entailed in the past on account of sub-contract and day work over a general contract for a complete building.

(16) The work of completing the plans in the future for the High Building will be less than for new work by 25% at least, and the architects will allow such deduction from the regular fees.

Exhibit A-5

17

*Preliminary Plans*:

It is safe to say that no group of buildings in the World have had such constant and exhaustive study as these have had for a period of six years.

With constant attention of President Newman and Vice-President Wilgus the Architects have carefully studied and worked out in plans every suggestion that these Officials have deemed wise to have considered.

After discarding a part the Architects still have in their files 3456 sheets of preliminary plans of which 1500 sheets are for the Station Building proper. It was necessary in order to have the Officials' suggestions intelligently worked out to a possible solution over the complicated and varying arrangement of tracks, street grades, etc., to employ on this work only high salaried draughtsmen.

The cost has not been kept separate for all of these preliminaries but has been of one set of two hundred (200) sheets, which did not include any of the twenty expensive perspectives, and therefore should be below the average.

These two hundred (200) sheets cost the Architects in cash expenditure $9,000.00 or $45.00 each. The preliminary work takes more attention from the members of the Associated Firm than other work.

*Temporary Buildings, Etc.,*
                    *For*
*Operation during Construction*:

At the time the agreement was made this was not considered architectural work and not mentioned in the agreement.

Exhibit A-5

18

As the work progressed the officials found parts of it such that the Architects were the only ones familiar with the conditions, but there were at no time sufficient definite limits to allow the Officials to give a formal order for the parts they were to care for.

These are partly but not wholly covered by items 7-A to 7-D inclusive in your Schedule. On this part of the work the Architects have expended for cost to them about $17,000.00 and estimate the cost to them of completing these items $8,000.00 or a total of $25,000.00. The fees at 4% in accordance with your Schedule will be $30,768.00 leaving only $5,-768.00 for compensation to the Architects for probably 120 months or less than $50.00 per month.

*Proposed Buildings North of Forty-Fifth Street.*

(1) In 1903 some sixty-eight (68) months ago Vice-President Wilgus requested the Architects' opinion on the development of the North approach to the Station. At that time only one story Baggage and Express Rooms were contemplated and the balance of the Yards to be left open. The Architects' advice at that time was to cover the entire area with a standard height building.

(2) During the sixty-eight (68) months that have elapsed, all responsibility (as far as the Architects have knowledge of the facts) has rested with them to conserve to the Railroad Company the value of these "Up-air Rights" and it has received their constant attention.

(3) To properly care for this work it has been necessary to prepare preliminary plans for

Exhibit A-5

19

various classes of buildings and adapt them
to the possibility of supports between the
tracks beneath. They have found it helpful
in this that preliminaries for definite pur-
poses, made under direction of the parties
proposing to use the same have been made by
them for Y. M. C. A. Building, Grand Central
Palace Company and Apartment Houses.

(4) From these and other preliminary plans
standard preliminaries have been made with
plans and sections, for all the property North
of Forty-Fifth Street, copies of which are on
file in your office.

(5) From the above preliminaries column lo-
cation plans and schedules have been made
(about 80% complete at this date) for all
necessary support of these buildings.

(6) The entire work is varied by switches and
change of direction in tracks underneath.
Requiring the determination of girders, often
of novel design to support without detract-
ing from the value of the building above, while
the immense area covered required provision
for expansion which is always a difficult de-
tail in connection with buildings of this class.

(7) From time to time as changes or suggested
revised or reconsidered.

changes in tracks are made these plans are
(8) In the design of Heating Plant, Elevators,
Lighting, Water Supply, Etc., for the Ter-
minal it has been necessary to take into con-
sideration the supply of these buildings, re-
quiring detail estimates of what quantities

Exhibit A-5

20

might be required. These estimates were more expensive because the use of the buildings were not fixed making it necessary to consider the effect of various uses on the quantities to be supplied by Heating and Power Plant.

(9) In the design of pipe subways throughout the Yard, spaces had to be arranged for these possible future additions.

(10) The supplying of these buildings over the tracks, has presented many difficult problems of getting pipes from subways, through the tracks to the building, all of which has received attention.

(11) Provision for access to the Yards has made it necessary to locate stairways which must come into these buildings without detriment to their use for many possible purposes.

(12) The necessary work to care for these Up-air Rights, will continue to be heavy throughout the construction of the Terminal, every change made must have a careful consideration by an Architect who keeps in mind the possible requirements of buildings above for various uses, for example, recently there was submitted to us, a variation required for an extra cross-over which entailed an additional expense as designed of $30,000.00, our knowledge of the effect on and possibilities in a building above allowed us to suggest a small movement in same that would allow of its being built without any extra expense. This suggestion could only be made by an Architect familiar with the necessities of the proposed buildings.

Exhibit A-5

21

(13) We have been employed on this work for sixty-eight (68) months, similar services will be necessary for an additional time making the whole period at least one hundred and forty (140) months.

The expenditures in cash by the Architects on this work (not counting extra time consumed by its consideration in connection with other work) has been $20,000.00 or about $300.00 per month.

The work actually accomplished will save at least 20% of the cost of preparing future plans for buildings and the Architects will allow such per cent. to be deducted from fees to be received for designing any of these buildings, in the future.

(14) You will appreciate that this is work of such importance that the Officials could only be warranted in depending on expert advice, which your Architects have felt competent to give from their thirty years experience in all classes of architectural work and probably a wider range of Railroad work than any other Architects in the Country.

*Care of Co-related Work*:

On starting work upon the Terminal it was found that certain Official work of the Company required a knowledge of building as well as Railroad experience, this has been assigned to the Executive of the Associated Architects and received his careful attention.

Yours truly,

GRAND CENTRAL STATION ARCHITECTS,

(sgd)   C. A. REED, Executive.

CAR/R

Exhibit A-5

22

## Plaintiff's Exhibit 209.

Telephone number   5184  Murray  Hill

C.A.Reed
A.H.Stem
A.Fellheimer

REED & STEM
  Associate
Architects
710 to 714 Transit  Building
5 and 7 East 42nd Street,
      New York
601 to 605 Endicott  Building
      St. Paul


New York, Dec. 27th, 1909.

Mr. G. W. Kittredge,
    Chief Engineer, N. Y. C. & H. R. R. R. Co,

Dear Sir :-

In looking over the matter of Utica Station
we find that Reed & Stem first undertook this
work in 1902, making preliminary plans and
estimates which were approved by Mr. Harring-
ton and for which they received payment on
June 13th, 1903.  After receiving this payment,
in 1904 they submitted plans and estimates on a
revised scheme for which they have received no
payment.

In carrying on the preliminary work we would
advise that the Architects should consult with
the local officers and submit for your considera-
tion schemes which they would approve, as being

Exhibit A-5

23

the quickest and most satisfactory way of pre-
paring preliminary plans for such work.

I would also suggest that the question as to
whether Division Quarters are to be removed to
Utica from Syracuse and Albany, will affect
materially the design of the building.

Yours truly,

C.A. Reed.

CAR/R

24

## Plaintiff's Exhibit 210.

NEW YORK CENTRAL & HUDSON RIVER
R. R. CO.

K-N

New York, December 30th, 1909.

Mr. C. A. Reed, Executive
  Grand Central Station Architects,
    314 Madison Avenue, New York City.

Dear Sir:—

        Referring to your letter of December
27th in regard to Utica passenger station:
  I have asked for authority and appropriation
to enter into contract with you for the work in
connection with the Utica Station.  As soon as
this is received it will be proper for you to pro-
ceed in accordance with your letter, consulting
with the local officers and others in regard to
such work.  We have collected a lot of informa-
tion and data which we shall be glad to turn over
to you.

        Yours truly,

            GEO. W. KITTREDGE,
                Chief Engineer.

Exhibit A-5

25

## Plaintiff's Exhibit 257.

HOLLAND HOUSE

New York, March the fifth, 1910

E. R. Graham, Esq.,
c/o Messrs. D. H. Burnham & Co.,
Railway Exchange Building,
Chicago, ILL.

My dear Mr. Graham:

I suggest to you the following sizes for rooms:

| | |
|---|---|
| 14 x 10 without bath | 25 |
| 15 to 17 x 11 without bath | 50 |
| 15 x 16          "          " | 25 |
| 14 to 15 x 13 with bath | 100 |
| 15 to 17 x 13 | 200 |
| 18 to 20 x 13 | 200 |
| 17 to 20 x 14 | 125 |
| 17 to 20 x 16 | 100 |
| 18 to 22 x 16 | 75 |
| 18 x 22 | 50 |
| 16 x 18, parlor | 20 |
| 20 x 18, parlor | 15 |
| 22 x 23, parlor | 15 |
| | ——— |
| | 1000 |

Very truly yours,

GUSTAV BAUMANN.

Exhibit A-5

26

**Plaintiff's Exhibit 256.**

New York.
March the twelfth,
1910.

E. R. Graham, Esq.,
  c/o Messrs. D. H. Burnham & Co.,
    Railway Exchange Building,
      Chicago, Ill.

My dear Mr. Graham:

I am afraid that I shall not
be able to leave here next Thursday, but I can
be with you on Monday morning, the 21st inst.
if that will suit you.  I learned that Mr. New-
man will not be back until the 1st of next month,
consequently, there will be plenty of time if you
are going to be home on the 21st or 22nd.  I
would like you to telegraph me on receipt of this
that I can make my plans accordingly.

Very truly yours,
GUSTAV BAUMANN.

Exhibit A-5

27

## Plaintiff's Exhibit 396.

Chicago, Ill., Mch. 18th, 1910.

E. R. Graham,
    Holland House.

  Telegram received.  Anderson and I will be
here Monday and Tuesday and glad to see
Baumann.

D. H. BURNHAM & CO.

28

**Plaintiff's Exhibit 397.**

D. H. BURNHAM & COMPANY

ARCHITECTS

Railway Exchange Building

Chicago, Illinois

March 21st, 1910.

Baumann Hotel

E. R. Graham,
 Holland House,
  New York, N. Y.

Please wire us shortest distance from corner
of Forty-third and Madison Avenue to nearest
point of Church Building. Mr. Baumann also
suggests that if you have no objection to secur-
ing further information at this time we could
make better progress with hotel plans if we
had a sketch plan of station beneath hotel
making clear how passengers and baggage enter
and leave hotel. In particular, we do not under-
stand head room twenty-two feet above side-
walk devoted to railway purposes at southeast
corner. Mr. Baumann suggests to secure in-
formation from Reed you may use his secre-
tary Mr. Jack Bowman if you prefer not to
get information directly yourself.

D. H. BURNHAM.

Confirmation this day sent by mail.
Via Postal Tel Co.
Dictated by PA.

Exhibit A-5

29

## Plaintiff's Exhibit 398.

New York, Mar. 22, 10.

D. H. Burnham & Co.
    Chicago.

Center of manse or Parish house door building line to corner one thirty-five south door of church one forty-four main door church one sixty-seven railroad has not completed plans for station underneath hotel yet our plans can help suggest this headroom twenty feet above sidewalk is space railroad must occupy for its suburban service.

E. R. GRAHAM.

Exhibit A-5

30

## Plaintiff's Exhibit 262.

(Copy)

TELEGRAM.

April 7, 1910.

D. H. Burnham & Co.
    Railway Exchange Building, Chicago, Ill.

When will Mr. Graham be here?

GUSTAV BAUMANN.

31

## Plaintiff's Exhibit 284.

Prospectus
for an

# EIGHTEEN STORY HOTEL BUILDING
in
New York City, N. Y.
D. H. BURNHAM & CO., Architects,
Chicago, Illinois.

9th April, 1910.

Prospectus for a proposed Hotel Building, 18 stories above and 3 stories below grade, in New York City, New York.

| | |
|---|---|
| Area of lot 200′ x 215′ | 43,000 sq. ft. |
| Less area of Rotunda, | 8,000 sq. ft. |
| Area which extends full height of building | 35,000 sq. ft. |
| Multiplied by total height from grade to mean height of roof | 250 |
| | 8,750,000 cu. ft. |

ADD:

| | |
|---|---|
| Three basements, 20,000 sq. ft. x 40′ | 800,000 cu. ft. |
| Court, 8,000 sq. ft. x 60′ | 480,000 cu. ft. |
| Sidewalk space, 8,000 sq. ft. x 40′ | 320,000 cu. ft. |
| Pent Houses | 50,000 cu. ft. |
| Total contents | 10,400,000 cu. ft. |
| Price per cubic foot | 50c |
| | $5,200,000.00 |

Exhibit A-5

32

ADD:

| | |
|---|---|
| Taxes while building | 40,000.00 |
| Interest while building | 150,000.00 |
| No ground rent while building. | |
| Architects fees for preparing drawings and specifications and supervision during construction | 300,000.00 |
| Changes, heating building until occupied, and reserve for contingencies | 110,000.00 |

| | |
|---|---|
| Total cost of building & carrying charges | $5,800,000.00 |
| Cost of furniture and working capital | 1,200,000.00 |
| Total | $7,000,000.00 |

## FINANCE

| | |
|---|---|
| 1st mortgage bonds at $4\frac{1}{2}\%$.... | $4,500,000.00 |
| 2nd mortgage bonds at 6% | 1,000,000.00 |
| Preferred stock at 7% | 1,500,000.00 |
| 750 common stock ($\frac{1}{2}$ share with each preferred share) | |
| 750 common stock for Treasury and good-will | |
| Total | $7,000,000.00 |

## ANNUAL INCOME.

| | |
|---|---|
| 900 rooms at an average of $5.00 per day = 4,500.00 per day, multiplied by 360 days = $1,620,-000.00, less 33-1/3% for vacancies= | $1,080,000.00 |

Exhibit A-5