1    C7v6gera

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------x

4    YANN GERON,

5                    Plaintiff,

6            v.                              12 CV 1364(WHP)
                                             11 CV 8967(WHP)
7    ROBINSON & COLE, LLP, et al.,

8                    Defendants.

9    ------------------------------x
                                             New York, N.Y.
10                                           July 31, 2012
                                             1:15 p.m.
11

12   Before:

13                   HON. WILLIAM H. PAULEY, III,

                                             District Judge
14
                            APPEARANCES
15
     DiCONZA TRAUIG MAGALIFF, LLP
16        Attorneys for Plaintiff
     BY:  HOWARD P. MAGALIFF
17
     MEISTER SEELIG & FEIN,LLP
18        Attorneys for Defendant, Robinson & Cole, LLP
     BY:  CHRISTOPHER J. MAJOR
19
     SEYFARTH SHAW, LLP
20        Attorneys for Defendant, Seyfarth Shaw, LLP
     BY:  ROBERT W. DREMLUK
21
     THOMPSON HINE, LLP
22        Attorney for Defendant, Seyfarth Shaw, LLP
     BY:  THOMAS FEHER
23

24

25

```
1                (Case called; in open court)
2                THE LAW CLERK:  Appearances for the plaintiff.
3                MR. MAGALIFF:  Good afternoon, your Honor.  Howard
4      Magaliff of DiConza Traurig Magaliff for Mr. Geron who is
5      seated with me at the table.
6                THE COURT:  Good afternoon, Mr. Magaliff.
7                THE LAW CLERK:  For the defendants.
8                MR. MAJOR:  Good afternoon, your Honor.  Christopher
9      Major of Meister Seelig & Fein representing Robinson & Cole.
10               THE COURT:  Good afternoon, Mr. Major.
11               MR. FEHER:  Good afternoon, your Honor.  Thomas Feher
12     representing Seyfarth Shaw, LLP, and I am accompanied by Robert
13     Dremluk of Seyfarth Shaw.
14               THE COURT:  Good afternoon, gentlemen.
15               This is argument on the defendant's motions to dismiss
16     and for summary judgment.
17               Mr. Major, do you want to be heard?
18               MR. MAJOR:  Yes, please, your Honor.
19               Your Honor, this case presents an exceedingly simple
20     set of facts:  The Thelen firm imploded in 2008.  In the fall
21     of 2008, the Thelen partners voted to dissolve the firm.  And
22     as part of that vote, they also voted to execute what is called
23     by the trustee, a "Jewel waiver."  Jewel is a case from the mid
24     1980s in an intermediate appellate court in California which
25     essentially held that partners have the duty to account to one
```

1    another for unfinished business conducted while the partnership

2    is being wound down.

3            Robinson & Cole subsequent to the dissolution hired

4    nine former Thelen partners and it's alleged by the trustee

5    that those Thelen partners, along with other attorneys at

6    Robinson & Cole who did not start at Thelen, worked on

7    unfinished matters that had been originated at the Thelen firm.

8    There is no allegation anywhere in the complaint that Robinson

9    & Cole took over matters that were on contingency while at

10   Thelen.  There is an allegation in the brief by the trustee

11   that he didn't plead one way or another, but I would

12   respectfully submit to the Court that he can't rely on his own

13   vagueness in his pleading to try get past the motion to

14   dismiss.  So having failed to plead any quantum meruit claim,

15   what we're talking about here are hourly fee cases, and I think

16   those are the only inferences that the Court can draw from the

17   pleadings.

18           So with that relatively straightforward set of facts

19   in mind, I think there are three bases on which this Court

20   should dismiss the claim against Robinson & Cole.  Just as a

21   footnote, your Honor, I represent only Robinson & Cole, not any

22   of the partners who are also named as partner does in the

23   lawsuit.  That very much does matter under California law.

24           The first reason, and these three reasons are

25   independent, your Honor, is that the pleading is deficient on

1   its face.  The second reason is that under the original Uniform

2   Partnership Act in California, under which *Jewel* is decided,

3   the trustee still cannot recover from a completely separate

4   firm like Robinson & Cole.  The only thing *Jewel* stood for is

5   that partners have a duty to account to one another.

6          THE COURT:  Has the trustee settled with the partners?

7          MR. MAJOR:  My understanding is that the trustee has

8   settled with some of the partners.  I am not, your Honor,

9   completely up to speed on where those matters stand.

10          The third reason is under the current statute in

11   California, which is the revised Uniform Partnership Act which

12   makes a critical change that I will get into in a moment from

13   the no-compensation rule that existed at the time of *Jewel* to

14   the reasonable compensation rule, *RUPA* in effect overrules the

15   *Jewel* decision.  And we have cited in our briefs some

16   commentary to the effect it was actually intended to overrule

17   cases like *Jewel*.

18          So I think those are three separate reasons on which

19   the Court should dismiss the complaint by the trustee, and it

20   should be dismissed with prejudice because any amendment would

21   be futile.

22          I will touch very briefly at the end on Judge

23   McMahon's decision in the *Coudert* case.  Seyfarth will be

24   arguing next.  They will make all the arguments under New York

25   law.  So with that said, let me get into the pleading issues.

1          First of all, all six counts in the complaint are

2     fraudulent transfer claims and what the trustee alleges was

3     transferred was the duty to account.  So the *Jewel* waiver is

4     the transfer that the trustee is alleging in the complaint.  By

5     analogy, your Honor, if a party were to execute, let's say, a

6     general release and it turns out later that the party that

7     executed the general release was not authorized to execute it

8     and the release is deemed void, what happens is the parties go

9     back to where they were before the release was signed.  The

10    elimination of a release doesn't create claims, but if you read

11    the complaint that is exactly what they said.  And I have got

12    further proof of that, your Honor.

13         The trustee in papers filed with this Court conceded

14    that but for the bankruptcy filing and even if the event of a

15    partnership dissolution, he cannot collect against any of the

16    firms.  He has made that concession.  So what he is saying is

17    he doesn't have state law claims against any of the firms.  I

18    would submit to the Court, your Honor, that he is half right.

19    He is correct that he doesn't have state law claims, and the

20    reason is there is not a single case that has been cited

21    anywhere in any of these briefs, whether in California or New

22    York frankly, where a separate law firm has been held liable

23    under any theory whether it be a duty to account, whether it be

24    that they acquired unfinished business improperly or anything

25    like that except for bankruptcy cases -- Judge Montali's

1    decisions and more recently Judge McMahon's decision under New

2    York law.  So he is half right that he doesn't have state law

3    claims and I don't think there would be much dispute about

4    that.

5         Where he is wrong is there is nothing in the

6    Bankruptcy Code that somehow transforms a duty to account into

7    a property right.  The Bankruptcy Code is set up not to create

8    property rights.  In fact, the Bankruptcy Code defers to the

9    state law to determine property rights.  What the Bankruptcy

10   Code does, it is a mechanism for collecting and redistributing

11   assets.  It sort of provides the mechanics, not the underlying

12   property interests.

13        THE COURT:  On that point, though, assuming that the

14   *Jewel* waiver was a fraudulent transfer, why isn't Robinson &

15   Cole liable as a mediate transferee?

16        MR. MAJOR:  Because nothing was transferred to

17   Robinson & Cole, your Honor.  First of all, the trustee would

18   have to allege how the *Jewel* waiver was a transfer to Robinson

19   & Cole.  It is impossible to do that since Robinson & Cole

20   stood in the exact same position before the *Jewel* waiver,

21   during the *Jewel* waiver and after the *Jewel* waiver.  It was a

22   nonevent for Robinson & Cole.  It was arguably an event maybe

23   for the individual Thelen partners by virtue of the *Jewel*

24   waiver which, by the way, every court that I have seen has

25   found to be a valid waiver under California state law.  But

1   even assuming the trustee were to unwind it, it was arguably

2   those partners whose position changed as a result of *Jewel*

3   waiver.   In other words, they had a duty to account and then

4   they didn't.

5         THE COURT:   The future profits were transferred to

6   them, weren't they?

7         MR. MAJOR:   The only thing that was transferred in our

8   view, your Honor, at the time the *Jewel* waiver was the duty to

9   account and I think Court may be touching on a key distinction.

10  There is a big difference between what the partners received

11  and what their new law firms received.   Even under the Uniform

12  Partnership Act for these partners, their duty to account is

13  for compensation they receives, not that some new entity they

14  become members of receive.   It is what they personally receive.

15  Nothing in the Uniform Partnership Act, whether the original or

16  the revised, and nothing in any of the California cases

17  surrounding *Jewel*, provides that the Partnership Act somehow

18  creates property interests for third-parties.   In fact, the

19  Partnership Act doesn't apply to third-parties.   It governs the

20  relations between partners.

21        I just want to flag something.   The trustee, and this

22  touches on your point, your Honor, about the mediate and

23  immediate transferees, they have alleged in their brief -- they

24  say, Well, we've asserted that you are a transferee, therefore

25  the Court has to accept these allegations as true.   That is

1    incorrect.  The Court only has to accept factual allegations as

2    true, not pure legal conclusions, which is what those are.

3    That is at page 20 of trustee's brief.

4            So, your Honor, for those reasons the complaint

5    doesn't state a plausible cause of action.

6            THE COURT:  What additional facts would the trustee

7    need to plead to adequately allege that Robinson & Cole was a

8    transferee?

9            MR. MAJOR:  He can't do it, your Honor.  There is

10   absolutely no duty owed by Robinson & Cole to account to some

11   other law firm.  There is no allegation that, for example,

12   Robinson & Cole aided and abetted a breach of fiduciary duty.

13   He couldn't allege that.  What Robinson & Cole did essentially

14   was extend a life raft to nine partners who had been cast aside

15   because their firm dissolved and imploded.  This is not a

16   situation where you have one enterprise raiding another

17   enterprise.  That is not at all what happened.  There is not a

18   set of facts out there by which Robinson & Cole could be held

19   liable.  For that reason, your Honor, any amendment where the

20   trustee asks for permission to amend would be futile.

21           Now, the second prong of my argument is that under the

22   Uniform Partnership Act, pursuant to which *Jewel* was decided,

23   the trustee can't prevail.  First of all, *Jewel* was decided

24   under what we call the no-compensation rule, which means if a

25   partner finishes business on the date a partnership is in

dissolution that partner is only entitled to whatever his or
her partnership share would have been under the dissolving
partnership's agreement.  That rule has since been changed to
reasonable compensation, at least in California.  What it is
grounded in is the fact that the partner is not entitled to
anything more than what you should get under the partnership
agreement because you are already duty-bound to wind up the
affairs of the business.  It is a very straightforward, legal
principle that has been engrained in our jurisprudence for
years but has been twisted in very recent years in a few
limited bankruptcy contexts and I would submit without proper
reasoning.

          THE COURT:  If unfinished business constitutes assets
of a debtor, isn't Robinson & Cole the transferee of those
assets?

          MR. MAJOR:  First of all, I don't think, your Honor,
that the unfinished business is the property of the estate.
The clients have the ultimate right at any time to dismiss
their law firms and hire a new law firm.  That is an absolute
right both for public policy reasons and as a matter of
contract.  So I don't think that Robinson & Cole was the
transferee of the unfinished business.  Not from the estate.
It wasn't the estate's to transfer.  It was the clients that
transferred.

          For example, your Honor, I can give you a few examples

1    to illustrate the point.  The trustee has not gone out and sued

2    law firms that landed X Associates who brought with them

3    unfinished business.  The trustee has not tracked down former

4    matters from Thelen that landed at a law firm that didn't get

5    Thelen equity partners.  The trustee hasn't gone after matters

6    that were conducted by law firms where there was a Thelen

7    partner who didn't even work on the matter, because this is all

8    based on the duty to account under the Uniform Partnership Act

9    whereby a partner who conducts the unfinished business of a

10   dissolving partnership is duty-bound to account to his

11   partners.  That is why, your Honor, in all of the cases in

12   California the only defendants who have been held liable for

13   the duty to account are partners.

14        In *Jewel* it was four partners broken into two,

15   two-partner law firms.  In the *Resnick* case the new firm was a

16   solo.  In the *Ozman* case it was two lawyers split into two

17   firms of one.  In the *Little* case it was a two-person

18   partnership which dissolved when one of those two partners

19   died.  The *Grossman*, *Fox* and *Rothman* cases -- all the same.

20   There is not a single case other than the bankruptcy cases that

21   hold that the new law firm that had nothing to do with the

22   prior law firm is on the hook for the duty to account, nor

23   could there be because the partnership law which gives rise to

24   that duty to account governs the relationship between the

25   partners, not outside parties.

1          Now, just to touch on the bankruptcy decisions, Judge

2     Montali respectfully was wrong in his two decisions.  In the

3     *Brobeck* decision he essentially -- and he did this in two

4     paragraphs of what was an otherwise very long decision -- after

5     finding the *Jewel* waiver was valid under California law, and

6     that is probably relevant to the partners, again a real

7     nonevent for my client Robinson & Cole -- held the firms were

8     either immediate or mediate transferees and for reasons that

9     your Honor and I discussed a few minutes ago that can't be

10    because you have to have the property right first for something

11    to be transferred, whether immediately or mediately.  His

12    second decison, your Honor, in *Heller* just cites to the *Brobeck*

13    footnote, which I just discussed.

14         So there really hasn't been a court in the face of

15    these claims brought by trustees to really take on this

16    analysis.  I think when you go through the California cases,

17    which are laid out in our brief and which I just discussed, and

18    you look at the Uniform Partnership Act and you look at *RUPA*,

19    there is absolutely nothing in there that can create a property

20    right.  It is all about the duty that the partners owe to one

21    another.  So really the question under *Jewel* and the original

22    Uniform Partnership Act is whether the former partner received

23    more than his or her partnership share under the former

24    partnership agreement for any unfinished business he or she may

25    have may have concluded.  Again, it is all about what the

1    partner received, not the new entity he attaches himself to.

2            In this case, your Honor, just to put some context in

3    it, these nine Thelen partners were not sharing profits among

4    the nine of them.  They were sharing profits among a

5    partnership of approximately 90 equity partners.  There is no

6    way that those other 90 equity partners are somehow bound

7    either by the Thelen partnership agreement or by California's

8    now revised Uniform Partnership Act.

9            Getting to that point, your Honor, this is the third

10   independent basis for the Court to dismiss the complaint with

11   prejudice:  The reasonable compensation rule now prevails in

12   California and this is very important.  Now the question

13   becomes whether the former partner received unreasonable

14   compensation for performing the unfinished business.  We do

15   have an example under California, which ironically long

16   predates the Uniform Partnership Act.  It is *Wikholm*, 29 Cal.2d

17   24.  It was decided in 1946.  However, even under the original

18   Uniform Partnership Act, there was an exception.  In the event

19   of the death of a partner and the surviving partner performed

20   the unfinished work, that surviving partner was permitted

21   reasonable compensation.  When you read the *Wikholm* case that

22   partner, the surviving partner there, concluded or attempted to

23   conclude the construction of a military base project and it was

24   found that he was entitled to profits because he was the one

25   who expended the capital and the risk.  So under *RUPA*, *Jewel*

1    goes by the wayside and there has not been a non-contingency

2    case decided in California which upholds *Jewel* after RUPA has

3    been enacted.

4           Judge Montali even acknowledged that RUPA put *Jewel* in

5    doubt.  In his decision in *Brobeck* he admitted that it possibly

6    changed the landscape, but the way he got around it was he

7    cited to this case named *Kuist* and said that it cited the

8    *Rothman* case and postdated *Rupa* so therefore there is some

9    indicia that it survived.  However, the *Kuist* case was a

10   contingency fee case.  As I said, there has been no case

11   decided under RUPA which extends *Jewel* under California law.

12          Now, as we just discussed with respect to the Uniform

13   Partnership Act, it frankly doesn't matter because you can't

14   get to Robinson & Cole under either act.  Briefly, your Honor,

15   on the Coudert case, it was decided under New York law and

16   therefore it is distinguishable on that basis and that is not a

17   purely academic point.  New York follows the no-compensation

18   rule.  So Judge McMahon never reached the third prong of my

19   argument.

20          Now, as I would say even under New York law, the

21   Uniform Partnership Act doesn't get to the non-partner firms.

22   What Judge McMahon held essentially was that there was

23   vicarious liability for partners who joined new firms, that

24   somehow the partners are committing a wrong while at these new

25   firms and their fellow partners are vicariously liable for

```
1    their wrongs.  There are a couple of problems with that.  One,

2    the partners would have to commit wrongful conduct.  That

3    didn't happen here.  Remember, Judge Montali has ruled twice

4    that the Jewel waiver itself is valid under California law.  So

5    the partners were within their rights to execute that Jewel

6    waiver.

7              Moreover, the trustee doesn't claim in this case, or

8    any other case that I have seen, that the partners should turn

9    away the work from these existing clients or that the new firms

10   were wrong just for taking the matters on.  It is only the duty

11   to account that is the wrongful conduct, alleged wrongful

12   conduct.  I submit that since the Jewel waiver was valid, it

13   wasn't wrongful at the time it was allegedly committed, and

14   therefore you don't have the wrongful act.  Even if you concede

15   the wrongful act, which we don't, it wasn't within the ordinary

16   course of Robinson & Cole's business.  Robinson & Cole is in

17   the business of performing legal services for clients and

18   charging them fees for those services.  That one of their

19   partners may have under law or under contract a duty to a

20   wholly separate entity is well outside the realm of Robinson &

21   Cole's business.

22             So, your Honor, just in closing again Robinson & Cole

23   hired these partners post-dissolution.  There is no allegation

24   that Robinson & Cole engaged in any wrongful conduct.  In fact,

25   what Robinson & Cole did was actually a good thing.  They gave
```

1    these partners a life raft and the upshot of what the trustee
2    is seeking to do is turn these partners who are looking for
3    places to land into less attractive candidates by engaging in
4    essentially a fiction of turning partner duties to one another
5    somehow into a property interest.  There is no statute and
6    there is no case to support that, your Honor.
7            So unless the Court has any questions, I can conclude.
8            THE COURT:  Thank you, Mr. Major.
9            Mr. Feher.
10           MR. FEHER:  Thank you, your Honor.  I appreciate the
11   opportunity to be in front of you again and thank you for
12   accommodating our schedule today.
13           THE COURT:  I appreciate your accommodating mine,
14   because I have a jury that is deliberating and you can't always
15   manage those things, which is why I had to move the schedule
16   from this morning.
17           MR. FEHER:  Well, my fiancee has asked me to express
18   her gratitude for your not giving me an excuse for us to be
19   late for our wedding trip.
20           Your Honor, the fundamental question to be addressed
21   under New York law is what circumstances, if any, can require a
22   law firm to disgorge -- to its clients' former lawyers -- fees
23   that it earns for work done by its own lawyers at an
24   undisputedly reasonable rate.  The answer under New York law is
25   none.  The trustee's analysis of California law, as described

1    by Mr. Major, is inaccurate anyway, but under New York law it

2    is even more difficult.  Under New York law that claim would

3    not even survive against the partners who had been at Thelen,

4    let alone a third party like Seyfarth.  There must, as Mr.

5    Major said, be a reasonable expectation of a property interest

6    for any of the trustees' claims can survive, and that interest

7    doesn't exist under New York law.  The fact is Thelen had no

8    right to these clients.  It had no right to control where they

9    went or who they hired.  It had no right to any portion of

10   future fees that those clients paid to other law firms.

11          THE COURT:  As a general rule, isn't it true that

12   unfinished business on the date a partnership dissolves is an

13   asset of the partnership?

14          MR. FEHER:  Using the euphemism "unfinished business"

15   from general partnership law in this context ignores the

16   reality of the situation.  We're talking about the application

17   of some general statutes from a long time ago that are meant to

18   apply to almost any partnership.  New York courts have gone

19   beyond that.  We're not talking here about a situation where

20   there was a contract to supply a specified number of pipes or a

21   contract to build to completion an Army base or a railroad

22   station.  What we're talking about here is an agreement to

23   provide legal services on an hourly basis that is terminable at

24   will by either party.  Thelen had no more right to demand that

25   clients continue to hire them and pay them after dissolution

1   than it had before dissolution.

2          THE COURT:  Haven't New York State courts held that

3   even a contract that is terminable at will by a client is a

4   partnership asset?

5          MR. FEHER:  If there is a contingent agreement, yes.

6   But certainly the cases that are out there in New York dealing

7   with these issues have gone the other way on hourly matters.

8          THE COURT:  What about *Stem*?

9          MR. FEHER:  First of all, *Stem* is not a legal case.

10  It has none of those overlays.  Judge McMahon says she sees no

11  reason to treat architects differently than lawyers.  In fact,

12  there are many reasons to treat them differently.  In fact, the

13  New York Court of Appeals in the *Cohen* case said, What partners

14  agree to is one thing, but our ethical rules supplant that.

15  New York courts have said, Whether it is in *Cohen*, whether it

16  is in *Sheresky*, whether it is *Burke*, notwithstanding the

17  written or unwritten provisions of partnership agreements,

18  these rules that are specific in the policy rules come first.

19          In this situation, the ethics rules are very clear.

20  You cannot split the fees.  We recited these rules in our

21  briefs.  You cannot pay fees to nonlawyers.  You cannot pay

22  fees to other lawyers, except in proportion to the work they

23  do.  There is no proportion here, your Honor.  Thelen

24  dissolved.  They could not do any of the work, let alone enough

25  of the work to take all of the profits, which is what they

1    claim here.  It is a violation of the ethical rules, it is a

2    violation of the rules on splitting fees with nonlawyers and it

3    is a violation of the rule that requires the client to consent

4    to a split of fees.

5             THE COURT:  Do ethical rules trump a statute?

6             MR. FEHER:  They do, your Honor.  They certainly did

7    in the context of *Cohen*.  The rules of the Court of Appeals

8    govern how lawyers in this state practice.  They promulgate

9    those rules and they decide the case law.  In this situation,

10   by the way, there is nothing in the legislative history or in

11   the statute so particular as to suggest that it was intended to

12   specifically apply to lawyers or the repayment of future hourly

13   fees.  More importantly, the statute doesn't have anything to

14   do with Seyfarth.  Seyfarth was not a party to that partnership

15   agreement.  As Mr. Major has said the claim, if there is a

16   claim and if it does trump the ethical rules and policy

17   considerations, is as against those former partners.

18            THE COURT:  Have the former Thelen partners who are

19   now Seyfarth partners, have they all resolved the claims by the

20   trustee against them?

21            MR. FEHER:  It is my understanding, your Honor, that

22   they have.  I haven't delved deeply into that, but that is my

23   understanding.  I understand also that the terms of those

24   agreements are confidential.  That is as much as I know about

25   it.

1          THE COURT:  All right.

2          MR. FEHER:  I would suggest, however, that whatever

3     agreement the trustee reached that was his decision.  If he

4     gave up claims against those partners, he must have made his

5     own decisions that the compensation he got was adequate.  If he

6     did not give up the claims against those partners, then he is

7     free to bring them in or sue them independently.  The issue, as

8     Mr. Major said, of what they got and what their duty to account

9     to what their former partnership is is different than what

10    Seyfarth got.  In most of these situations it would not

11    surprise the court to find out that the former Thelen partners

12    are not the only people working on those cases.

13         It's interesting that Thelen's position is that they

14    are in a better situation once they dissolved.  They can no

15    longer provide the legal service to this client.  The client

16    not even of its own choosing but because of this dissolution

17    has to go out and hire a new law firm.  And that new law firm,

18    according to Thelen, is obligated to pay back its profit for

19    taking on those clients.  As we know from this very case, prior

20    to dissolution any partner could leave Thelen, go work at

21    Seyfarth, Robinson & Cole or any other law firm and do so

22    without any fear of having to pay anything back to Thelen.  We

23    know that is true in this case because Thompson Hine was

24    dismissed when it was discovered that its partners had left

25    before the dissolution.  That is the law in New York.  That is

1    what *Cohen* says.  That is what the law is.

2           Thelen's position is that somehow by virtue of its own

3    failure to survive, by virtue of the fact that it left clients

4    and lawyers high and dry, it is better off than it was before

5    it was dissolved and before it filed bankruptcy.  It is so

6    counterintuitive it is hard to argue against.  The fact that

7    there is a set of cases in California dealing with disputes

8    over contingent matters between former partners who are

9    essentially raiding each other's pockets doesn't mean anything

10   in the context of these cases.  Those cases are different

11   facts.  They are decided under different law and they don't

12   have any application here.

13          It is significant, when we talk about a property

14   interest, to think about the distinction between contingent

15   cases and hourly cases.  In an hourly case if a Thelen partner

16   works for an hour, Thelen had a right to be paid for that hour.

17   If a Seyfarth partner worked for an hour, Seyfarth is entitled

18   to be paid for it.  But those hours belong to those firms and

19   the dissolution of Thelen doesn't change that.  We're not

20   talking about accounts receivable.  If the allegation in this

21   case was that Thelen had done work that was unpaid and that

22   that unpaid receivable had been transferred to and collected by

23   Seyfarth, we would be talking about a transfer.

24          Instead what the trustee alleges is a right to a

25   future portion of the Seyfarth's fees was a property interest,

1    and that doesn't make any sense.  Contrast that with the

2    contingent fees where, if Thelen had such cases, they would

3    have done work, and they would have not been paid for it.  It

4    amounts to a receivable, but that is not what the allegation is

5    here.  That is the problem with the pleading, your Honor.

6    There is not an allegation that there is anything that Thelen

7    did that it was unpaid for.  This isn't a Jackson Pollack.

8    This isn't a piece of furniture.

9             THE COURT:  What about Judge McMahon's reliance on the

10   need for Uniform Partnership Act jurisdictions to harmonize

11   their interpretations?

12            MR. FEHER:  Well, your Honor, I would submit that her

13   decision doesn't achieve that.  Mr. Major has properly pointed

14   out that the decisions in California have to do with a

15   particular set of facts that have no application here.  The

16   decisions in California have to do with essentially fights

17   between partners over fiduciary duties that they owed to each

18   other when their firms split up.  The defendants in those cases

19   are either the individual partners or the firm's they have

20   formed.  As Mr. Major said no third party firms have been held

21   liable under this line of cases.

22            So there is nothing un-uniform, if you will, about

23   ruling in this situation that as to hourly fees there is no

24   property interest and therefore there cannot be a fraudulent

25   transfer claim.  In fact, to the contrary, the cases that are

1  out there that deal with hourly fees have found that there is

2  no such right.  Including, in fact, the *Sheresky* case here and

3  the *Burke* case here.  So the issue of uniformity is one that

4  actually favors dismissing this complaint as opposed to denying

5  that motion to dismiss.

6         THE COURT:  I think I understand your arguments, Mr.

7  Feher.

8         MR. FEHER:  Thank you, your Honor.

9         THE COURT:  Mr. Magaliff, do you wish to be heard on

10  behalf of the trustee?

11         MR. MAGALIFF:  I do, your Honor.  Thank you.

12         THE COURT:  First, starting with very first point that

13  Mr. Major made in his argument, do you have reason to believe

14  that any of the matters at issue are contingency fee matters as

15  opposed to hourly fee matters?

16         MR. MAGALIFF:  My understanding is that nearly all of

17  them were hourly fee matters but not all of them.

18         THE COURT:  Am I correct to understand that the

19  trustee has settled with the former Thelen parters who moved to

20  Seyfarth?

21         MR. MAGALIFF:  Your Honor, the trustee settled with

22  many partners, but significantly the trustee did not settle

23  unfinished business or *Jewel* claims.  Those were specifically

24  carved out of every single settlement that the trustee entered

25  into.

1          THE COURT:  Is that also true with respect to Thelen &

2     Cole partners who moved to Robinson & Cole?

3          MR. MAGALIFF:  All partners whom the trustee settled

4     with regardless of where they went to carved out unfinished

5     business claims.

6          THE COURT:  Okay.

7          MR. MAGALIFF:  I think the place to start, your Honor,

8     is to understand what the case is.  There are two things really

9     that set this case apart from virtually every other case that

10    has been discussed or cited in the briefs.  The first is that

11    this is a partnership in dissolution and operates by a

12    different set of rules.  All the cases that discuss this

13    recognize that there are a different set of rules for

14    partnership and dissolution as opposed to a situation where a

15    partner leaves or where one partner dies.

16         The second is that this a bankruptcy case.  There is

17    an overlay of bankruptcy law that cannot be ignored, that

18    distinguishes what is going on here from most of the other

19    cases that have been cited in the briefs.  The overriding

20    principle in bankruptcy law, your Honor, is to marshal and

21    collect and reduce to money, assets of the estate, for

22    distribution to creditors.  It is important in the sense that

23    Robinson & Cole for instance has argued that under the Revised

24    Uniform Partnership Act, limited partners in a registered

25    limited liability company are not liable for the debts of the

1  partnership.  Well, that is what RUPA said, that is what

2  Thelen's partnership agreement says.

3         But recognizing there is a difference, Thelen's

4  partnership agreement also says that we are waiving unfinished

5  business claims as among the partners and the partnership

6  because there is a difference.  Because when you recover an

7  asset of the estate, you are not going out to all the former

8  partners and saying Thelen had liabilities $150 million.  You

9  are all going to contribute according to your percentage equity

10  ownership to make up that difference.  That is what happens in

11  a general partnership.  This wasn't a general partnership.  The

12  purpose of recovering assets in a bankruptcy case, your Honor,

13  is to bring them all in, as many as you can, and then to

14  distribute them pro rata to the creditors in the statutory

15  order of priority.  It is very different.

16         THE COURT:  Isn't *Jewel* limited to general

17  partnerships?

18         MR. MAGALIFF:  *Jewel* was a general partnership case,

19  your Honor, but there have been subsequent cases which have

20  discussed the concept of unfinished business in the situation

21  of registered limited liability partnerships or other types of

22  partnerships.  In fact, there is a case -- I don't recall which

23  one it is, but it is cited in one of the papers -- where the

24  judge specifically talks about the fact that you have to look

25  beyond the form of a professional corporation or an entity

1   where the partnership is made up of other entities because at

2   bottom you have lawyers who are practicing law with an

3   expectation that the firm as a whole is going to recover

4   revenues.

5          Remember, what we're talking about here, Judge, are

6   client matters.  We're not talking about clients.  We're

7   talking about business that belonged to the partnership.  And

8   every case that has looked at this recognizes that the matters

9   in a law firm belong to the partnership.  Thelen's partnership

10  agreements specifically says, for example in Section 2.3 I

11  think, that the earnings of the partners from the practice of

12  law belong to the partnership.  Of course that makes sense.

13  You take Robinson's argument that they receive nothing when the

14  former partners came to the firm.  It makes no sense.

15          They weren't altruistic by throwing out a life raft

16  and saying, Come work for us.  They expected these lawyers to

17  generate revenue, bill clients, collect fees and for everybody

18  to make money.  When a partner leaves a dissolved firm, your

19  Honor, there is a different set of rules that applies.  That is

20  what the partnership laws say.  In both states, New York and

21  California, a partner who leaves a dissolved firm is governed

22  by the obligations imposed on him or her by the partnership

23  law.  The firm which takes the partner from the dissolved firm

24  must also equally recognize that this partner may come with

25  baggage in the form of an unfinished business claim.

1          THE COURT:  Under RUPA, why wouldn't profits from

2     unfinished hourly fee matters constitute reasonable

3     compensation?

4          MR. MAGALIFF:  Well, I think what the cases say, your

5     Honor, is that the lawyers are entitled to reasonable

6     compensation but profits don't equal compensation.  Even Judge

7     McMahon recognized that you have to determine what is a

8     reasonable amount of money to pay.

9          I will give you a perfect example.  A lawyer goes to a

10    firm and bills at $800 an hour.  The lawyer isn't paid $800 an

11    hour.  Out of the 800 bucks an hour that the new firm collects,

12    they have to pay all of their expenses, they have to pay

13    salaries, they have to pay overhead, and they have to pay

14    reasonable compensation to the lawyer under RUPA who performs

15    those services.

16         Does reasonable compensation to the lawyer mean the

17    entire difference between the cost and the hourly rate?  The

18    cases don't say that.  The only cases that have spoken to that

19    say you have to have an accounting.  You have to determine what

20    is reasonable compensation.  Even Judge McMahon when she was

21    talking about the *Kirsch* rule recognized that -- and Judge

22    Montali also -- as a practical matter when you get through with

23    your accounting and your analysis, which by the way is not

24    proper on a motion to dismiss or for judgment on the pleadings,

25    but when you get through with this analysis it may be that you

1    have very little profit.  It may be that you have no profit.

2    But it may be there is a quantum of revenue there that exceeds

3    what the properly allocable expenses are to complete the

4    unfinished business plus reasonable compensation to the

5    attorney.

6         THE COURT:  Isn't there a difference given the fact

7    that *Jewel* as I understand it was based on the no-compensation

8    rule?

9         MR. MAGALIFF:   *Jewel* was based on the no-compensation

10   rule and New York follows the no-compensation rule.  One of the

11   points that Judge McMahon made in her analysis, which Mr. Feher

12   touched upon, is the importance of Section 4.4 of New York

13   partnership law.  That is a statute that deals with

14   construction.  You raised the question, your Honor, how does

15   the New York court or federal court interpreting New York law

16   decide what this means when there is no controlling law from

17   the state's highest court.  What the statute says is that you

18   have to interpret New York's law to be consistent with the law

19   in other Uniform Partnership Act jurisdictions, i.e,

20   no-compensation jurisdictions.  That is what Judge McMahon did,

21   a thorough analysis and that is why she looked at cases from

22   many of the jurisdictions.  One of the defendants said we have

23   a case right here.  We have *Sheresky*.

24        THE COURT:  But *RUPA* repealed the no-compensation

25   rule.

1          MR. MAGALIFF:  Yes, it did, but that is a fact issue.

2     It is a fact issue, Judge, as to what constitutes reasonable

3     compensation.  There is no case that says per se reasonable

4     compensation is the entire profit margin, if you will, that is

5     earned from whatever hourly fee is charged less the cost and

6     the overhead and expense that comes out of that hourly fee.

7          THE COURT:  Let's skip back to New York then.  Given

8     Judge Bransten's decision in *Sheresky*, why shouldn't this Court

9     defer to that state court on a matter of New York state public

10     policy?

11          MR. MAGALIFF:  I will tell you.  Because Justice

12     Bransten did not herself do what the statute instructs.  She

13     did not look at any other Uniform Partnership Act cases in any

14     jurisdiction in the absence of controlling law by the New York

15     Court of Appeals.  She looked at three contingent fee cases, at

16     least one of which was also cited by Judge McMahon, and she

17     said, Well, the only thing that there is in New York is

18     contingent fee cases so I don't think it applies.

19          Judge McMahon did what the statute requires and what

20     all federal judges do when they are asked to rule on a matter

21     of state law where the court has not set the precedent.  She

22     went out and she made a determination as to what she believed

23     the New York Court of Appeals would rule.  Is she right?  I

24     don't know.  She just granted an interlocutory appeal and it is

25     going up to the Second Circuit and maybe the circuit will

1    certify it to the New York Court of Appeals and maybe it won't.

2             THE COURT:  I wouldn't bet against it.

3             MR. MAGALIFF:  No, I wouldn't bet against it either.

4             She did point out in her decision granting the

5    interlocutory appeal that she believes that when the New York

6    Court of Appeals does the same analysis that is required by

7    Section 4.4, it will most likely come up with the same

8    conclusion.  But you are right, we don't know.  The point about

9    *Sheresky* is that Justice Bransten didn't do it.  In Mr. Feher's

10   words, or maybe Mr. Major's words, that was just a couple of

11   paragraphs in a much larger decision.  There was no analysis at

12   all.  Now, we have to assume, your Honor, that Judge McMahon

13   knew about the *Sheresky* decision when she wrote her decision in

14   *Coudert*.

15            THE COURT:  She didn't mention it.

16            MR. MAGALIFF:  No, she didn't mention it.  But it is

17   interesting because she points out in her decision that the

18   Second Circuit also didn't talk about the *Cohen* decision and

19   *Denburg* decision in *Santalucia* even though they were out there

20   and they had some ostensible relevance to the issue being

21   decided.  So the fact that there is a case out there that you

22   don't mention doesn't necessarily mean that you can draw any

23   inference one way or another.

24            I don't know, but I do know that Justice Branson did

25   not do the analysis that is required by the statute, that Judge

1    McMahon did and came up with the conclusion that she came up

2    with.  Right now, okay, you don't have to follow that.  I

3    understand that, but right now Judge McMahon's decision is the

4    controlling authority here on the question of whether or not

5    the New York Court of Appeals would recognize a claim for

6    unfinished business.

7              Now, let's talk about the property interests.  We've

8    argued, and I think it is clear that whether it is California

9    law or New York law, a dissolving firm on the date of

10   dissolution has an asset in the form of its clients' matters.

11   These are not clients.  We know that firms don't own clients

12   and the clients can go anywhere they want.  Judge McMahon

13   recognized that when she did an analysis and applied a New York

14   public policy does not bar unfinished business claims and

15   Bankruptcy Judge Stoll, I think it was, in the *Labrum & Doak*

16   case in 1998 did a similar analysis under the Pennsylvania

17   model rules of professional conduct, which had very similar

18   provisions, and came to the conclusion it was not improper

19   because what you were doing here was squaring up under

20   partnership law as to what the partners owed to each other.

21             So we have a property interest in the unfinished

22   business in the matters.  That property interest was divested

23   by the execution of the Jewel waiver.  Now, what happens if you

24   avoid the waiver?  It is not simply a matter of saying nothing

25   because all that comes back is a duty to account because that

1  evidences a misunderstanding of what the duty to account is all

2  about.  It is not just give my a spreadsheet, give me a chart,

3  show me what goes in Partner A's column, Partner B's column or

4  Partner C's column.  It entails a squaring up at the end of

5  that Partner C has more than he or she is supposed to have.

6            THE COURT:  I am intrigued by some of the

7  hypotheticals that were posed by some of the moving parties.

8  If unfinished hourly fee matters are property of the estate,

9  can they be sold to the highest bidder?

10           MR. MAGALIFF:  I don't know, your Honor.

11           THE COURT:  There is a trial that just began involving

12 Samsung and Apple.  If a firm involved there was in bankruptcy,

13 could they just auction the right to represent Samsung in the

14 patent infringement case of the century if I take the reports

15 from California at face value?

16           MR. MAGALIFF:  No.  I don't think so.  Nothing in the

17 jurisprudence --

18           THE COURT:  Why not?  Why couldn't they if it is the

19 property of the estate?

20           MR. MAGALIFF:  Because the right to represent a client

21 is not a right that belongs to the law firm.  It is not the

22 representation that is the property right because of course the

23 client can always discharge the lawyer before bankruptcy,

24 during bankruptcy, after bankruptcy.  But so long as the lawyer

25 who is a former partner of the firm that dissolved is

1    continuing to work on the matters that were unfinished business

2    matters, the cases and the statutes say that the profit, and

3    whether it is all profit because you are in a no-compensation

4    jurisdiction or the profit over and above reasonable

5    compensation, has to go back to the former firm.

6            If one of these clients came to Robinson & Cole or

7    Seyfarth Shaw and those firms worked on a matter for six months

8    and then the client said, You know what, I don't like what you

9    are doing so I am going to go get another lawyer, the claim for

10   unfinished business as against the firm, the initial firm,

11   would be limited to the profits in the six months during which

12   the firm represented it.  That firm would not be liable for

13   what happens at the next firm.  We're not talking about what

14   claims the estate might have against subsequent firms.  We're

15   talking about the business that is completed and the profit on

16   the revenues generated from completing that business while the

17   former partners are at the firm doing it.  That is what this

18   case is about.

19           So when you avoid the Jewel waiver, your Honor, and

20   the duty to account comes back, what comes back with it is

21   payment if the squaring up says there ought to be payment.

22   These firms, they cannot credibly sit here, Judge, and say we

23   got no benefit.  They were getting the revenues.  The partners

24   all worked for the firm.  The revenues were coming into the

25   firm.  The matters were firm matters.  The revenues were firm

1    revenues.  How they got divided is a question of contract law

2    under Robinson's partnership or Seyfarth's partnership or

3    Thelen's partnership.  It is not the clients that are owned by

4    the firm.  It is the matters and the revenues.

5              THE COURT:  What if in the example you have given the

6    Thelen partner takes a matter and he goes to another law firm

7    and he works on the matter with his colleagues at the new law

8    firm for six months, and then he retires.  What is that new law

9    firm -- whether it is Robinson & Cole or Seyfarth -- what is

10   their obligation under trustee's theory?

11             MR. MAGALIFF:  I don't know, but I think the correct

12   answer would be that once the partner is no longer there,

13   whatever duties there are to account back would terminate when

14   that person is no longer a partner.  So I would argue or answer

15   your question by saying if the partner retires after six months

16   or eight months that would be the cutoff.

17             In the discussions that we have had with the firms we

18   have settled with, and we have settled over a dozen cases for

19   two million dollars give or take a couple of bucks, one of the

20   discussions has always been where is the cutoff.  Do you go out

21   one year?  Do you go out two years?  Do you go out until the

22   matter is concluded?  There is no definitive answer.  In the

23   *Heller* case they have been publically settling cases with a

24   two-year cutoff from the time of dissolution.

25             There are areas here, Judge, that don't have

1    decisions.  Mr. Major talks about, Well, there is no decision.

2    Yes, there may not be any decisions, but that is not to say

3    that there isn't a rather robust and well developed body of

4    case law that goes back 100 years as to how you treat

5    partnership assets and what responsibility former partners have

6    to their law firms.  It has been adopted, if you will, and

7    recognized in the jurisprudence that if the model of law firm

8    changes, the underlying duty doesn't change.  I think even

9    Judge McMahon made some reference to, you know, the quaint

10   rules in the day of the mega firm, but this is the law.

11        These are the rules and this is what the New York

12   partnership law requires and even California *RUPA* doesn't say

13   there is no unfinished business.  *RUPA* says reasonable

14   compensation and it may well be that when you do the accounting

15   and the analysis, it comes down to very little.  Even Judge

16   McMahon said that.  She said if it was one way, it would be

17   very easy.  No-compensation law, you take revenues, you take

18   off costs, here is your answer.  If it is a reasonable

19   compensation jurisdiction, if that is what the New York Court

20   of Appeals decides, well, then it is going to be harder because

21   the accounting will be different.  One way or another you have

22   to have an accounting.  Those are fact questions.

23        Again, I get back to one of the things I said from the

24   beginning, Judge, this is a motion to dismiss by Robinson &

25   Cole.  It is a motion for judgment on the pleadings by

1    Seyfarth.  It is not a motion for summary judgment.  Although,

2    I do recognize that if you were to rule that under California

3    law or New York law or both there is no such thing as an

4    unfinished business claim for hourly matters that might

5    effectively achieve the same result.  But since we believe that

6    there is a tremendous amount of jurisprudence that says that

7    you do recognize hourly matters, then we have to test the

8    sufficiency of the trustee's complaint under the rules of

9    Federal Rules of Civil Procedure, *Twombly* and *Iqbal* and the

10   requirements of Rule 8 and requirements of Rule 12(b) and the

11   trustee has more than adequately pled everything that he needs

12   to sustain on a motion to dismiss the claims that are asserted

13   in the complaint.  I don't think there is any question about

14   that, Judge.

15         THE COURT:  On the conflict of laws point, if I could

16   just digress for a moment, how could Seyfarth be bound by the

17   choice of law provision in Thelen's partnership agreement if it

18   wasn't a party to the agreement?

19         MR. MAGALIFF:  It probably can't, your Honor.  On that

20   point what we had said in the brief is that there are many

21   facts that Seyfarth alleges which become relevant to a

22   determination of whether New York law applies or not if you

23   rule that hourly-fee matters are not part of the unfinished

24   business.  If you conclude, as we think you must, that

25   hourly-fee matters are cognizable within the realm of

1   unfinished business under New York as they are in California

2   law, then it really doesn't matter which state's law applies

3   because for purposes of the motion to dismiss, we have met

4   tests.  What becomes a triable issue of fact then is what are

5   the appropriate deductions and what is reasonable compensation

6   or not reasonable compensation, what are the revenues and all

7   of those things that go into the calculation and the

8   accounting.

9           THE COURT:  Anything further, Mr. Magaliff?

10          MR. MAGALIFF:  If I could have one moment to look at

11  my notes, I would appreciate it.

12          THE COURT:  Sure.

13          (Pause)

14          MR. MAGALIFF:  There is one other point, your Honor.

15  I think this ties back into the bankruptcy nature of these

16  claims.  Mr. Major said something about Judge McMahon

17  essentially approaching her decision from a perspective of

18  vicarious liability to wrongdoing.  This isn't a case of

19  wrongdoing.  What the trustee has alleged, your Honor, is a

20  constructive fraudulent transfer under Section 548(a)(1)(B) of

21  the Bankruptcy Code and a constructive fraudulent transfer does

22  not require any allegation of wrongdoing.  That is why it is

23  constructive.  It looks back on whether property was

24  transferred, whether the transferor or debtor was insolvent or

25  rendered insolvent on the date of the transfer and whether

1   there was reasonably equivalent value given.  Contrast that

2   with Section 548(a)(1)(A), which is an actual fraudulent

3   transfer which looks to the intent of the transferor to hinder,

4   delay or defraud creditors.  In that situation you are looking

5   at wrongdoing, but for our claims wrongdoing is not an issue at

6   all.

7          THE COURT:  Thank you, Mr. Magaliff.

8          Mr. Major, do you want to be heard briefly?

9          MR. MAJOR:  Yes, your Honor.  Thank you.

10         Your Honor, there is a reason Mr. Magaliff struggles

11   to answers some of your questions, for example, can these

12   client matters be sold, what happens in a case of a retired

13   partner -- it is because he is so far out on a limb, these

14   questions cannot be answered.  Your Honor, it is not because

15   this is some novel area of law.  Mr. Magaliff himself says this

16   has been happening for 100 years.  We've been citing cases of

17   law firms breaking up in California since the 1800s.  What has

18   happened here is that it is actually a very straightforward

19   area of the law.  Under the partnership agreements, partners

20   owe one another a duty to account.

21         A few courts have taken a wrong turn and have in the

22   bankruptcy context, without a basis I would submit, have

23   applied that and somehow transferred it into a property

24   interest.  What we have to go back to is what the trustee sued

25   us on and that is the *Jewel* decision.  The *Jewel* decision, and

1    Mr. Magaliff said right at the start of his argument that none

2    of the cases are dissolution cases, *Jewel* was a dissolution

3    case.  We also cited a legion of others.  The *Grossman* case,

4    which is in our papers, but *Jewel* is a dissolution case, and

5    what happened there is only the partners had a duty to account.

6    As Mr. Magaliff said it has been happening for a hundred years

7    and the non-party law firms have not been held liable.

8         The Second Circuit, your Honor, will benefit.  If

9    everything is headed to the Second Circuit, the Second Circuit

10   will benefit from this Court taking a thorough analysis and

11   looking at what the trustee has sued us for an going through

12   the California cases because there is no basis under California

13   state law to hold Robinson & Cole liable.

14        In terms of the unreasonable compensation your Honor

15   was questioning the trustee about that, it frankly doesn't

16   matter which rule you apply from our perspective because all of

17   the cases and the statute talk about the partner accounting.

18   It doesn't matter what the firm that partner is affiliated with

19   collects.  It only matters what the partner gets.  To touch on

20   that point, your Honor, and frankly I am a little bit

21   handicapped here because I don't represent the individual

22   partners, and Mr. Magaliff can speak to this better, my

23   understanding though is that those partners with whom he

24   settled he said had carve-out for these claims.  I think he

25   also gave them covenants not to sue, which means those

1    carve-outs are not worth very much if I am correct about that.

2            Finally, your Honor flagged something I forgot to

3    mention in my remarks to the limited liability partnership

4    issue.  The former partners of a limited liability partnership

5    cannot be forced to perform work -- that further eviscerates

6    the trustee's claims here.

7            Finally Mr. Magaliff said in response to my remark

8    that Robinson & Cole had actually done a good thing, he said,

9    Well, they got the benefit of these lawyers who were supposed

10   to work the billable hours.  Of course that is the case.  What

11   Mr. Magaliff is hinting to the Court is he wants a ransom from

12   the new law firms taking on these lawyers.  There is now duty

13   not to compete under the Uniform Partnership Act and certainly

14   as a matter of public policy one can't bar lawyers from

15   competing.  That, at the end of the day, your Honor, is what

16   this case is about and I would respectfully submit that is why

17   the trustee has sued the law firms figuring they're better

18   pockets -- he referenced his settlements -- than the individual

19   partners to go after.

20            THE COURT:  Thank you, Mr. Major.

21            MR. MAJOR:  Thank you, your Honor.

22            THE COURT:  Anything further, Mr. Feher?

23            MR. FEHER:  Yes, your Honor.

24            If you would indulge me for a minute, I would like to

25   first come to the defense of Justice Bransten.  It is as false

1    and unfair as it could be to say that her decision was either

2    cursory or that it failed to do an analysis.  This was a matter

3    that was fully briefed by very component counsel on both sides.

4    Proskauer represented the defendants in that case.  The briefs

5    are very lengthy and we can provide them to you if it is

6    relevant.  The fact is that Justice Bransten had a full set of

7    briefs on all these issues and concluded that hourly matters

8    could not be the basis of an unfinished business claim in New

9    York given the ethical considerations.

10          The Second Circuit has instructed that district courts

11   when they are trying to assess what the highest court would say

12   is to give great weight to decisions like *Sheresky* and like

13   *Burke*.  Yet Judge McMahon completely ignored those cases.  She

14   did not do the analysis of what the highest court would do with

15   those specific considerations.

16          On the *Iqbal* and *Twombly* issue, I respectfully suggest

17   that Mr. Magaliff is exactly wrong.  It was his obligation to

18   plead the facts entitling him to relief, not to plead facts

19   that might entitle him to relief.  All the Court has to do is

20   look at the *Burke* decision to see what the pleading

21   requirements are to state a claim under New York law.  In *Burke*

22   the complaint was filed and it was dismissed for failing to

23   allege that there were current matters.  It was refiled and it

24   was dismissed again, specifically for failing to allege that

25   there were contingent matters at issue.  That is his obligation

1    because hourly matters are not compensable and are not

2    unfinished business under New York law.  He has to plead that

3    they are contingent matters.

4           I want to go back briefly to the Court's question

5    about *Stem*.  There are two important facts about that.  One is,

6    as was noted in other cases cited, that case had a specific

7    fact in it that doesn't exist here.  The contract at issue

8    contemplated that it would survive past the death of a partner.

9    More important, *Stem*, like *Jewel* and the other cases we talked

10   about, was a dispute between those former partners and not as

11   to a third-party who took over.  It is at end of the day a

12   fiduciary duty claim.

13          That is not who the parties are here.  No one sued

14   another company that came in and did this work just because

15   there was another architect who worked there that was at the

16   former firm.  That wasn't the case.  It was again a dispute, as

17   was *Jewel*, as every case that talks about unfinished business

18   claims, between those partners.  Again, Mr. Magaliff and his

19   client have apparently reached resolution with those partners.

20   They elected their remedies.  There is no third-party liability

21   to this firm or to Robinson & Cole for their profits.

22          Again, we have to go back to the big picture.  What

23   the trustee is saying is that firms like Robinson & Cole and

24   Seyfarth are obligated to work for free for these clients just

25   because Thelen couldn't stay in business.  The policy

considerations for that are monumental.  Mr. Major hinted to

this, if that is the rule in New York or California or

elsewhere, every partner who senses that his firm might be in

trouble has the incentive to leave as soon as possible.  The

more business he has, the sooner he will leave.  It hastens the

downfall of law firms.

　　　　More importantly, and this is where Judge McMahon I

think got it very wrong, this notion that a client doesn't care

what happens to the money, that this is just a squaring up

after the fact, it is just wrong.  It ignores reality.  If I

were a client, if you were a client, if Mr. Magaliff was a

client, he would want to know whether his lawyer was working

for free on his case and might have an incentive to work on

somebody else's case where they will make more money.

　　　　He would also be very interested in the fact that his

lawyer could not go to work at a smaller firm who couldn't

afford to pay over the profits, who couldn't afford to defend

suits like this.  He would be interested to know that his

lawyer had to go to a mega firm as Judge McMahon likes to talk

about it and pay huge hourly rates because his lawyer couldn't

go to a smaller firm with lower rates because that firm

wouldn't take him because they couldn't afford to defend these

suits.

　　　　That is a significant policy consideration, and as the

courts of New York have found, and in the *Nixon Peabody* case

1    that we cited to you, talks about the preeminent concern is "Is

2    client choice of lawyer going to be affected by the rule?"

3    This rule would substantially affect the client choice.  That

4    is why notwithstanding general partnership law and

5    notwithstanding *Stem* that has to do with architects, New York

6    courts would reach a different result.

7            Mr. Magaliff acknowledges as he must law firms cannot

8    own their clients.  They likewise cannot own the future fees of

9    those clients.  That is the client's decision who to pay those

10   fees to.  That is why the ethical rules say you must have a

11   client's consent before you pay your fees to somebody else.

12   That is the rule in New York and there is nothing about the

13   general partnership law or about Judge McMahon's decision that

14   mandates a different result.

15           Thank you, your Honor.

16           THE COURT:  Thank you, Mr. Feher.

17           Counsel, I want to thank you for your arguments today.

18   They have been informative.  I want to compliment all of you on

19   your briefs.  They are outstanding.

20           Decision reserved.

21                            o0o

22

23

24

25